2014-1774

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

JBF RAK LLC,

Plaintiff - Appellant

v.

UNITED STATES,

Defendant - Appellee

---

Appeal from the United States Court of International Trade in case no.
13-CV-00211, Senior Judge Judith M. Barzilay

---

**BRIEF OF PLAINTIFF-APPELLANT JBF RAK LLC**

---

Jack D. Mlawski
Galvin & Mlawski
245 Fifth Avenue
Suite 1902
New York, NY 10016
Tel: (212) 679-1500

*Counsel for Plaintiff- Appellant JBF RAK LLC*

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

JBF RAK LLC _____ v. UNITED STATES

No. 14-1774

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of
JBF RAK LLC
_____ certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.    The full name of every party or amicus represented by me is:

JBF RAK LLC

2.    The name of the real party in interest (if the party named in the caption is not the real
party in interest) represented by me is:

JBF RAK LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more
of the stock of the party or amicus curiae represented by me are:

JBF RAK is a limited liability company registered in the Emirate of Ras Al Khaimah, UAE
Affiliated Parties. JBF Industry Limited, India is the holding company of JBF Global Pte. Ltd, Singapore, which is a
publicly listed company in INDIA. JBF Global Pte. Ltd, Singapore is the parent company of JBF RAK LLC.

4. The names of all law firms and the partners or associates that appeared for the party or
amicus now represented by me in the trial court or agency or are expected to appear in this
court are:

JACK MLAWSKI, GALVIN & MLAWSKI

Date: October 27, 2014          /s/JACK MLAWSKI
                                _____
                                     Signature of counsel

                                JACK MLAWSKI
                                _____
                                     Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

**I. STATEMENT OF RELATED CASES**

...................................................................................................................1

**II. JURISDICTIONAL STATEMENT**

...................................................................................................................1

**III. STATEMENT OF THE ISSUES**

...................................................................................................................1

**IV. STATEMENT OF THE CASE**

...................................................................................................................2

**V. STATEMENT OF THE FACTS**

...................................................................................................................2

**VI. SUMMARY OF THE ARGUMENT**

...................................................................................................................4

**VII. STANDARD OF REVIEW**

...................................................................................................................5

**VIII. ARGUMENT**

  **1**.  There is No Statutory Authority in Administrative Reviews to Consider an Allegation of Targeted Dumping. Contrary to the Decision below, the Statute as well as the Legislative History Are Not Silent; the Exception for Investigations is Not Applicable to Reviews

...................................................................................................................6

  **2**. The Targeted Dumping allegation Was Not Timely Filed Pursuant To 19 CFR 351.301

...................................................................................................................13

  **3**. Commerce Issued an Unauthorized "Post-Preliminary Determination"

...................................................................................................................24

**4**. Commerce Must Consider Evidence That Price Patterns That Meet the Nails Test Do Not Constitute Targeted Dumping

..............................................................................................26

**IX. CONCLUSION**...............................................................30

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Gardner*, 513 U.S. 115, 120 (1994)..............................................8

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)..............................................................................8

*FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002).........8

*Gold East Paper (Jiangsu) Co., LTD, v. United States*, 918 F. Supp. 2d 1317 (Ct Int'l Trade 2013)..........................................................................20, 22

*GPX International Tire Corp. v. United States*, 666 F3d 732, 745 (Fed. Cir. 2011).............................................................................9

*JBF RAK LLC v. United States*, Slip Op. 14-78 (CIT July 1, 2014)...............2

*JTEKT Corp. v. United States*, 642 F.3d 1378, (Fed. Cir.2008).....................5

*Mid Continental Nail Corp. v. United States*, 712 F.Supp. 2d 1370, 1377-78 (CIT 2010)......................................................................16

*Nken v. Holder*, 556 U.S. 418, 430 (2009)..............................................8

*NSK Ltd. v. United States*, 510 F.3d 1375, 1377 (Fed.Cir.2007).....................6

*SeaH Steel Corp. v. United States*, 764 F. Supp. 2d 1322, 1325-26 (Ct. Int'l Trade 2011)......................................................................23

*SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir.2008)..........6

*Union Steel v. US*, 713 F 3d 1101 (Fed. Cir. 2013)....................................26

**Statutes and Regulations**

19 C.F.R. § 351.213(h)........................................................................5

C.F.R. § 351.221(b)(5)......................................................................24

19 C.F.R § 351.301......................................................................4, 13-24

19 C.F.R.§ 351.302..........................................................................19

19 U.S.C. § 1675(a)(2)(B)(iv), (C)......................................................4, 24

19 U.S.C. § 1677f-1............................................1,4,6-13,21,26,30

**Other Authorities**

*Final Rule*, 62 Fed. Reg.27296, (Dept. of Commerce, May 19, 1997........................................................................................28

*Polyethylene Terephthalate Film from the United Arab Emirates*, *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation,* 76 Fed. Reg. 67413 (Dep't Commerce November 1, 2011) (opportunity to request review)..........................................................2

*Polyethylene Terephthalate Film from the United Arab Emirates*, 77 Fed. Reg. 73010 (Dep't Commerce Dec. 7, 2012 (preliminary results)................3

*Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates Final Results*, 78 Fed. Reg. 29,700 (Dep't Commerce May 21, 2013)..................................................................................2

*Statement of Administrative Action*, H.R. No. 103-316, vol. 1(1994)......................................................................................12

# I. STATEMENT OF RELATED CASES

Counsel is not aware of any cases directly affected by a decision in this appeal.

# II. JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. 1295(a)(5) of this appeal of the final judgment of the United States Court of International Trade in *JBF RAK LLC v. United States*, case no. 13-CV-00211.

# III. STATEMENT OF THE ISSUES

Whether Congress has conferred the statutory authority under 19 U.S.C. § 1677f-1(d)(**2**) to Commerce to consider in antidumping duty reviews such as here, allegations of targeted dumping where 19 U.S.C. § 1677f-1(d)(**1**) provides for a specific "exception" to consider such allegations in investigations but does not provide for a similar exception in reviews under 19 U.S.C. § 1677f-1(d)(**2**).

Whether Commerce unlawfully considered the untimely submitted targeted dumping allegation.

Whether Commerce unlawfully issued a "Post Preliminary Determination" when the statute only provides for preliminary and final determinations.

Can Commerce refuse to consider evidence demonstrating that the price pattern found was not due to targeted pricing to mask dumped sales.

## IV. STATEMENT OF THE CASE

This is an appeal of the decision of the United States Court of International Trade in *JBF RAK LLC v. United States*, Slip Op. 14-78 (CIT July 1, 2014) sustaining Commerce's final antidumping duty administrative review determination in *Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates Final Results*, 78 Fed. Reg. 29,700 (Dep't Commerce May 21, 2013).

## V. STATEMENT OF FACTS

On November 1, 2011, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on Polyethylene Terephthalate Film from the United Arab Emirates issued by the U.S. Department of Commerce. *See Polyethylene Terephthalate Film from the United Arab Emirates*, *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation,* 76 Fed. Reg. 67413 (Dep't Commerce November 1, 2011) (opportunity to request review).

By letter dated November 30, 2011, JBF timely requested review of its exports to the United States covering the period November 1, 2010, to October 31, 2011. Jt. App. 29.

On December 30, 2011, Commerce initiated the administrative review of Polyethylene Terephthalate Film from the United Arab Emirates issued by the U.S.

2

Department of Commerce. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 76 Fed. Reg. 82268, 82274 (Dep't Commerce Dec. 30, 2011).

By letter of November 16, 2012, Petitioners first submitted to Commerce an allegation of targeted dumping. Jt. App. at 73

On December 7, 2012, Commerce published its preliminary results in the antidumping duty review of Polyethylene Terephthalate Film from the United Arab Emirates calculating a A/D rate for JBF of 5.31% *ad valorem.*, *See Polyethylene Terephthalate Film from the United Arab Emirates*, 77 Fed. Reg. 73010 (Dep't Commerce Dec. 7, 2012 (preliminary results).

On March 8, 2013, Commerce issued its post preliminary determination. Jt. App. 159

On May 21, 2013, Commerce published its final results in Polyethylene Terephthalate Film from the United Arab Emirates. *See Polyethylene Terephthalate Film from the United Arab Emirates*, 78 Fed. Reg. 29700 (Dep't Commerce May 21, 2013) (Final results antidumping duty review) (the "Final Results"). In the Final Results, Commerce calculated a weighted average dumping margin of 9.80% for JBF. Commerce did not change its calculation methodology from that of the post preliminary memorandum and finding dated March 8, 2013.

## VI. SUMMARY OF THE ARGUMENT

- Congress set forth specific dumping margin calculation methods in Section 1677f-1(d)(1)(A)(i) and (ii) but also <u>explicitly</u> provided for an "exception" to those calculation methods in Section 16677f-1(d)(1)(B); i.e. an alternative calculation method in the case of so-called targeted dumping. Contrary to the decision below, the statute and the SAA do not provide the authority to apply the explicit exception for investigations in Section 1677f-1(d)(1)(B) to administrative reviews.

- Petitioners' targeted dumping allegation is improperly submitted information and should be rejected. Petitioners' submission is untimely as allegations of targeted dumping are defined as "factual information" under 19 CFR 351.301 and subject to the time limits under 19 CFR 351.301(b), (c) or (d). The allegation failed to meet any of these regulatory deadlines and, as such was improperly submitted information**.**

-The statute and Commerce's regulations authorize Commerce to issue only two determinations in an administrative review - a preliminary and a final determination. 19 U.S.C. § 1675(a)(2)(B)(iv) and (C) ("The administering authority shall make a preliminary determination in a review ... within 180 days ...,

and a final determination within 90 days ...; "Results of determinations. The determination under this paragraph shall be the basis for the assessment of ... antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties."). 19 C.F.R. § 351.213(h). There is no authority to issue, as here, a second preliminary determination and, clearly, not when, as here, petitioner undeniably could have filed its allegation at a point where it could have been considered and become part of the preliminary determination. Instead, it delayed its filing so that Commerce in order to consider the allegation had to create an unauthorized second preliminary determination.

- Commerce refusal to consider evidence showing that the pricing pattern Commerce adduced from the Nails test was not the result of targeted sales is an abuse of discretion. JBF submits that when all evidence is considered together they compel the conclusion that the price pattern was not the result of targeting to mask dumped sales.

## VII. STANDARD OF REVIEW

This Court reviews the Court of International Trade's determination de novo, stepping into its shoes and applying the same standard of review. Commerce's determination is upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *JTEKT Corp. v. United States*,

642 F.3d 1378, 1381 citing  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379

(Fed. Cir.2008),  *NSK Ltd. v. United States,* 510 F.3d 1375, 1377 (Fed.Cir.2007).

# VIII. ARGUMENT

**1.  There is No Statutory Authority in Administrative Reviews to Consider an Allegation of Targeted Dumping. Contrary to the Decision below, the Statute as well as the Legislative History Are Not Silent; the Exception for Investigations is Not Applicable to Reviews.**

19  U.S.C.  §  1677f-1(d)  authorizes  the  method  of  calculation  of

antidumping duty margins in antidumping investigations and reviews. § 1677f-

1(d)1(B)  provides  for  an  "*exception*"  to  the  calculation  methodology  in

investigations after considering an allegation of targeted dumping while a similar

"exception"   is  not  provided  in  §  1677f-1(d)(2)  for  reviews.  Sections  1677f-

1(d)(1) and (2) state:

.

TITLE 19—CUSTOMS DUTIES
§ 1677f–1
                                 *       *       *
(d) Determination of less than fair value
**(1) Investigations**
(A) In general
In an investigation under part II of this subtitle, the
administering authority shall determine whether the subject
merchandise is being sold in the United States at less than
fair value -
(i) by comparing the weighted average of the normal values
to the weighted average of the export prices (and constructed
export prices) for comparable merchandise, or

6

(ii) by comparing the normal values of individual
transactions to the export prices (or constructed export
prices) of individual transactions for comparable
merchandise.

**(B) Exception**

*The administering authority may determine whether the subject
merchandise is being sold in the United States at less than
fair value by comparing the weighted average of the normal
values to the export prices (or constructed export prices) of
individual transactions for comparable merchandise, if -*
*(i) there is a pattern of export prices (or constructed
export prices) for comparable merchandise that differ
significantly among purchasers, regions, or periods of time,
and*
*(ii) the administering authority explains why such
differences cannot be taken into account using a method
described in paragraph (1)(A)(i) or (ii).*

**(2) Reviews**

In a review under section 1675 of this title, when comparing
export prices (or constructed export prices) of individual
transactions to the weighted average price of sales of the
foreign like product, the administering authority shall limit its
averaging of prices to a period not exceeding the calendar month
that corresponds most closely to the calendar month of the
individual export sale. [Emphasis added]

\*      \*      \*

Commerce improperly considered the targeting allegation by relying on the

statutory provision for investigations to fill in what Commerce and the decision

below presume is a "gap" in the statutory authority.  "But no case of which we are

aware holds that an administrative agency has authority to fill gaps in a statute that

exist because of the absence of statutory authority." *FAG Italia*, 291 F.3d at 816. It

is well settled that "where Congress includes particular language in one section of

a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotes omitted); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994). Here, the statute is not silent. The provision with respect to investigations creates an "exception" and the provisions immediately after applicable to reviews, do not, and, thus, refute any asserted ambiguity or silence. Neither Commerce nor the decision below address or even recognize that the statutory authority for investigations that is the basis for the so called "gap filling" is an explicit (and designated) "exception" to the rule. Clearly, the statute creates the authority to consider the allegation in investigations and the explicit absence thereof in reviews denies any such authority in reviews. Any attempt by regulation or otherwise to create the authority where the statute omits such authority is unlawful. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "The Supreme Court has noted that 'an agency literally has no power to act ... unless and until Congress confers power upon it." *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002). "...Although Commerce has wide discretion in administrating countervailing and antidumping law, it cannot exercise this discretion contrary to

congressional intent." *GPX International Tire Corp. v. United States*, 666 F3d 732, 745 (Fed. Cir. 2011).

If, as incorrectly asserted, the Department has the discretionary authority in reviews to conduct targeting inquiries and impose alternative calculation methods by mere silence, that discretionary authority would also apply to investigations and, therefore, there would have been no need for Congress to create an explicit exception in Section 1677f-1(d)1(B). By providing a specific "exception" in investigations for such authority, Congress clearly indicates that without that exception it did not intend to provide that authority to the Department. An exception to a rule can not logically be implied to exist in the absence of the exception. That is why it is an exception. That is also the very reason why the exception here in issue is designated as an "Exception" in the statutory text.

That Congress explicitly provided for consideration of the existence of targeted dumping in investigations but intentionally refrained from including similar language in connection with reviews when it could easily have done so, is powerful evidence that Congress did not intend for such an alternative to be used in reviews. That is, Congress created the exception because if the statutory text omitted the exception - i.e., was silent - the exceptional authority would not exist in investigations.

The court below and Commerce both conclude that the exceptional authority is granted in reviews although no such language exists in the statute by virtue of the absence of an affirmative prohibition in the particular subparagraph relating to reviews. Yet, it is crystal clear that without the "Exception" language relating to investigations, Commerce would have no authority to consider the existence of targeted dumping and use an alternative comparison method. It is inconsistent to have a situation wherein Congress by providing for the exceptional authority in investigations and by that makes it known that silence on this point in connection with investigations deprives Commerce of the authority, but the same silence in connection with reviews actually confers such authority. This is absurd on its face.

Further, if an exception can be applied to subsections of the same provision where it does not exist that would allow Commerce or any governmental agency to create non existing exceptions to statutory authority as long as the statute does not specifically or explicitly prohibit it from doing so. Stated another way, under this principle, a statute granting authority must set forth affirmative prohibitions or restrictions on the exercise of that authority and any prohibition or restriction that is not listed will be within the agency's discretionary authority. This would be a clear case of an administrative agency acting *ultra vires*. Here, Congress created an exception granting Commerce the authority in investigations. Commerce cannot

infer discretionary authority with respect to reviews simply by virtue of the absence of an explicit prohibition.

If Congress intended that Section 1677f-1(d)(1)(B) apply to reviews, it would have so stated as it did with other "exceptions" within the provision. Indeed, the immediate preceding subsection, Section 1677f-1(c), entitled "determination of dumping margin" provides that the dumping margin shall be determined for each exporter and producer. An "Exception" under Section 1677f-1(c)(2) provides Commerce the authority to make that determination for a reasonable number of exporters or producers, rather than each, exporter or producer where there is a "large number of exporters or producers involved in the **investigation or review**... ". See also Section 1677f-1(e)(2) providing for a similar exception in "**the investigation or review**" with respect to the determination of a countervailable subsidy rate. Therefore, where the drafters of § 1677f-1(d) granted the exceptional authority to both investigations and reviews, the provision explicitly so states.

Any doubt that Congress did not provide Commerce the discretion to create exceptional authority where none exists is resolved by the legislative history to the provision which, again, Commerce and the decision below, did not address other than to state that it does "not violate... the SAA". Jt. App. at 6. In summarizing

Article 2.4.2 of the agreement, the SAA states, Statement of Administrative Action, H.R. No. 103-316, vol. 1(1994) at 810:

\*          \*          \*

In a departure from current U.S. law, Article 2.4.2 provides that in investigations (**not reviews**), national authorities normally will establish dumping margins by comparing either:

• a weighted-average of normal values to a weighted-average of export prices of comparable merchandise; or

• normal value and export price on a transaction-to-transaction basis.

Where such comparisons are inappropriate, however, the United States' current methodology is authorized. Authorities may compare a weighted-average normal value to individual export transactions, provided that there is a pattern of prices that differs significantly and that they explain why a weighted-average-to-weighted-average or transaction-to-transaction comparison is not appropriate. (Emphasis added)

The parenthetical language in the SAA "(not reviews)" clearly and unambiguously establishes Congress' understanding of the obligation under the agreement that the targeting allegation is to be considered and, if it exists, an alternative comparison method is applied in investigations and "not reviews". In the statute, as explained above, Congress created an explicit exception in Section 1677f-1(d)(1)(B) for investigations (not reviews). Thus, the creation of the exception for investigations but not reviews was not an oversight or silence by Congress with respect to reviews. Rather, the statutory exception reflects the clear and unambiguous intention of the drafters of the Act to comply with the U.S. obligations as

expressed in the SAA that the targeting allegation be applied to investigations and "not reviews" to determine whether a comparison method can be used.

Against this background, clearly the creation by Congress of an exception with respect to investigations and its omission of the exception for reviews within the **same section of the Act**, does not confer the authority in reviews created by the exception for investigations and, therefore, the decision below is reversible error.

## 2. The Targeted Dumping Allegation Was Not Timely Filed Pursuant To 19 CFR 351.301

JBF submits that petitioners untimely allegation of targeted dumping was improperly considered in violation of the time requirements of 19 CFR §351.301. The court below, however, initially concludes that notwithstanding any violation of 19 CFR §351.301, Commerce could waive its regulatory time limits where "the ends of justice" require it. Therefore, the court below held that the burden was on JBF to demonstrate that it was substantially prejudiced by Commerce's violation. Jt App. at 9. What that determination failed to address is how the ends of justice require the waiving of the untimely submission. Here, it is undisputed that petitioner had the information upon which its allegation was based over two

months prior to submission. [1]There was no claim of excusable neglect or as matter of fact any explanation as to why the allegation was not submitted in time for Commerce to consider it before the scheduled preliminary determination. Further, as discussed in point 3 below, the untimely submission resulted in Commerce issuing a second ("post") preliminary determination that is not authorized by statute and the justification for that unlawful determination was due to the fact that Commerce was unable to consider the allegation for the preliminary determination because of the untimely submission. Thus, there was no basis for waiver here as the ends of justice do not require the consideration of a untimely submission where there is no claim of excusable neglect for such filing and, further, if there is a required burden on JBF to demonstrate substantial prejudice, clearly JBF was substantially prejudiced by the issuance of a second preliminary determination not authorized under the statute.

JBF now turns to the Commerce's submission of facts and the regulatory time limits. Section 353.301 provides in part:

§ 351.301 Time limits for submission of factual information.

*(a)Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets

---

[1] Petitioner's allegation dated November 16, 2012, was allegedly based upon JBF's database submission of September 12, 2012.

> forth **the time limits for submitting such factual information**, i**ncluding** information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, **allegations** concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents (Emphasis added)

The above language is clear and unambiguous. It covers "Time limits for submission of <u>factual information</u>" and the "section sets forth the time limits for submitting <u>such factual information</u>, including...<u>allegations....</u>".  Thus, if there was any ambiguity as to what constitutes "factual information", it is resolved by the regulation defining "such factual information" to include allegations.   Further, Section 351.301 provides for specific time limits - subsection (c) for rebuttal factual information, allegations under subsection (d) and where subsections (c) and (d) do not apply, the general catch-all time limits of subsection (b). Thus, submissions of factual information are covered by a time limit and it is not disputed that petitioner's allegation was not submitted within the required time.

   A. Subsection 351.301(c)

   JBF claimed that the targeted dumping allegation herein was subject to subsection 351.301(c) of the regulations and, as such, was untimely submitted rebuttal factual information. Commerce asserted, and the court below agreed, that

the submission is not rebuttal factual information because the domestic producer's allegation did not present "new facts" as it relied on information on record. Jt. App at 11

Assuming that the rebuttal facts must be "new," although there is no such requirement in the regulation, the allegation herein certainly adduced facts that were not evident from the information on record. Furthermore, Commerce made the questionable assertion that reliance on record information cannot be "new." Under this concept, the discovery by Johannes Kepler of the 3 laws of planetary motion could not be "new" because their derivation was based solely on the voluminous existing observational data compiled by Tycho Brahe. Clearly, the discovery of the 3 laws was "new".

In our case, petitioner's allegation contained extensive "new" facts that were not part of, or even remotely evident from the information on record. Jt. App. 73. Instead, as the allegation states the US sales data was subjected to the "Nails Test" as applied by Commerce. *Mid Continental Nail Corp. v. United States*, 712 F.Supp. 2d 1370, 1377-78 (CIT 2010). The court below describes the Nail Test that petitioner relied upon as a basis for its allegation, Jt. App. 14-15:

> In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's (*i.e.*, purchaser, region or time period) sales of subject merchandise (by sales volume) that

are at prices more than one standard deviation below the weighted- average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the *Nails* Test. If that volume exceeded 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the *Nails* Test.

In the second stage, the "gap test," we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for allegedly targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non- targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted group's sales were not included in the non-targeted groups; the allegedly targeted group's average price was compared only to the average prices for the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the *Nails* Test.

In the second stage, we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price to the allegedly targeted group and the next higher weighted-average price to a nontargeted group exceeds the average price gap (weighted by sales volume) between the nontargeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted sales were not included in the non-targeted groups; the allegedly targeted group's weighted-average sales price was compared only to the weighted-average sales prices to the non-targeted groups. If the

volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the *Nails* Test.

If the two-step analysis confirmed the allegation of targeting and sufficient sales were found to have passed the Nails test, then the allegation considered whether the average to-average method could take into account the observed price differences. To do this, petitioner evaluated the difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method. Where there was a meaningful difference between the results of the average-to-average method and the average-to-transaction method, the average-to-average method would not be able to take into account the observed price differences, and the average-to transaction method would be used to calculate the weighted-average dumping margin for the respondent in question. Where there was not a meaningful difference in the results, the average to-average method would be able to take into account the observed price differences, and the average-to-average method would be used to calculate the weighted-average dumping margin for the respondent in question.

Petitioners' Exhibits 1 and 2, (33 pages long) to its allegation contain the results of the above procedures. Jt. App. 89-122. These results are presented as facts and are not part of JBF's sales database or any other information previously

on record. This lengthy and extensive alleged factual information detailing and supporting the allegation is not remotely evident from the sales database and previously submitted information. It is in every sense "new". As such, the allegation is subject to the limits in subsection 351.301(c) and was indisputably untimely filed and should have been rejected pursuant to 19 CFR 351.302(d)

B. Subsection 351.301(d)(5)(2007)

19 CFR 351.301(d)(5)(2007) provides:

### § 351.301 Time limits for submission of factual information.

*(a)Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents

\*                    \*                    \*

(d) *Time limits for certain allegations—*

\*                    \*                    \*

(5) *Targeted dumping.* In an antidumping investigation, an allegation of targeted dumping made by the petitioner or other domestic interested party under §351.414(f)(3) is due no later than 30 days before the scheduled date of the preliminary determination.

Pursuant to the above, the allegation dated November 16, 2012 was not filed 30 days prior to the preliminary determination published on December 7, 2012 and should not have been considered. Plaintiff asserted below that the regulation was allegedly revoked by Commerce by its notice -*Withdrawal of Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg.74930 (Dec. 10, 2008) ("*Withdrawal Notice*"). However, the *Withdrawal Notice* failed to meet the notice and comment requirements of the Administrative Procedure Act' ("APA")*, 5 U.S.C. § 500, et seq.* In *Gold East Paper (Jiangsu) Co., LTD.; Ningbo Zhonghua Paper Co., LTD, v United States,* Slip. Op. 13-74, WL2996231 (CIT June 17, 2013) it was held that Commerce's justifications failed to support revocation of the regulations in the *Withdrawal Notice (*Slip Op 13-74 at 15*)*:

> The court finds that none of Commerce's reasons in support of immediate revocation (without prior notice and comment) rise to the level required. That Commerce improvidently enacted rules without adequate experience of how they would work, that the rules apply to ongoing investigations, and the rules could deny relief to domestic industries, do not rise to the level required for it to avoid the APA's requirements. Indeed, those justifications could apply to *almost any* rule promulgated by the agency.

As a result of Commerce's failure to comply with the notice requirements in the APA, Plaintiff submits that 19 CFR 351.301(d)(5)(2007) was not revoked as

the result of the *Withdrawal Notice* and remains in effect. Accordingly, Petitioner's allegation was untimely submitted.

Opposing parties previously asserted that Subsection 351.301(d)(5)(2007) is in any event applicable to investigations and not reviews. The irony here should not be ignored. Opposing parties claimed that the regulation which is silent with respect to reviews is, therefore, not applicable to reviews. However, they then inconsistently argued that even though the alternative comparison exception in Section 1677f-1(d)(1)(B) which is silent with respect to reviews is still applicable to reviews because an express prohibition does not exist.

JBF submits that if subsection 351.301(d)(5)(2007) of the regulations is restricted to investigations, it evidences Commerce's understanding at the time of enactment of 19 USC 1677-1(d) that the exception providing for consideration of targeting allegations was only applicable to investigations. That is the reason why Commerce's regulations provided for specific time limits with respect to such allegations in investigations and not reviews.

The court below held that JBF's failure to assert the matter at the administrative level, and whether the facts are within the exception to the exhaustion doctrine was an academic question that it would not address. Jt. App. at 9. However, here, the claims in JBF's administrative briefs were based on what it

understood was the existing regulations. *Gold East* (decided after this case was filed), and the invalidity of the revocation of Subsection 351.301(d)(5) was unknown to JBF at that time its administrative briefs were submitted. As such, JBF did not have an opportunity to present this claim. Therefore, clearly *Gold East* is intervening legal authority and the exhaustion of administrative remedies doctrine is not applicable.

The allegation therefore was indisputably untimely filed under Subsection 351.301(d)(5) and should have been rejected pursuant to 19 CFR 351.302(d).

C. Subsection 351.301(b)

Subsection 351.301(b) is a catch all or basket for factual information not specified in subsections (c) and (d):

> (b) *Time limits in general.* Except as provided in paragraphs (c) and (d) of this section and § 351.302 a submission of factual information is due no later than:
>
> \*     \*     \*
>
> For the final results of an administrative review, 140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed;

JBF addressed above whether allegations are factual information pursuant to 19CFR351.301. JBF further addressed above whether petitioners' allegation contained new factual information subject to 19CFR351.301. Briefly, contrary to

Commerce's interpretation of its regulations, the introduction to Section 351.301 defines "factual information" to include allegations. Further, the extensive information provided in Exhibits 1 and 2 of the allegation is not in any way evident from the information on record and, does constitute new facts. As such, if Subsections (c) and (d) are not applicable, then the allegation is factual information subject to the catch all time limits of Subsection (b).

The court below, however, determined that JBF failed to exhaust its administrative remedies by not specifically citing to Section 351.301(b) although the claim of untimely filing was made under Section 351.301. Jt. App. at 8. JBF disagrees. The issues here as framed by Commerce are whether for purposes of Section 351.301, an allegation is factual information and whether the allegation here contains new facts not previously on record. Those issues were considered by Commerce and rejected. The administrative agency considered and addressed the issues and, as such, the exhaustion of administrative remedies has no application here. Therefore, JBF submits there is no reason to address the exceptions to the doctrine since the issues were in fact considered by Commerce. If, however, exhaustion was applicable, as the arguments were considered, addressed and rejected here by Commerce, exhaustion would have been futile and subject to the futility exception. *SeaH Steel Corp. v. United States*, 764 F. Supp. 2d 1322, 1325-26(Ct.Int'l Trade 2011).

As such, if subsections (c) and (d) are not applicable, then the allegation is factual information subject to the catch all time limits of Subsection (b). The allegation therefore was indisputably untimely filed and should have been rejected pursuant to 19 CFR 351.302(d).

## 3. Commerce issued an unauthorized "post- preliminary determination".

Under the statute, Commerce is required to issue two determinations in an administrative review - preliminary and final determinations. 19 U.S.C. § 1675(a)(2)(B)(iv), (C) ("The administering authority shall make a preliminary determination in a review ... within 180 days ..., and a final determination within 90 days ...; "The determination under this paragraph shall be the basis for the assessment of ... antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties.").

Commerce's regulations also provide for the two determinations and deadlines pursuant to 19 C.F.R. § 351.213(h) ("*Time limits* —(1) *In general.* The Secretary will issue preliminary results of review (*see* § 351.221(b)(4)) within 245 days after the last day of the anniversary month of the order or suspension agreement for which the administrative review was requested, and final results of review (*see* § 351.221(b)(5)) within 120 days after the date on which notice of the preliminary results was published in the FEDERAL REGISTER.").

It is an indisputable fact that petitioners possessed the information used as the starting point for its targeted dumping allegation over two months prior to its submission; and that it delayed its submission to just before the date scheduled for the issuance of the preliminary determination. As a result, it was not possible for Commerce to consider the allegation in the preliminary determination. No reason was offered for the delay. If petitioners did not delay submission, then the allegation could have been part of the preliminary determination and Commerce would not have had to issue a third determination that is not authorized under the statute or regulations. In short, neither Commerce nor the decision below point to language in the statute that authorizes the issuance of two preliminary determinations in an administrative review.[2] Further, the second determination was a wholesale new determination based on new facts using a different methodology from that in the preliminary determination and the justification for this impermissible determination was, as stated in the decision below "Commerce made a decision to consider petitioners' allegation of targeted dumping in a separate determination because there was insufficient time to consider the issue given the

---

[2] Acceptance could be precedent of allowing submission of such allegations on the date of, or even after, the preliminary determination. Time limits for submission of certain allegations are provided in 19 CFR 351.301(d). All provide deadlines that are a reasonable time after filing of information needed as a basis for the allegation. No deadline is provided some two months after the information necessary as a basis for the allegation is of record, and in no case does a deadline allow consideration and a determination after the preliminary determination.

statutory deadline for publishing the preliminary determination." Jt. App. at 13.

JBF submits this is reversible error as there is no statutory basis to issue a "post preliminary determination" and Commerce does not have the discretionary authority to issue a third determination.

## 4. Commerce Must Consider Evidence That Price Patterns That Meet the Nails Test Do Not Constitute Targeted Dumping

19 U.S.C. § 1677f-1(d)(1)(B) provides for exception to the A-to-A (Average to Average) methodology in investigations where it is established that the seller sells to customers at higher prices to mask lower priced dumped sales -

> The statute carves out an exception, however, allowing Commerce to use average-to-transaction comparisons if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differs significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B). This is generally referred to as **"targeted" or "masked" dumping.** *Union Steel v. US*, 713 F 3d 1101, 1104, Fn 4 (Fed. Cir. 2013)(emphasis added)

JBF claimed that because of its sales practice it could not target customers, regions or periods of time and the pricing pattern found by Commerce was the result of market conditions. The court below held that Commerce has no obligation to establish that the pricing pattern it finds constitutes "targeted" dumping. Once it determines that a pattern exists pursuant to the *Nails* test, targeted dumping is established *per se* and cannot be rebutted. That is, notwithstanding this court's, the

regulations and Commerce's, reference to the statutory exception as "targeted" dumping, Commerce has no obligation to consider any evidence that the pricing pattern was not "targeted ". Jt. App. 15-16

Let us be clear, JBF is not asserting that Commerce has the burden of establishing the seller's intent. It is conceded that the pattern of pricing established by passing the *Nails* test creates a rebuttable presumption that it is a "targeted" pricing pattern. But it is arbitrary, capricious and an abuse of discretion to refuse to consider evidence which would tend to establish that the pricing pattern was not due to targeted sales but, instead, was for a valid business purpose.

Commerce's position and the decision below is in stark contrast to the clear statement of Commerce's statutory obligations set forth in its response to comments when it first issued its targeted dumping regulations in 1997:

> More specifically, several commenters suggested that the Department recognize in its final rule that certain ''common commercial patterns of pricing'' do not constitute targeted dumping, such as (1) different pricing for larger or smaller orders, (2) seasonal pricing, and (3)price changes associated with industry practices, such as downward price changes pursuant to lower costs as are typical for semiconductors, personal computers, and other technical products. In contrast, other commenters contended that common commercial practices in an industry can constitute targeted dumping and that such behavior should not be excused or ignored simply because it is considered to be a common commercial practice.
>
> Other commenters proposed additional substantive guidance. For example, one party suggested that targeted dumping should not be found to exist where the pattern of prices exists in both the U.S. and the comparison market. Another commenter suggested that the Department not obligate

itself to use ''standard statistical techniques'' in all of its determinations. Several commenters suggested that the Department define in the final regulations the evidentiary threshold for initiating a targeted dumping inquiry. One commenter, in particular, contended that the final rule establish a low threshold for an allegation to be accepted, similar to allegations of sales below cost. Another commenter expressed concern that the Department's brief practice in this area already has established an arbitrarily high initiation standard.

In the preamble to the proposed regulations, the Department specifically avoided the adoption of any per se rules on targeted dumping due to the Department's limited experience administering this provision of the Act. However, the Department recognizes the need to establish guidance in this area and thus will issue policy bulletins setting forth more specific criteria as the Department develops its practice in this area. Moreover, the Department plans to employ common statistical methods in its targeted dumping determinations in order to ensure that the test is applied on a consistent basis and in a manner that ensures transparency and predictability to all parties concerned. In addition, the Department will ensure that parties have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping. A policy bulletin setting forth some basic guidelines for applying statistical techniques to targeted dumping questions will be issued in the near future. As we gain more experience in this area, the bulletins will be supplemented or replaced. *Final Rule*, 62 Fed.Reg.27296, 27374, May 19, 1997

The foregoing expression of policy shortly after legislative enactment is the complete opposite of the position Commerce has taken herein. Commerce's intent was to avoid "the adoption of any per se rules on targeted dumping" as well as to ". . . ensure that parties have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping". Clearly, when it issued its regulations after legislative enactment, Commerce understood

that it was required to consider and, not disregard evidence that price differences were not the result of targeted sales to mask dumping.

Here, JBF requested Commerce to consider the following in support of its claim that the pricing pattern does not constitute targeting: (1) its pricing practices limit its ability to sell at high prices to mask dumping; , i.e., prices are negotiated on an individual sale-by-sale basis (2) market prices for the product decreased one third over the course of the POR and its pricing reflected this extreme market price decrease and was not an attempt to mask dumped sales; and (3) similar price differences can be found in this review on sales by JBF in the home market. Since targeting is established by comparing US sales and not home market sales, the pricing pattern in the home market was due to JBF's sales practices and the market price decrease, not because of targeting. These factors which negate targeting with respect to home market price patterns are equally applicable to US sales and, therefore, by analogy, negate the existence of targeting in the U.S. market.

While no one of the 3 factors noted above may suffice to negate the targeted dumping allegation, JBF submits that when all three are considered together they compel the conclusion that the price pattern was not the result of targeting to mask dumped sales. However, Commerce refused to consider JBF's evidence because of the assertion that it does not have any obligation to review any information that would show that the pricing pattern was not the result of targeting by the seller.

JBF submits that when all three are considered together they compel the conclusion that the price pattern was not the result of targeting to mask dumped sales. The failure to consider these factors is an abuse of discretion and is reversible error.

## IX.   CONCLUSION

For the reasons set forth above, JBF respectfully requests that this Court:

-Hold that Commerce does not have the statutory authority under 19 U.S.C. § 1677f-1(d) to consider in reviews, allegations of targeted dumping;

- Hold that Petitioners' targeted dumping allegation was untimely, improperly submitted information, and was unlawfully considered.;

-Hold that Commerce unlawful issued a post preliminary determination;

- Hold that there is no evidence that the pricing pattern found by Commerce was a targetd pricing pattern to mask dumped sales, and

-Grant such other relief as may be just and proper.

Respectfully submitted,

 /s/ Jack D. Mlawski
Jack D. Mlawski

Galvin & Mlawski
245 Fifth Avenue
Suite 1902
New York, NY 10016
Tel: (212) 679-1500

*Counsel for Plaintiff JBF RAK LLC*

Slip Op. 14- 78

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| JBF RAK LLC, | |
| Plaintiff, | |
| v. | Before: Judith M. Barzilay, Senior Judge |
| UNITED STATES, | Court No. 13-00211 |
| Defendant, | |
| and | |
| MITSUBISHI POLYESTER FILM, INC., DUPONT TEIJIN FILMS and SKC, INC., | |
| Defendant-Intervenors. | |

**OPINION**

[Commerce's final results are sustained.]

July 1, 2014

*Jack D. Mlawski* and *John J. Galvin*, Galvin & Mlawski, for Plaintiff.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, (*Melissa M. Devine*), Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of counsel, *Devin S. Sikes*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Ronald I. Meltzer*, *Patrick J. McLain*, *David M. Horn*, and *Jeffrey I. Kessler*, Wilmer Cutler Pickering Hale and Dorr LLP, for Defendant-Intervenors.

BARZILAY, Senior Judge:  Before the court is Plaintiff JBF RAK LLC's ("JBF RAK")

motion for judgment on the agency record under USCIT Rule 56.2, challenging Defendant U.S.

Department of Commerce's ("Commerce") final results of the administrative review covering

polyethylene terephthalate film ("PET Film") from United Arab Emirates for the November 1,

2010 through October 31, 2011 period of review. *See Polyethylene Terephthalate Film, Sheet,*

*and Strip From the United Arab Emirates*, 78 Fed. Reg. 29,700 (Dep't Commerce May 21, 2013)

(final results) ("*Final Results*"); *Issues and Decision Memorandum for Polyethylene*

*Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, A-520-803 (May 13, 2013)

("*Issues and Decision Memorandum*"), *available at*

http://enforcement.trade.gov/frn/summary/uae/2013-12086-1.pdf (last visited July 1, 2014).

Specifically, JBF RAK claims that (1) Commerce unlawfully applied its targeted dumping

methodology in the context of an administrative review; (2) Commerce improperly considered

petitioners' allegation of targeted dumping; (3) Commerce unlawfully issued a post-preliminary

determination; (4) Commerce failed to consider certain facts about JBF RAK's pricing practices

in its targeted dumping determination; (5) Commerce's improperly applied its model matching

methodology; and (6) Commerce unlawfully applied its 15-Day Rule for issuing liquidation

instructions.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and (i).  For the reasons

set forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. §

1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains

Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

More specifically, when reviewing agency determinations, findings, or conclusions for

substantial evidence, the court assesses whether the agency action is "reasonable and supported

by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (internal quotations and citation omitted).  Substantial evidence has been described as

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been

described as "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607,

620 (1966).

        Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res.*

*Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984) ("*Chevron*"), governs judicial review of

Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555

U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous

statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

        JBF RAK is a manufacturer and exporter of PET Film from the United Arab Emirates.

JBF RAK and other interested parties requested that Commerce conduct an administrative

review of the antidumping duty order on PET Film covering the November 1, 2010 through

October 31, 2011 period of review.  After Commerce initiated the review, but before publishing

the preliminary results, petitioners filed an allegation of targeted dumping against JBF RAK.

Commerce published its preliminary results and assigned JBF RAK a dumping margin of 5.31%

using its average-to-average comparison methodology. *See Polyethylene Terephthalate Film,*

*Sheet, and Strip from the United Arab Emirates*, 77 Fed. Reg. 73,010 (Dep't Commerce Dec. 7,

2012) (preliminary results) ("*Preliminary Results*").  Commerce, though, indicated that it did not

have sufficient time to analyze the targeted dumping issue and therefore addressed it later in the

proceeding.

Commerce published a post-preliminary determination addressing the issue of targeted dumping on March 8, 2013. *See 2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Post-Preliminary Analysis and Calculation Memorandum of JBF RAK LLC*, A-520-803 (Dep't Commerce Mar. 8, 2013) ("*Post-Preliminary Determination*"). Commerce preliminarily concluded that JBF RAK had engaged in targeted dumping and assigned a revised dumping margin of 9.80% using its average-to-transaction comparison methodology. Commerce then invited interested parties to comment on its targeted dumping analysis. In the *Final Results*, Commerce continued to apply the average-to-transaction comparison methodology and assigned JBF RAK a dumping margin of 9.80%. *See Final Results*, 78 Fed. Reg. 29,700.

### III. DISCUSSION

*A. Targeted Dumping in Administrative Reviews*

JBF RAK argues that there is no statutory authority for Commerce to consider an allegation of targeted dumping in the context of an administrative review. JBF RAK Br. 6. It claims that 19 U.S.C. § 1677f-1(d) authorizes Commerce to apply its average-to-transaction comparison method in the context of an investigation, but does not authorize Commerce to apply that methodology in the context of a review. JBF RAK Br. 7-8. JBF RAK claims that Commerce's application of the average-to-transaction comparison methodology in the context of a review violates the statute. JBF RAK Br. 8-9. The court disagrees.

In an administrative review, the statute requires Commerce to review and determine the amount of any antidumping duty, 19 U.S.C. § 1675(a)(1)(B), by calculating the normal value and export price (or constructed export price) of each entry of subject merchandise, and the dumping margin of each such entry. § 1675(a)(2)(A). The term "dumping margin" is defined by statute as "the amount by which normal value exceeds the export price or constructed export price of the

subject merchandise. § 1677(35)(A).  Section 1677f-1(d), in turn, establishes three different

methods by which Commerce may compare normal value with export price to determine whether

merchandise is being sold for less than fair value (*i.e.*, dumping).  *See also* H.R. Doc. No. 103-

316 vol. I (1994), reprinted in 19 U.S.C.C.A.N. 3373 ("SAA").  Although the statute places some

restrictions on Commerce's selection of a particular methodology in investigations, *see* § 1677f-

1(d)(1), it is silent with respect to administrative reviews. *See* § 1677f-1(d)(2).  Commerce,

therefore, has exercised its gap-filling discretion by applying a comparison methodology in

reviews that parallels the methodology used in investigations. *See Antidumping Proceedings:*

*Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain*

*Antidumping Proceedings,* 77 Fed. Reg. 8,101, 8,102 (Dep't of Commerce Feb. 14, 2012)*.*

Commerce promulgated a regulation that codifies its approach in both investigations and

reviews. *See* 19 C.F.R. § 351.414.  It states that in "an investigation or review, the Secretary will

use the average-to-average method unless the Secretary determines another method is

appropriate in a particular case." *Id.* § 351.414(c)(1). This gives Commerce discretion to apply

its average-to-transaction methodology when the facts of a particular case justify using it rather

than the average-to-average methodology.

  Contrary to JBF RAK's claims, Commerce's decision to apply its average-to-transaction

comparison methodology in the context of an administrative review is reasonable.  As

Commerce explained,

> The silence of the statute with regard to application of an alternative comparison
> methodology in administrative reviews does not preclude the Department from
> applying such a practice. Indeed, the Court of Appeals for the Federal Circuit
> (Federal Circuit) has stated that courts "must, as we do, defer to Commerce's
> reasonable construction of its governing statute where Congress 'leaves a gap in
> the construction of the statute that the administrative agency is explicitly
> authorized to fill or implicitly delegates legislative authority, as evidenced by the
> agency's generally conferred authority and other statutory circumstances.'"
> Further, the Court of International Trade has stated that this "silence has been

interpreted as 'an invitation' for an agency administering unfair trade law to 'perform its duties in the way it believes most suitable' and courts will uphold these decisions '{s}o long as the {agency}'s analysis does not violate any statute and is not otherwise arbitrary and capricious.'" We find that the above discussion of the extension of the statute with respect to investigations is a logical, reasonable, and deliberative method to fill the silence with regard to administrative reviews.

Further, the Department's revision of its practice with regard to administrative reviews, and to follow its World Trade Organization (WTO)-consistent practice for investigations, was a deliberate decision on the part of the Executive Branch pursuant to the authority provided in section 123 of the Uruguay Round Agreements Act. Specifically, the Executive Branch solicited public comments, consulted with the appropriate congressional committees, and issued a preliminary and final determination. This decision was made in order to implement several adverse WTO reports in which it was found that the United States was not meeting its WTO obligations.

*Issues and Decision Memorandum* at 6.

Commerce has provided a legitimate explanation for applying its targeted dumping methodology in this context. It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews. The fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties. In fact, this is precisely the type of the situation where Commerce would be expected to establish comparison methodologies to apply in administrative reviews. This deliberate policy choice by Commerce does not violate the statute or SAA. Moreover, it does not violate any rules of statutory interpretation as suggested by JBF RAK. JBF RAK Br. 8. It is therefore a reasonable exercise of Commerce's gap-filling authority under 19 U.S.C. 1677f-1(d). Indeed, this Court has already considered another case in which Commerce applied its targeted dumping methodology in the context of an administrative review. *See Timken Co. v. United States*, 38 CIT __, 968 F. Supp. 2d 1279 (2014) ("*Timken*"). Although this particular issue was

never raised, *Timken* does imply that Commerce may lawfully apply its targeted dumping

methodology in reviews.

JBF RAK cites several court decisions to support its argument but, unfortunately, has

cherry-picked various quotes and mischaracterized the legal principles established in those

decisions to advance its preferred outcome. JBF RAK Br. 8 (citing *FAG Italia S.p.A. v. United*

*States*, 291 F.3d 806 (Fed. Cir. 2002), *Nken v. Holder*, 556 U.S. 418, 430 (2009), *Brown v.*

*Gardner*, 513 U.S. 115, 120 (1994)). Commerce explained, and the court agrees, that these cases

have no application here. *See Issues and Decision Memorandum* at 6-7 ("With respect to *FAG*

*Italia*, JBF mischaracterizes the Federal Circuit's holding. In that case, and unlike the instant

review, the Federal Circuit determined that the statute unambiguously did not provide the

Department with the authority to take action because the 'absence of a statutory probation cannot

be the source of agency authority.' . . . [T]he Act provides the Department with the authority to

engage in comparisons between normal value and export price to calculate dumping margins;

however, as explained above, in the context of an administrative review, the Act does not state

explicitly which method the Department must use in so doing. The Department has reasonably

filled that gap to allow it to use the A-T comparison method when it encounters certain patterns

of export prices. Thus, *FAG Italia* is inapposite to the current proceeding. Similarly, in *Brown*,

the Supreme Court found the relevant statutory language at issue to include express terms that

resolved the inquiry. 513 U.S. at 120. However, as explained above, the provision at issue in this

proceeding does not expressly resolve the issue. Consequently, *Brown* does not support JBF's

arguments. Finally, as to *Nken*, that case did not involve an interpretation of a statute under the

*Chevron* framework by which the Department also must interpret the Act and, thus, concerns a

different scenario than that faced by the Department in this proceeding."). The court will

Case 1:14-cv-00041-JMC Document 12 Filed 07/01/14 Page 44 of 19
Case 1:13-cv-00211-JMC Document 48 Filed 07/10/14 Page 8 of 19

Court No. 13-00211                                                              Page 8

therefore sustain Commerce's decision to apply its average-to-transaction methodology in the

context of an administrative review as a permissible construction of the statute.

### B. Timeliness of Targeted Dumping Allegation

JBF RAK also claims that Commerce improperly considered the targeted dumping

allegation because it was filed too late in the administrative proceedings.  More specifically, JBF

RAK argues that petitioners failed to file their targeted dumping allegation at least thirty-days

before the preliminary determination as required by the <u>old</u> regulation, 19 C.F.R. § 351.301(d)(5)

(2007) (repealed).  JBF RAK Br. 9-10.  This argument implicates a secondary argument

concerning whether Commerce properly withdrew its targeting dumping regulations in 2008.

JBF RAK Br. 10 (citing *Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT __, 918 F.

Supp. 2d 1317 (2013) ("*Gold East*")).  Alternatively, JBF RAK argues that if the old regulation

does not apply, then petitioners' targeted dumping allegation is nevertheless untimely under 19

C.F.R. § 351.301(b)(1)(2) and 19 C.F.R. § 351.301(c)(1). JBF RAK Br. 11-14.

JBF RAK has failed to exhaust its administrative remedies on its claims involving 19

C.F.R. § 351.301(d)(5) (2007) and 19 C.F.R. § 351.301(b)(1)(2).

> Requiring exhaustion can protect administrative agency authority and promote judicial efficiency. *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S. Ct. 1081, 117 L.Ed.2d 291 (1992). The requirement can protect an agency's interest in being the initial decisionmaker in implementing the statutes defining its tasks. *Id*. And it can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution. *Id.* at 145–46, 112 S. Ct. 1081. At the same time, "the interest of the individual in retaining prompt access to a federal judicial forum" is taken into account in deciding when exhaustion is demanded in order to protect "institutional interests." *Id.* at 146, 112 S. Ct. 1081.

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).

JBF RAK did not present these arguments to Commerce when it had the opportunity.  It

did not mention that 19 C.F.R. § 351.301(d)(5) and 19 C.F.R. § 351.301(b)(1)(2) prohibited

Commerce from considering petitioners' targeted dumping allegation. *See* JBF RAK Admin.

Case Br. 5; JBF RAK Resp. to Post-Prelim. Results 5.  It could have raised these arguments in its

comments to the post-preliminary determination or its administrative case brief.  *Id.*  By not

presenting them at the appropriate time, JBF RAK deprived Commerce of the opportunity to

"apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial

review-advancing the twin purposes of protecting administrative agency authority and promoting

judicial efficiency." *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp.

2d 1344, 1346 (2006).

        JBF RAK contends that requiring exhaustion is not appropriate with respect to its

argument involving 19 C.F.R. § 351.301(d)(5) because *Gold East* represents intervening legal

authority (effectively reinstating the regulation) and therefore qualifies as an exception to the

exhaustion requirement. JBF RAK Reply Br. 11.  This presents an interesting academic question

but it is one the court need not answer.  Even if the court were to accept that the targeted

dumping regulations are somehow operative in this case, the government may waive its

procedural deadlines under general principles of administrative law. *See, e.g.*, *Am. Farm Lines v.*

*Black Ball Freight Service*, 397 U.S. 532, 538 (1970) ("Thus there is no reason to exempt this

case from the general principle that '[i]t is always within the discretion of a court or an

administrative agency to relax or modify its procedural rules adopted for the orderly transaction

of business before it when in a given case the ends of justice require it. The action of either in

such a case is not reviewable except upon a showing of substantial prejudice to the complaining

party.").  The burden, therefore, is on JBF RAK to demonstrate that it was substantially

prejudiced by Commerce's supposed violation of its regulatory deadlines.  JBF RAK has made

no showing that it was substantially prejudiced by Commerce's decision to review the targeted

dumping allegation. It appears instead that JBF RAK is attempting to avoid application of the

targeted dumping remedy based on a technicality. This is ultimately a losing argument.

JBF RAK's also challenges Commerce's decision to consider the allegation of targeted

dumping under 19 C.F.R. § 351.301(a) & (c)(1).[1]  JBF RAK argues that the allegation of

targeted dumping constitutes rebuttal factual information under the regulation. JBF RAF Br. 13.

According to JBF RAK, Commerce should have rejected the allegation as untimely factual

information. JBF RAK Br. 13.  This argument is not persuasive.

Section 351.301(a) provides:

> The Department obtains most of its factual information in antidumping and
> countervailing duty proceedings from submissions made by interested parties
> during the course of the proceeding. This section sets forth the time limits for
> submitting such factual information, including information in questionnaire
> responses, publicly available information to value factors in nonmarket economy
> cases, allegations concerning market viability, allegations of sales at prices below
> the cost of production, countervailable subsidy allegations, and upstream subsidy
> allegations. Section 351.302 sets forth the procedures for requesting an extension
> of such time limits. Section 351.303 contains the procedural rules regarding filing,
> format, translation, service, and certification of documents.

19 C.F.R. § 351.301(a) (2012).  Section 351.301(c)(1) then states:

> Any interested party may submit factual information to rebut, clarify, or correct
> factual information submitted by any other interested party at any time prior to the
> deadline provided in this section for submission of such factual information. If
> factual information is submitted less than 10 days before, on, or after (normally
> only with the Department's permission) the applicable deadline for submission of
> such factual information, an interested party may submit factual information to
> rebut, clarify, or correct the factual information no later than 10 days after the date
> such factual information is served on the interested party or, if appropriate, made
> available under APO to the authorized applicant.

19 C.F.R. § 351.301(c)(1) (2012).

---

[1]  During the course of this review, Commerce modified subsections (a), (b) and (c) to 19 C.F.R.
§ 351.301. *See Definition of Factual Information and Time Limits for Submission of Factual
Information*, 78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013). Those modifications did
not apply to the underlying review. The 2012 version of section 351.301 is available at
http://www.gpo.gov/fdsys/pkg/CFR-2012-title19-vol3/pdf/CFR-2012-title19-vol3-part351.pdf.

In the *Final Results*, Commerce did not view petitioners' allegation of targeted dumping

as "factual information" under § 351.301(c)(1). Commerce explained:

> JBF's arguments on the timeliness of the allegation are unpersuasive. While 19
> C.F.R. § 351.301(c)(1) pertains to rebuttal factual information, Petitioners'
> targeted dumping allegation cannot reasonably be characterized as rebuttal factual
> information, as JBF claims. Rather, Petitioners used the information on the record
> of this review for purposes of advocating that the Department consider using a
> different method to compare normal value and export price (or constructed export
> price). However, that does not transform Petitioners' allegation into the
> submission of facts, for the facts that served as the basis for Petitioners' claim
> already were on the record. In other words, Petitioners did not submit additional
> facts to disprove anything that JBF previously submitted; instead, Petitioners
> relied upon the very facts submitted by JBF to make an allegation. Moreover, in
> its regulations, the Department explicitly has delineated factual submissions from
> documents containing allegations similar to Petitioners' targeted dumping
> allegation. Because the nature of the filings listed in 19 C.F.R. § 351.301(d)
> closely resemble Petitioners' targeted dumping allegation, (and in fact the now-
> withdrawn targeted dumping allegation was listed under that very provision), it
> stands to reason that the Department properly considered Petitioners' submission
> as an allegation and not rebuttal factual information.

*Issues and Decision Memorandum* at 7-8.

Commerce reasonably rejected JBF RAK's argument on this issue. Petitioners used

factual information already on the record (submitted by JBF RAK) as the basis for their targeted

dumping allegation. The allegation of targeted dumping cannot be characterized as rebuttal

factual information under § 351.301(c)(1). *Cf. PSC VSMPO-Avisma Corp. v. United States*, 688

F.3d 751, 760-61 (Fed. Cir. 2013) ("*PSC VSMPO*"). The 10-day deadline mentioned in the

regulation does not apply here. Allegations, such as an allegation of targeted dumping, are

covered by 19 C.F.R. § 351.301(d) (2012). The court's understanding of the regulations is

consistent with Commerce's own interpretation of its regulations, which is afforded "substantial

deference unless an alternative reading is compelled by the regulation's plain language." *Mason

v. Shinseki*, 743 F.3d 1370, 1374-75 (Fed. Cir. 2014) (internal quotations omitted) (quoting

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Moreover, even if the allegation was untimely under a given regulation, Commerce may "relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) (quoting *Am. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538–39 (1970)). Therefore, Commerce's decision to review petitioners' targeted dumping allegation represents an acceptable exercise of agency discretion.

### C. Post-Preliminary Determination

JBF RAK next argues that Commerce violated 19 U.S.C. § 1675(a)(2)(B)(iv) by issuing a post-preliminary determination. JBF RAK claims that § 1675(a)(2)(B)(iv) only contemplates a preliminary and final determination and therefore any additional determination issued by Commerce is not authorized by the statute (or regulation). JBF RAK Br. 14-15. JBF RAK has advanced a superficial legal argument that ignores general principles of administrative law.

Commerce enjoys considerable discretion in the conduct of its administrative proceedings. The Federal Circuit has stated that "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO*, 688 F.3d at 760 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Counsel, Inc.*, 435 U.S. 519, 543-44 (1978)). Although § 1675(a)(2)(B)(iv) establishes statutory deadlines for Commerce to publish its preliminary and final results, which Commerce satisfied here, it does not prevent Commerce from fashioning procedures to properly administer the antidumping statute. In the *Final Results*, Commerce explained:

> [W]hile the Act and the regulations provide deadlines for preliminary and final determinations in administrative reviews, the Department is not limited by any statutory or regulatory provision to issuing only preliminary and final results in such a proceeding. In this proceeding, the Department issued its Preliminary Results by the applicable deadline and is issuing these final results by the

applicable deadline. Moreover, the Department enjoys wide discretion in conducting its proceeding, including the allocation of resources to develop suitable approaches for new policies such as the Final Modification for Reviews. Issuing a Post-Preliminary Analysis and providing all parties with an opportunity to comment on that analysis embodies the principles of transparency and openness underlying the Act and administrative law in general. For example, when issues arise or information is submitted too late in a proceeding to be considered for the preliminary results, issuing a Post-Preliminary Analysis ensures that parties are aware of all issues before the Department releases final results and that they have an adequate opportunity to provide comments to the Department. Because all parties were provided an opportunity to comment on the Post-Preliminary Analysis (the same opportunity they were provided to comment on the Preliminary Results), JBF was not disadvantaged by this approach.

*Issues and Decision Memorandum* at 8.

Contrary to JBF RAK's claim, Commerce's decision to issue a post-preliminary

determination did not violate the statute.  Commerce made a decision to consider petitioners'

allegation of targeted dumping in a separate determination because there was insufficient time to

consider the issue given the statutory deadline for publishing the preliminary determination.

Commerce gave the parties an opportunity to file comments on its *Post-Preliminary*

*Determination* and still managed to issue the *Final* Results within the statutory time-frame.  JBF

RAK was not prejudiced by Commerce's decision to modify the proceedings.  This is a

reasonable exercise of agency discretion. *See PSC VSMPO*, 688 F.3d at 760.  Indeed, Commerce

has issued post-preliminary determinations in the past without issue. *See, e.g.*, *Timken*, 968 F.

Supp. 2d 1279.  Commerce's decision to issue a post-preliminary determination in this case was

reasonable.

### D. Targeted Dumping Analysis

JBF RAK claims that Commerce's targeted dumping analysis under 19 U.S.C. § 1677f-

1(d)(1)(B) failed to provide an explanation "as to why and how the alleged targeted customers,

and time periods were selected and thus allegedly resulted in targeted dumping."  JBF RAK Br.

15.  According to JBF RAK, "such explanation is necessary for the Department to initiate a

targeted dumping inquiry, because it is required to determine whether any observed pricing

pattern is the result of intentional targeted dumping strategy." JBF RAK Br. 15. The court

disagrees.

Section § 1677f-1(d)(1)(B) provides:

The administering authority may determine whether the subject merchandise is
being sold in the United States at less than fair value by comparing the weighted
average of the normal values to the export prices (or constructed export prices) of
individual transactions for comparable merchandise, if—

(i) there is a pattern of export prices (or constructed export prices) for
comparable merchandise that differ significantly among purchasers,
regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be
taken into account using [the A-A methodology or the transaction-to-
transaction methodology].

§ 1677f-1(d)(1)(B). The "'pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or periods of time' is what is

referred to as 'targeted dumping.'" *Timken*, 968 F. Supp. 2d at 1282. Targeted dumping,

therefore, is a statutorily defined set of pricing patterns that permit Commerce to apply an

alternative comparison methodology in antidumping investigations and reviews.

Commerce has established a methodology known as the *Nails* test to determine whether a

targeted dumping analysis is appropriate. *See Certain Steel Nails from the People's Republic of*

*China: Final Determination of Sales at Less than Fair Value and Partial Affirmative*

*Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008);

*Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at*

*Not Less than Fair Value*, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008). The *Nails* test

involves a two-step analysis:

In the first stage of the test, the "standard-deviation test," we determined the
volume of the allegedly targeted group's (*i.e.*, purchaser, region or time period)

sales of subject merchandise (by sales volume) that are at prices more than one standard deviation below the weighted- average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the *Nails* Test. If that volume exceeded 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the *Nails* Test.

In the second stage, the "gap test," we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for allegedly targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non- targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted group's sales were not included in the non-targeted groups; the allegedly targeted group's average price was compared only to the average prices for the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the *Nails* Test.

*Issues and Decision Memorandum* at 9.  The Court has upheld the *Nails* test as reasonable. *See*

*Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp. 2d 1370, 1376-80

(2010).

Here, Commerce determined that JBF RAK's sales satisfied the *Nails* test and applied its

average-to-transaction comparison methodology to calculate JBF RAK's dumping margin. *See*

*Issues and Decision Memorandum* at 9-10.  Commerce, however, did not consider why JBF

RAK's sales demonstrated a pattern of export prices that differ significantly among purchasers,

regions, or periods of time. *See id.*  Commerce rejected JBF RAK's argument suggesting that

Commerce must consider whether a given respondent intended to engage in targeted dumping to

satisfy the statute.  *See id.* at 10.  Commerce is correct.

Section 1677f-1(d)(1)(B) does not require Commerce to investigate the various reasons why a particular respondent's U.S. sales demonstrate a pattern of targeted dumping. Rather, the statute instructs Commerce to look at U.S. sales price only in making a determination of targeted dumping. *See id.* The *Nails* test implements the statute by providing greater specificity on how Commerce evaluates these prices across the targeted group's sales of the subject merchandise. *See Issues and Decision Memorandum* at 9. This constitutes a permissible construction of the statute. JBF RAK, though, urges the court to read into the statute some sort of "intent" requirement not mentioned in the text of the statute or legislative history. The court cannot adopt such an interpretation. It would add a new element to the targeted dumping analysis, requiring Commerce to also consider whether respondents intended to engage in targeted dumping. *See Viraj Group v. United States*, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007). This "would create a tremendous burden on Commerce that is not required or suggested by the statute." *Id.* at 1358.

### E. Home Market Sales: Model Matching

JBF RAK next claims that Commerce erred by not comparing home market sales of non-prime merchandise (grade B film) with United States sales of prime merchandise (grade A film). JBF Br. 18-21. Unfortunately, though, JBF RAK has recycled its argument from its administrative case brief (verbatim) without attempting to analyze Commerce's findings and conclusions against the operative standard of review. *Compare* JBR RAK Admin. Case Br. 10-13, *with* JBF RAK Br. 18-21; *see* USCIT R. 56.2(c)(1) ("briefs . . . must include . . . the issues of law presented together with the reasons for contesting or supporting the administrative determination, specifying how the determination may be arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, unsupported by substantial evidence; or, how the determination may be unwarranted by the facts to the extent that the agency may or may not have considered facts which, as a matter of law, should have been properly considered."). JBF

RAK attempted this same form of litigation in a previous proceeding, which this court

summarily rejected. *See JBF RAK LLC v. United States*, 38 CIT __, __, 961 F. Supp. 2d 1274,

1281 (2014).  Arguments made before the administrative agency may, of course, be restated in a

judicial proceeding but must conform to the different requirements of each process.  Here, JBF

RAK's arguments do not.  Therefore, the court will do the same as it did in the previous case and

deem the issue waived.

*F. 15-Day Liquidation Policy*

JBF RAK's final claim is a challenge to Commerce's 15-day liquidation policy.  JBF

RAK Br. 21.  JBF RAK argues, as it did in the previous proceeding, that the *SKF* cases render

Commerce's 15-day liquidation policy unlawful as a matter of law. *See JBF RAK LLC*, 961 F.

Supp. 2d at 1279.  It therefore argues that Commerce is ignoring the Court's declaratory

judgment by continuing to apply its policy to other respondents involved in trade disputes before

the agency.  Commerce, for its part, contends that the court lacks jurisdiction to review this issue

because JBF RAK did not suffer any harm and therefore does not have standing to challenge

Commerce's 15-day policy. Def. Br. 35.  Alternatively, Commerce argues that Commerce's 15-

day liquidation policy is a reasonable interpretation of the statute. Def. Br. 38.

The court has already considered and rejected Commerce's jurisdictional argument on

this issue in a previous proceeding. *See JBF RAK LLC v. United States*, Court No. 11-00141,

Docket Entry No. 30 (Oct. 12, 2011) (order denying motion to dismiss). In the court's view, JBF

RAK has properly established jurisdiction under 28 U.S.C. § 1581(i) and may therefore

challenge Commerce's 15-day liquidation policy. *See* Amended Compl. ¶¶ 2, 49, 50.  The real

question here is whether JBF RAK has presented this issue in a manner suitable for judicial

review.  The answer is no.

JBF RAK has framed this issue as though the *SKF* decisions render Commerce's 15-day policy unlawful as a matter of law. JBF RAK Br. 20-23. As the court has already explained, *see JBF RAK LLC*, 961 F. Supp. 2d at 1279, this is incorrect. The *SKF* decisions represent persuasive authority. But there are other decisions by the Court that have held Commerce's 15-day liquidation policy to be a reasonable interpretation of the statute. *See Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1141, 502 F. Supp. 2d 1295, 1313 (2007); *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 736, 491 F. Supp. 2d 1273, 1279 (2007); *Mukand Int. Ltd. v. United States*, 30 CIT 1309, 1312, 452 F. Supp. 2d 1329, 1332 (2006). These decisions are also persuasive authority. JBF RAK does not mention these other decisions as contrary authority, nor does it attempt to distinguish them from this particular case.

JBF RAK also fails to apply the *Chevron* framework (as the court must do) to analyze the many competing policy issues implicated by this legal question. *See, e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 2014 WL 1613883 at *3 (Fed. Cir. 2014). JBF RAK does not address Commerce's findings and conclusions on this issue in the *Final Results*. *See Issues and Decision Memorandum* at 13-14. It simply quotes language from selected *SKF* decisions and then states in conclusory terms that Commerce's 15-day policy is unlawful. JBF RAK Br. 20-23. If the court were to review the issue in this context, it would first have to assume the role of co-plaintiff, reframe JBF RAK's arguments under the *Chevron* framework, wrestle with the existing decisions on this issue, and analyze Commerce's 15-day policy under that framework. The court would effectively be litigating the issue for JBF RAK, which is something it cannot do. *See United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578, 659 F.Supp.2d 1303, 1308 (2009) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived. It is not enough merely to mention a possible

argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for

the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17

(1st Cir. 1990)).  Accordingly, the court deems the issue waived.

## IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained.  Judgment will be

entered accordingly.

Dated:  __July 1, 2014_____                    _____/s/ Judith M. Barzilay_____ _____
              New York, New York                        Judith M. Barzilay, Senior Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

---

JBF RAK LLC,

                Plaintiff,

    v.

UNITED STATES,

                Defendant,

    and

MITSUBISHI POLYESTER FILM, INC.,
DUPONT TEIJIN FILMS and SKC, INC.,

                Defendant-Intervenors.

Before: Judith M. Barzilay, Senior Judge

Court No. 13-00211

## **JUDGMENT**

Upon consideration of Plaintiff's motion for judgment on the agency record, Defendant's response in opposition, and all other papers in this action, and upon due deliberation, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained.

Dated:  July 1,  2014                         /s/ Judith M. Barzilay
      New York, NY                    Judith M. Barzilay, Senior Judge

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

Oct 27, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

JACK MLAWSKI

/S/JACK MLAWSKI

Name of Counsel                          Signature of Counsel

Law Firm    GALVIN & MLAWSKI

Address    245 FIFTH AVENUE, SUITE 1902

City, State, ZIP    NEW YORK, NEW YORK 10016

Telephone Number    212 679-1500

FAX Number    212 971-0417

E-mail Address    JM@CUSTOMSLAW.COM

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

**CERTIFICATE OF COMPLIANCE W1TH TYPE-VOLUME**

**LIMITATION,**

**TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule Appellate Procedure 32(a)(7)(B).

The brief contains 6942 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies wiih the typeface requirements of Federal Rule Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionaly spaced typeface using Microsoft Word in Times New Roman 14 point font size.

<u>/s/ Jack Mlawski</u>
JackMlawski
Counsel for Plaintiff-Appellant

October  27, 2014