2014-1774

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

JBF RAK LLC,

Plaintiff - Appellant

v.

UNITED STATES,

Defendant - Appellee,

and

MITSUBISHI POLYESTER FILM, INC.,
DUPONT TEIJIN FILMS, and SKC, INC.

Defendants.

_____

Appeal from the United States Court of International Trade in case no.
13-CV-00211, Senior Judge Judith M. Barzilay

_____

## CORRECTED NON CONFIDENTIAL JOINT APPENDIX

Jack D. Mlawski
Galvin & Mlawski
245 Fifth Avenue
Suite 1902
New York, NY 10016
Tel: (212) 679-1500
*Counsel for Plaintiff- Appellant JBF
RAK LLC*

JOYCE R. BRANDA
Acting Assistant Attorney General


JEANNE E. DAVIDSON
Director
PATRICIA M. McCARTHY
OF COUNSEL:                              Assistant Director

DEVIN S. SIKES                           MELISSA M. DEVINE
Attorney                                 Trial Attorney
 Office of the Chief Counsel             Commercial Litigation Branch
   for Trade Enforcement & Compliance    Civil Division
Department of Commerce                   Department of Justice
                                         P.O. Box 480
                                         Ben Franklin Station
                                         Washington, D.C. 20044
                                         Telephone: (202) 616-0341
                                         Facsimile: (202) 514-8624
                                         melissa.m.devine@usdoj.gov

                                         Attorneys for Defendant-Appellee

NONCONFIDENTIAL JOINT APPENDIX
*JBF RAK LLC v. United States*, 2014-1774

## TABLE OF CONTENTS

*Jt. APP. 82, 86, 89-122, 165 CONTAINING CONFIDENTIAL INFORMATION SUBJECT TO ADMINISTRATIVE PROTECTIVE ORDER DELETED FROM NONCONFIDENTIAL JOINT APPENDIX*

Administrative Protective Order, December 11, 2011, In the Matter of the Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate (Pet) Film from United Arab Emirates (A-520-803) (11/1/10-10/31/11)
............................................................................................ Jt. App. i

Decision and Judgment, *JBF RAK LLC v. United States*, Slip Op. 14-78 (CIT July 1, 2014)
............................................................................................ Jt. App. 1

Docket - *JBF RAK LLC v. United States*, Slip Op. 14-78 (CIT July 1, 2014)
............................................................................................Jt. App. 21

Galvin & Mlawski letter dated November 30, 2011 to Secretary of Commerce pertaining to JBF request for Administrative Review, PR Doc.1
............................................................................................Jt. App. 29

Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Secretary of Commerce pertaining to Petitioners request for administrative review (Nov. 30, 2011), page 1
............................................................................................ Jt. App.34

Letter, November 16, 2012, from Petitioners to Acting Secretary of Commerce pertaining to pre-preliminary comments, C.R. Doc. 130
............................................................................................ Jt. App.73

Memo from IA to DAS/IA pertaining to JBF, Flex decision, PR 105
............................................................................................ Jt. App.123

Notice published from IA to file pertaining to Flex, JBF preliminary determination, FR (Dec. 7, 2012) PR 106
................................................................................................. Jt. App.132

Brief from Galvin & Mlawski to acting Secretary of Commerce pertaining to case brief (Jan. 14, 2013) PR116
.................................................................................................Jt. App.134

Memo from IA TO AS/IA pertaining to JBF Post Preliminary Analysis (Mar. 8, 2013) PR 123
................................................................................................. Jt. App.159

Memo to IA to file pertaining to JBF post preliminary calculation (Mar. 11, 2013), page 1 PR 124
.................................................................................................Jt. App.164

Memo from IA to file pertaining to JBF post preliminary calculation (Mar. 11, 2013), page 2, CR 149
................................................................................................. Jt. App.165

Brief from Galvin & Mlawski to Acting Secretary of Commerce pertaining to JBF case brief (Mar. 18, 2013) PR 128
................................................................................................. Jt. App.166

Memo from IA to AS/IA pertaining to interested parties, Final I&D (May 14, 2013) PR134
................................................................................................. Jt. App.188

FR notice published from IA to file pertaining to interested parties, FR notice for final (May 21, 2013) PR135
................................................................................................. Jt. App.202

Memo from IA to file pertaining to JBF, Final analysis (May 21, 2013), page 1 PR 138
................................................................................................. Jt. App.205

JBF RAK LLC Trial Court Opening Brief (excerpts)

................................................................................................. Jt. App. 214

JBF RAK LLC Trial Court Reply Brief (excerpts)
.................... ........................................................................................ Jt. App. 244

A-520-803
Administrative Review
11/1/10-10/31/11
Public Document
APO: Lohre Holter

In the Matter of the Administrative Review of the Antidumping Duty Order on
Polyethylene Terephthalate (Pet) Film from United Arab Emirates (A-520-803)
(11/1/10-10/31/11)

ADMINISTRATIVE PROTECTIVE ORDER

IT IS HEREBY ORDERED THAT:

All business proprietary information submitted in the above-referenced segment of the proceeding, including new information submitted in a remand during litigation on this segment of the proceeding, which the submitting party agrees to release or the Department of Commerce ("the Department") determines to release, will be released to the authorized applicants on the administrative protective order ("APO") service list for this segment of the proceeding, except the following:

• customer names in an investigation; and

• specific information of a type for which the Department determines there is a clear and compelling need to withhold from disclosure.

**USE OF BUSINESS PROPRIETARY INFORMATION UNDER THIS APO**

An authorized applicant may use business proprietary information submitted in this segment of the proceeding in this segment. If business proprietary information that is submitted in this segment of the proceeding is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews. If business proprietary information submitted in this segment of the proceeding is relevant to an issue in other segments of this proceeding (such as scope, anticircumvention, changed circumstances) that are initiated before publication of the final results in the second consecutive subsequent administrative review, an authorized applicant may place such information on the record of those
segments. At the conclusion of the second consecutive subsequent administrative review or at such earlier date as the Department may determine to be appropriate, the authorized applicant must certify to the destruction of business proprietary information within 30 days in accordance with item 6 of this APO. The existence of a judicial protective order in a subsequent administrative review does not extend the deadline for destruction of business proprietary information subject to this APO.

**REQUIREMENTS FOR AUTHORIZED APPLICANTS**

All applicants authorized to have access to business proprietary information under this APO are subject to the following terms:

1. The authorized applicant must establish and follow procedures to ensure that no employee of the authorized applicant's firm releases business proprietary information to any person other than the submitting party, an authorized applicant, or the appropriate Department official identified in section 351.306(a) of the regulations. No person in the authorized applicant's firm may release business proprietary information received under this APO to any person other than those described in this paragraph.

2. The authorized applicant may allow APO access to one or more paralegals, law clerks, secretaries, or other support staff employed by or on behalf of the applicant's firm and operating within the confines of the firm. The authorized applicant also may use the services of subcontracted individuals to transport business proprietary information released by the Department and to deliver APO information to other parties. All support staff must sign and date an acknowledgment that they will abide by the terms and conditions of the APO at the time they are first permitted access to any information subject to APO.

3. The authorized applicant must ensure that business proprietary information in an electronic format will not be accessible to parties not authorized to receive business proprietary information.

JT. App. i

A-520-803

4. The authorized applicant must pay all reasonable costs incurred by the submitter of the electronic business proprietary information for the copying of its electronic information released to the authorized applicant, if payment is requested. Reasonable costs include the cost of the electronic medium and the cost of copying the complete proprietary version of the electronic information/medium submitted to the Department in APO releasable form, but not costs borne by the submitter of the electronic data in the creation of the electronic data/medium submitted to the Department.

## NOTIFICATION REQUIREMENTS

5. If changed circumstances affect the authorized applicant's representation of an interested party at any time authorized under this APO (i.e., reassignment, departure from firm), the authorized applicant must notify the Department in accordance with section 351.305(a)(2) of the regulations.

6. At the expiration of the time specified in this APO, the authorized applicant must destroy all business proprietary information and notify the Department of the destruction in accordance with section 351.305(a)(3) of the regulations, or provide to the Department official responsible for the administration of the APO in this segment of the proceeding a protective order issued by a court or in a binational panel proceeding.

## SANCTIONS FOR BREACH OF THIS APO

7. The authorized applicant will be subject to any or all of the sanctions described in 19 C.F.R. Part 354 if there is a violation of this APO by the authorized applicant or any of the persons identified in item 8 of this APO.

8. The authorized applicant will accept full responsibility, individually and on behalf of the authorized applicant's firm or corporate office, for violation of this APO by any employee of the firm or corporate office, support staff retained by the firm or corporate office, or any other consultant, expert, or other outside staff retained for the subject proceeding, who is permitted access to APO information.

9. The authorized applicant will promptly report and confirm in writing any possible violation of this APO to the Department.

A-520-803
## DEFINITIONS

For purposes of this APO , the following definitions apply:

"**Representative**" is an individual, enterprise, or entity acting on behalf of an interested party.

"**Applicant**" is an individual representative of an interested party who has applied for access to business proprietary information under this APO.

"**Authorized Applicant**"is an applicant that the Secretary has authorized to receive business proprietary information under this APO.

"**Lead firm**" is the firm that will be the primary contact with the Department and that will accept service of all documents for the party it represents where two firms independently have access under APO.

"**Support staff**" includes paralegals, law clerks, secretaries and other support staff that are employed by or on behalf of the applicant's firm, are operating within the premises of the firm, and work under the supervision of an authorized applicant, as well as subcontractors of the firm providing similar support staff functions.

"**Electronic data**" includes (1) data submitted by a party, generated by the Department, or entered by the recipient on computer tape, disk, diskette, or any other electronic computer medium; and (2) all electronic work products resulting from manipulation of this data, as transferred in any form onto any other electronic computer medium, such as tape, disk, diskette, Bernoulli cartridge, removable disk pack, etc.

*original on file*

Evangeline D. Keenan
Director, APO/Dockets Unit
Import Administration

JT. App. i i

12/30/2011
_____

(date)

A-520-803

JT. App. i i i

Slip Op. 14- 78

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| JBF RAK LLC, | |
| Plaintiff, | |
| v. | Before: Judith M. Barzilay, Senior Judge |
| UNITED STATES, | Court No. 13-00211 |
| Defendant, | |
| and | |
| MITSUBISHI POLYESTER FILM, INC., DUPONT TEIJIN FILMS and SKC, INC., | |
| Defendant-Intervenors. | |

## **OPINION**

[Commerce's final results are sustained.]

July 1, 2014

*Jack D. Mlawski* and *John J. Galvin*, Galvin & Mlawski, for Plaintiff.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, (*Melissa M. Devine*), Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of counsel, *Devin S. Sikes*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Ronald I. Meltzer*, *Patrick J. McLain*, *David M. Horn*, and *Jeffrey I. Kessler*, Wilmer Cutler Pickering Hale and Dorr LLP, for Defendant-Intervenors.

BARZILAY, Senior Judge: Before the court is Plaintiff JBF RAK LLC's ("JBF RAK")

motion for judgment on the agency record under USCIT Rule 56.2, challenging Defendant U.S.

Department of Commerce's ("Commerce") final results of the administrative review covering

polyethylene terephthalate film ("PET Film") from United Arab Emirates for the November 1,

2010 through October 31, 2011 period of review. *See Polyethylene Terephthalate Film, Sheet,*

*and Strip From the United Arab Emirates*, 78 Fed. Reg. 29,700 (Dep't Commerce May 21, 2013)

(final results) ("*Final Results*"); *Issues and Decision Memorandum for Polyethylene*

*Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, A-520-803 (May 13, 2013)

("*Issues and Decision Memorandum*"), *available at*

http://enforcement.trade.gov/frn/summary/uae/2013-12086-1.pdf (last visited July 1, 2014).

Specifically, JBF RAK claims that (1) Commerce unlawfully applied its targeted dumping

methodology in the context of an administrative review; (2) Commerce improperly considered

petitioners' allegation of targeted dumping; (3) Commerce unlawfully issued a post-preliminary

determination; (4) Commerce failed to consider certain facts about JBF RAK's pricing practices

in its targeted dumping determination; (5) Commerce's improperly applied its model matching

methodology; and (6) Commerce unlawfully applied its 15-Day Rule for issuing liquidation

instructions. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and (i). For the reasons

set forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. §

1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains

Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

More specifically, when reviewing agency determinations, findings, or conclusions for

substantial evidence, the court assesses whether the agency action is "reasonable and supported

by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (internal quotations and citation omitted). Substantial evidence has been described as

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984) ("*Chevron*"), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

JBF RAK is a manufacturer and exporter of PET Film from the United Arab Emirates. JBF RAK and other interested parties requested that Commerce conduct an administrative review of the antidumping duty order on PET Film covering the November 1, 2010 through October 31, 2011 period of review. After Commerce initiated the review, but before publishing the preliminary results, petitioners filed an allegation of targeted dumping against JBF RAK. Commerce published its preliminary results and assigned JBF RAK a dumping margin of 5.31% using its average-to-average comparison methodology. *See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 77 Fed. Reg. 73,010 (Dep't Commerce Dec. 7, 2012) (preliminary results) ("*Preliminary Results*"). Commerce, though, indicated that it did not have sufficient time to analyze the targeted dumping issue and therefore addressed it later in the proceeding.

Commerce published a post-preliminary determination addressing the issue of targeted dumping on March 8, 2013. *See 2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Post-Preliminary Analysis and Calculation Memorandum of JBF RAK LLC*, A-520-803 (Dep't Commerce Mar. 8, 2013) ("*Post-Preliminary Determination*"). Commerce preliminarily concluded that JBF RAK had engaged in targeted dumping and assigned a revised dumping margin of 9.80% using its average-to-transaction comparison methodology. Commerce then invited interested parties to comment on its targeted dumping analysis. In the *Final Results*, Commerce continued to apply the average-to-transaction comparison methodology and assigned JBF RAK a dumping margin of 9.80%. *See Final Results*, 78 Fed. Reg. 29,700.

### III. DISCUSSION

*A. Targeted Dumping in Administrative Reviews*

JBF RAK argues that there is no statutory authority for Commerce to consider an allegation of targeted dumping in the context of an administrative review. JBF RAK Br. 6. It claims that 19 U.S.C. § 1677f-1(d) authorizes Commerce to apply its average-to-transaction comparison method in the context of an investigation, but does not authorize Commerce to apply that methodology in the context of a review. JBF RAK Br. 7-8. JBF RAK claims that Commerce's application of the average-to-transaction comparison methodology in the context of a review violates the statute. JBF RAK Br. 8-9. The court disagrees.

In an administrative review, the statute requires Commerce to review and determine the amount of any antidumping duty, 19 U.S.C. § 1675(a)(1)(B), by calculating the normal value and export price (or constructed export price) of each entry of subject merchandise, and the dumping margin of each such entry. § 1675(a)(2)(A). The term "dumping margin" is defined by statute as "the amount by which normal value exceeds the export price or constructed export price of the

subject merchandise. § 1677(35)(A).  Section 1677f-1(d), in turn, establishes three different

methods by which Commerce may compare normal value with export price to determine whether

merchandise is being sold for less than fair value (*i.e.*, dumping).  *See also* H.R. Doc. No. 103-

316 vol. I (1994), reprinted in 19 U.S.C.C.A.N. 3373 ("SAA").  Although the statute places some

restrictions on Commerce's selection of a particular methodology in investigations, *see* § 1677f-

1(d)(1), it is silent with respect to administrative reviews. *See* § 1677f-1(d)(2).  Commerce,

therefore, has exercised its gap-filling discretion by applying a comparison methodology in

reviews that parallels the methodology used in investigations. *See Antidumping Proceedings:*

*Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain*

*Antidumping Proceedings,* 77 Fed. Reg. 8,101, 8,102 (Dep't of Commerce Feb. 14, 2012).

Commerce promulgated a regulation that codifies its approach in both investigations and

reviews. *See* 19 C.F.R. § 351.414.  It states that in "an investigation or review, the Secretary will

use the average-to-average method unless the Secretary determines another method is

appropriate in a particular case."  *Id.* § 351.414(c)(1). This gives Commerce discretion to apply

its average-to-transaction methodology when the facts of a particular case justify using it rather

than the average-to-average methodology.

  Contrary to JBF RAK's claims, Commerce's decision to apply its average-to-transaction

comparison methodology in the context of an administrative review is reasonable.  As

Commerce explained,

> The silence of the statute with regard to application of an alternative comparison
> methodology in administrative reviews does not preclude the Department from
> applying such a practice. Indeed, the Court of Appeals for the Federal Circuit
> (Federal Circuit) has stated that courts "must, as we do, defer to Commerce's
> reasonable construction of its governing statute where Congress 'leaves a gap in
> the construction of the statute that the administrative agency is explicitly
> authorized to fill or implicitly delegates legislative authority, as evidenced by the
> agency's generally conferred authority and other statutory circumstances.'"
> Further, the Court of International Trade has stated that this "silence has been

interpreted as 'an invitation' for an agency administering unfair trade law to 'perform its duties in the way it believes most suitable' and courts will uphold these decisions '{s}o long as the {agency}'s analysis does not violate any statute and is not otherwise arbitrary and capricious.'" We find that the above discussion of the extension of the statute with respect to investigations is a logical, reasonable, and deliberative method to fill the silence with regard to administrative reviews.

Further, the Department's revision of its practice with regard to administrative reviews, and to follow its World Trade Organization (WTO)-consistent practice for investigations, was a deliberate decision on the part of the Executive Branch pursuant to the authority provided in section 123 of the Uruguay Round Agreements Act. Specifically, the Executive Branch solicited public comments, consulted with the appropriate congressional committees, and issued a preliminary and final determination. This decision was made in order to implement several adverse WTO reports in which it was found that the United States was not meeting its WTO obligations.

*Issues and Decision Memorandum* at 6.

Commerce has provided a legitimate explanation for applying its targeted dumping methodology in this context. It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews. The fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties. In fact, this is precisely the type of the situation where Commerce would be expected to establish comparison methodologies to apply in administrative reviews. This deliberate policy choice by Commerce does not violate the statute or SAA. Moreover, it does not violate any rules of statutory interpretation as suggested by JBF RAK. JBF RAK Br. 8. It is therefore a reasonable exercise of Commerce's gap-filling authority under 19 U.S.C. 1677f-1(d). Indeed, this Court has already considered another case in which Commerce applied its targeted dumping methodology in the context of an administrative review. *See Timken Co. v. United States*, 38 CIT __, 968 F. Supp. 2d 1279 (2014) ("*Timken*"). Although this particular issue was

never raised, *Timken* does imply that Commerce may lawfully apply its targeted dumping

methodology in reviews.

JBF RAK cites several court decisions to support its argument but, unfortunately, has

cherry-picked various quotes and mischaracterized the legal principles established in those

decisions to advance its preferred outcome.  JBF RAK Br. 8 (citing *FAG Italia S.p.A. v. United

States*, 291 F.3d 806 (Fed. Cir. 2002), *Nken v. Holder*, 556 U.S. 418, 430 (2009), *Brown v.

Gardner*, 513 U.S. 115, 120 (1994)).  Commerce explained, and the court agrees, that these cases

have no application here.  *See Issues and Decision Memorandum* at 6-7 ("With respect to *FAG

Italia*, JBF mischaracterizes the Federal Circuit's holding. In that case, and unlike the instant

review, the Federal Circuit determined that the statute unambiguously did not provide the

Department with the authority to take action because the 'absence of a statutory probation cannot

be the source of agency authority.' . . . [T]he Act provides the Department with the authority to

engage in comparisons between normal value and export price to calculate dumping margins;

however, as explained above, in the context of an administrative review, the Act does not state

explicitly which method the Department must use in so doing. The Department has reasonably

filled that gap to allow it to use the A-T comparison method when it encounters certain patterns

of export prices. Thus, *FAG Italia* is inapposite to the current proceeding. Similarly, in *Brown*,

the Supreme Court found the relevant statutory language at issue to include express terms that

resolved the inquiry. 513 U.S. at 120. However, as explained above, the provision at issue in this

proceeding does not expressly resolve the issue. Consequently, *Brown* does not support JBF's

arguments. Finally, as to *Nken*, that case did not involve an interpretation of a statute under the

*Chevron* framework by which the Department also must interpret the Act and, thus, concerns a

different scenario than that faced by the Department in this proceeding.").  The court will

therefore sustain Commerce's decision to apply its average-to-transaction methodology in the

context of an administrative review as a permissible construction of the statute.

### B. Timeliness of Targeted Dumping Allegation

JBF RAK also claims that Commerce improperly considered the targeted dumping

allegation because it was filed too late in the administrative proceedings. More specifically, JBF

RAK argues that petitioners failed to file their targeted dumping allegation at least thirty-days

before the preliminary determination as required by the old regulation, 19 C.F.R. § 351.301(d)(5)

(2007) (repealed). JBF RAK Br. 9-10. This argument implicates a secondary argument

concerning whether Commerce properly withdrew its targeting dumping regulations in 2008.

JBF RAK Br. 10 (citing *Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT __, 918 F.

Supp. 2d 1317 (2013) ("*Gold East*")). Alternatively, JBF RAK argues that if the old regulation

does not apply, then petitioners' targeted dumping allegation is nevertheless untimely under 19

C.F.R. § 351.301(b)(1)(2) and 19 C.F.R. § 351.301(c)(1). JBF RAK Br. 11-14.

JBF RAK has failed to exhaust its administrative remedies on its claims involving 19

C.F.R. § 351.301(d)(5) (2007) and 19 C.F.R. § 351.301(b)(1)(2).

> Requiring exhaustion can protect administrative agency authority and
> promote judicial efficiency. *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S. Ct.
> 1081, 117 L.Ed.2d 291 (1992). The requirement can protect an agency's interest
> in being the initial decisionmaker in implementing the statutes defining its tasks.
> *Id*. And it can serve judicial efficiency by promoting development of an agency
> record that is adequate for later court review and by giving an agency a full
> opportunity to correct errors and thereby narrow or even eliminate disputes
> needing judicial resolution. *Id.* at 145–46, 112 S. Ct. 1081. At the same time, "the
> interest of the individual in retaining prompt access to a federal judicial forum" is
> taken into account in deciding when exhaustion is demanded in order to protect
> "institutional interests." *Id.* at 146, 112 S. Ct. 1081.

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).

JBF RAK did not present these arguments to Commerce when it had the opportunity. It

did not mention that 19 C.F.R. § 351.301(d)(5) and 19 C.F.R. § 351.301(b)(1)(2) prohibited

Commerce from considering petitioners' targeted dumping allegation. *See* JBF RAK Admin.

Case Br. 5; JBF RAK Resp. to Post-Prelim. Results 5. It could have raised these arguments in its

comments to the post-preliminary determination or its administrative case brief. *Id.* By not

presenting them at the appropriate time, JBF RAK deprived Commerce of the opportunity to

"apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial

review-advancing the twin purposes of protecting administrative agency authority and promoting

judicial efficiency." *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp.

2d 1344, 1346 (2006).

JBF RAK contends that requiring exhaustion is not appropriate with respect to its

argument involving 19 C.F.R. § 351.301(d)(5) because *Gold East* represents intervening legal

authority (effectively reinstating the regulation) and therefore qualifies as an exception to the

exhaustion requirement. JBF RAK Reply Br. 11. This presents an interesting academic question

but it is one the court need not answer. Even if the court were to accept that the targeted

dumping regulations are somehow operative in this case, the government may waive its

procedural deadlines under general principles of administrative law. *See, e.g.*, *Am. Farm Lines v.*

*Black Ball Freight Service*, 397 U.S. 532, 538 (1970) ("Thus there is no reason to exempt this

case from the general principle that '[i]t is always within the discretion of a court or an

administrative agency to relax or modify its procedural rules adopted for the orderly transaction

of business before it when in a given case the ends of justice require it. The action of either in

such a case is not reviewable except upon a showing of substantial prejudice to the complaining

party."). The burden, therefore, is on JBF RAK to demonstrate that it was substantially

prejudiced by Commerce's supposed violation of its regulatory deadlines. JBF RAK has made

no showing that it was substantially prejudiced by Commerce's decision to review the targeted

dumping allegation. It appears instead that JBF RAK is attempting to avoid application of the

targeted dumping remedy based on a technicality. This is ultimately a losing argument.

JBF RAK's also challenges Commerce's decision to consider the allegation of targeted

dumping under 19 C.F.R. § 351.301(a) & (c)(1).[1]  JBF RAK argues that the allegation of

targeted dumping constitutes rebuttal factual information under the regulation. JBF RAF Br. 13.

According to JBF RAK, Commerce should have rejected the allegation as untimely factual

information. JBF RAK Br. 13.  This argument is not persuasive.

Section 351.301(a) provides:

> The Department obtains most of its factual information in antidumping and
> countervailing duty proceedings from submissions made by interested parties
> during the course of the proceeding. This section sets forth the time limits for
> submitting such factual information, including information in questionnaire
> responses, publicly available information to value factors in nonmarket economy
> cases, allegations concerning market viability, allegations of sales at prices below
> the cost of production, countervailable subsidy allegations, and upstream subsidy
> allegations. Section 351.302 sets forth the procedures for requesting an extension
> of such time limits. Section 351.303 contains the procedural rules regarding filing,
> format, translation, service, and certification of documents.

19 C.F.R. § 351.301(a) (2012).  Section 351.301(c)(1) then states:

> Any interested party may submit factual information to rebut, clarify, or correct
> factual information submitted by any other interested party at any time prior to the
> deadline provided in this section for submission of such factual information. If
> factual information is submitted less than 10 days before, on, or after (normally
> only with the Department's permission) the applicable deadline for submission of
> such factual information, an interested party may submit factual information to
> rebut, clarify, or correct the factual information no later than 10 days after the date
> such factual information is served on the interested party or, if appropriate, made
> available under APO to the authorized applicant.

19 C.F.R. § 351.301(c)(1) (2012).

---

[1]  During the course of this review, Commerce modified subsections (a), (b) and (c) to 19 C.F.R.
§ 351.301. *See Definition of Factual Information and Time Limits for Submission of Factual
Information*, 78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013). Those modifications did
not apply to the underlying review. The 2012 version of section 351.301 is available at
http://www.gpo.gov/fdsys/pkg/CFR-2012-title19-vol3/pdf/CFR-2012-title19-vol3-part351.pdf.

In the *Final Results*, Commerce did not view petitioners' allegation of targeted dumping

as "factual information" under § 351.301(c)(1).  Commerce explained:

> JBF's arguments on the timeliness of the allegation are unpersuasive. While 19
> C.F.R. § 351.301(c)(1) pertains to rebuttal factual information, Petitioners'
> targeted dumping allegation cannot reasonably be characterized as rebuttal factual
> information, as JBF claims. Rather, Petitioners used the information on the record
> of this review for purposes of advocating that the Department consider using a
> different method to compare normal value and export price (or constructed export
> price). However, that does not transform Petitioners' allegation into the
> submission of facts, for the facts that served as the basis for Petitioners' claim
> already were on the record. In other words, Petitioners did not submit additional
> facts to disprove anything that JBF previously submitted; instead, Petitioners
> relied upon the very facts submitted by JBF to make an allegation. Moreover, in
> its regulations, the Department explicitly has delineated factual submissions from
> documents containing allegations similar to Petitioners' targeted dumping
> allegation. Because the nature of the filings listed in 19 C.F.R. § 351.301(d)
> closely resemble Petitioners' targeted dumping allegation, (and in fact the now-
> withdrawn targeted dumping allegation was listed under that very provision), it
> stands to reason that the Department properly considered Petitioners' submission
> as an allegation and not rebuttal factual information.

*Issues and Decision Memorandum* at 7-8.

Commerce reasonably rejected JBF RAK's argument on this issue.  Petitioners used

factual information already on the record (submitted by JBF RAK) as the basis for their targeted

dumping allegation.  The allegation of targeted dumping cannot be characterized as rebuttal

factual information under § 351.301(c)(1). *Cf. PSC VSMPO-Avisma Corp. v. United States*, 688

F.3d 751, 760-61 (Fed. Cir. 2013) ("*PSC VSMPO*").  The 10-day deadline mentioned in the

regulation does not apply here.  Allegations, such as an allegation of targeted dumping, are

covered by 19 C.F.R. § 351.301(d) (2012).  The court's understanding of the regulations is

consistent with Commerce's own interpretation of its regulations, which is afforded "substantial

deference unless an alternative reading is compelled by the regulation's plain language." *Mason*

*v. Shinseki*, 743 F.3d 1370, 1374-75 (Fed. Cir. 2014) (internal quotations omitted) (quoting

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Moreover, even if the allegation was untimely under a given regulation, Commerce may
"relax or modify its procedural rules adopted for the orderly transaction of business before it
when in a given case the ends of justice require it." *PAM S.p.A. v. United States*, 463 F.3d 1345,
1348 (Fed. Cir. 2006) (quoting *Am. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532,
538–39 (1970)). Therefore, Commerce's decision to review petitioners' targeted dumping
allegation represents an acceptable exercise of agency discretion.

### C. Post-Preliminary Determination

JBF RAK next argues that Commerce violated 19 U.S.C. § 1675(a)(2)(B)(iv) by issuing a
post-preliminary determination. JBF RAK claims that § 1675(a)(2)(B)(iv) only contemplates a
preliminary and final determination and therefore any additional determination issued by
Commerce is not authorized by the statute (or regulation). JBF RAK Br. 14-15. JBF RAK has
advanced a superficial legal argument that ignores general principles of administrative law.

Commerce enjoys considerable discretion in the conduct of its administrative
proceedings. The Federal Circuit has stated that "[a]bsent constitutional constraints or extremely
compelling circumstances the administrative agencies should be free to fashion their own rules
of procedure and to pursue methods of inquiry capable of permitting them to discharge their
multitudinous duties." *PSC VSMPO*, 688 F.3d at 760 (quoting *Vt. Yankee Nuclear Power Corp.
v. Nat. Res. Def. Counsel, Inc.*, 435 U.S. 519, 543-44 (1978)). Although § 1675(a)(2)(B)(iv)
establishes statutory deadlines for Commerce to publish its preliminary and final results, which
Commerce satisfied here, it does not prevent Commerce from fashioning procedures to properly
administer the antidumping statute. In the *Final Results*, Commerce explained:

> [W]hile the Act and the regulations provide deadlines for preliminary and final
> determinations in administrative reviews, the Department is not limited by any
> statutory or regulatory provision to issuing only preliminary and final results in
> such a proceeding. In this proceeding, the Department issued its Preliminary
> Results by the applicable deadline and is issuing these final results by the

applicable deadline. Moreover, the Department enjoys wide discretion in conducting its proceeding, including the allocation of resources to develop suitable approaches for new policies such as the Final Modification for Reviews. Issuing a Post-Preliminary Analysis and providing all parties with an opportunity to comment on that analysis embodies the principles of transparency and openness underlying the Act and administrative law in general. For example, when issues arise or information is submitted too late in a proceeding to be considered for the preliminary results, issuing a Post-Preliminary Analysis ensures that parties are aware of all issues before the Department releases final results and that they have an adequate opportunity to provide comments to the Department. Because all parties were provided an opportunity to comment on the Post-Preliminary Analysis (the same opportunity they were provided to comment on the Preliminary Results), JBF was not disadvantaged by this approach.

*Issues and Decision Memorandum* at 8.

Contrary to JBF RAK's claim, Commerce's decision to issue a post-preliminary determination did not violate the statute. Commerce made a decision to consider petitioners' allegation of targeted dumping in a separate determination because there was insufficient time to consider the issue given the statutory deadline for publishing the preliminary determination. Commerce gave the parties an opportunity to file comments on its *Post-Preliminary Determination* and still managed to issue the *Final* Results within the statutory time-frame. JBF RAK was not prejudiced by Commerce's decision to modify the proceedings. This is a reasonable exercise of agency discretion. *See PSC VSMPO*, 688 F.3d at 760. Indeed, Commerce has issued post-preliminary determinations in the past without issue. *See, e.g.*, *Timken*, 968 F. Supp. 2d 1279. Commerce's decision to issue a post-preliminary determination in this case was reasonable.

### D. Targeted Dumping Analysis

JBF RAK claims that Commerce's targeted dumping analysis under 19 U.S.C. § 1677f-1(d)(1)(B) failed to provide an explanation "as to why and how the alleged targeted customers, and time periods were selected and thus allegedly resulted in targeted dumping." JBF RAK Br. 15. According to JBF RAK, "such explanation is necessary for the Department to initiate a

targeted dumping inquiry, because it is required to determine whether any observed pricing pattern is the result of intentional targeted dumping strategy." JBF RAK Br. 15. The court disagrees.

Section § 1677f-1(d)(1)(B) provides:

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be taken into account using [the A-A methodology or the transaction-to-transaction methodology].

§ 1677f-1(d)(1)(B). The "'pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time' is what is referred to as 'targeted dumping.'" *Timken*, 968 F. Supp. 2d at 1282. Targeted dumping, therefore, is a statutorily defined set of pricing patterns that permit Commerce to apply an alternative comparison methodology in antidumping investigations and reviews.

Commerce has established a methodology known as the *Nails* test to determine whether a targeted dumping analysis is appropriate. *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008). The *Nails* test involves a two-step analysis:

In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's (*i.e.*, purchaser, region or time period)

sales of subject merchandise (by sales volume) that are at prices more than one standard deviation below the weighted- average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the *Nails* Test. If that volume exceeded 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the *Nails* Test.

In the second stage, the "gap test," we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for allegedly targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non- targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted group's sales were not included in the non-targeted groups; the allegedly targeted group's average price was compared only to the average prices for the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the *Nails* Test.

*Issues and Decision Memorandum* at 9.  The Court has upheld the *Nails* test as reasonable. *See*

*Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp. 2d 1370, 1376-80

(2010).

Here, Commerce determined that JBF RAK's sales satisfied the *Nails* test and applied its

average-to-transaction comparison methodology to calculate JBF RAK's dumping margin. *See*

*Issues and Decision Memorandum* at 9-10.  Commerce, however, did not consider why JBF

RAK's sales demonstrated a pattern of export prices that differ significantly among purchasers,

regions, or periods of time. *See id.*  Commerce rejected JBF RAK's argument suggesting that

Commerce must consider whether a given respondent intended to engage in targeted dumping to

satisfy the statute.  *See id.* at 10.  Commerce is correct.

Section 1677f-1(d)(1)(B) does not require Commerce to investigate the various reasons why a particular respondent's U.S. sales demonstrate a pattern of targeted dumping. Rather, the statute instructs Commerce to look at U.S. sales price only in making a determination of targeted dumping. *See id.* The *Nails* test implements the statute by providing greater specificity on how Commerce evaluates these prices across the targeted group's sales of the subject merchandise. *See Issues and Decision Memorandum* at 9. This constitutes a permissible construction of the statute. JBF RAK, though, urges the court to read into the statute some sort of "intent" requirement not mentioned in the text of the statute or legislative history. The court cannot adopt such an interpretation. It would add a new element to the targeted dumping analysis, requiring Commerce to also consider whether respondents intended to engage in targeted dumping. *See Viraj Group v. United States*, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007). This "would create a tremendous burden on Commerce that is not required or suggested by the statute." *Id.* at 1358.

### E. Home Market Sales: Model Matching

JBF RAK next claims that Commerce erred by not comparing home market sales of non-prime merchandise (grade B film) with United States sales of prime merchandise (grade A film). JBF Br. 18-21. Unfortunately, though, JBF RAK has recycled its argument from its administrative case brief (verbatim) without attempting to analyze Commerce's findings and conclusions against the operative standard of review. *Compare* JBR RAK Admin. Case Br. 10-13, *with* JBF RAK Br. 18-21; *see* USCIT R. 56.2(c)(1) ("briefs . . . must include . . . the issues of law presented together with the reasons for contesting or supporting the administrative determination, specifying how the determination may be arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, unsupported by substantial evidence; or, how the determination may be unwarranted by the facts to the extent that the agency may or may not have considered facts which, as a matter of law, should have been properly considered."). JBF

Case 1:18-cv-00711-JMC Document 45 Filed 07/05/2015 Page 25 of 159
Case 1:14-cv-00211-JMC Document 31 Filed 07/05/2015 Page 25 of 19
Court No. 13-00211                                                                          Page 17

RAK attempted this same form of litigation in a previous proceeding, which this court

summarily rejected. *See JBF RAK LLC v. United States*, 38 CIT __, __, 961 F. Supp. 2d 1274,

1281 (2014). Arguments made before the administrative agency may, of course, be restated in a

judicial proceeding but must conform to the different requirements of each process. Here, JBF

RAK's arguments do not. Therefore, the court will do the same as it did in the previous case and

deem the issue waived.

*F. 15-Day Liquidation Policy*

JBF RAK's final claim is a challenge to Commerce's 15-day liquidation policy. JBF

RAK Br. 21. JBF RAK argues, as it did in the previous proceeding, that the *SKF* cases render

Commerce's 15-day liquidation policy unlawful as a matter of law. *See JBF RAK LLC*, 961 F.

Supp. 2d at 1279. It therefore argues that Commerce is ignoring the Court's declaratory

judgment by continuing to apply its policy to other respondents involved in trade disputes before

the agency. Commerce, for its part, contends that the court lacks jurisdiction to review this issue

because JBF RAK did not suffer any harm and therefore does not have standing to challenge

Commerce's 15-day policy. Def. Br. 35. Alternatively, Commerce argues that Commerce's 15-

day liquidation policy is a reasonable interpretation of the statute. Def. Br. 38.

The court has already considered and rejected Commerce's jurisdictional argument on

this issue in a previous proceeding. *See JBF RAK LLC v. United States*, Court No. 11-00141,

Docket Entry No. 30 (Oct. 12, 2011) (order denying motion to dismiss). In the court's view, JBF

RAK has properly established jurisdiction under 28 U.S.C. § 1581(i) and may therefore

challenge Commerce's 15-day liquidation policy. *See* Amended Compl. ¶¶ 2, 49, 50. The real

question here is whether JBF RAK has presented this issue in a manner suitable for judicial

review. The answer is no.

JBF RAK has framed this issue as though the *SKF* decisions render Commerce's 15-day policy unlawful as a matter of law. JBF RAK Br. 20-23. As the court has already explained, *see JBF RAK LLC*, 961 F. Supp. 2d at 1279, this is incorrect. The *SKF* decisions represent persuasive authority. But there are other decisions by the Court that have held Commerce's 15-day liquidation policy to be a reasonable interpretation of the statute. *See Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1141, 502 F. Supp. 2d 1295, 1313 (2007); *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 736, 491 F. Supp. 2d 1273, 1279 (2007); *Mukand Int. Ltd. v. United States*, 30 CIT 1309, 1312, 452 F. Supp. 2d 1329, 1332 (2006). These decisions are also persuasive authority. JBF RAK does not mention these other decisions as contrary authority, nor does it attempt to distinguish them from this particular case.

JBF RAK also fails to apply the *Chevron* framework (as the court must do) to analyze the many competing policy issues implicated by this legal question. *See, e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 2014 WL 1613883 at *3 (Fed. Cir. 2014). JBF RAK does not address Commerce's findings and conclusions on this issue in the *Final Results*. *See Issues and Decision Memorandum* at 13-14. It simply quotes language from selected *SKF* decisions and then states in conclusory terms that Commerce's 15-day policy is unlawful. JBF RAK Br. 20-23. If the court were to review the issue in this context, it would first have to assume the role of co-plaintiff, reframe JBF RAK's arguments under the *Chevron* framework, wrestle with the existing decisions on this issue, and analyze Commerce's 15-day policy under that framework. The court would effectively be litigating the issue for JBF RAK, which is something it cannot do. *See United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578, 659 F.Supp.2d 1303, 1308 (2009) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived. It is not enough merely to mention a possible

argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for

the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17

(1st Cir. 1990)).  Accordingly, the court deems the issue waived.

## IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained.  Judgment will be

entered accordingly.


Dated:  July 1, 2014                                    /s/ Judith M. Barzilay
        New York, New York                    Judith M. Barzilay, Senior Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

JBF RAK LLC,

          Plaintiff,

   v.

UNITED STATES,

          Defendant,

   and

MITSUBISHI POLYESTER FILM, INC.,
DUPONT TEIJIN FILMS and SKC, INC.,

          Defendant-Intervenors.

Before: Judith M. Barzilay, Senior Judge

Court No. 13-00211

### JUDGMENT

Upon consideration of Plaintiff's motion for judgment on the agency record, Defendant's response in opposition, and all other papers in this action, and upon due deliberation, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained.

Dated:  July 1,  2014                              /s/ Judith M. Barzilay     
       New York, NY                         Judith M. Barzilay, Senior Judge

APPEAL,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
## CIT DOCKET FOR CASE #: 1:13-cv-00211-JMB

JBF RAK LLC v. United States
**Assigned to:** Judith M. Barzilay
**Lead Docket:**

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Category:**
Final Determination: 751 Periodic Review 19USC § 1516a(a)
(2)(B)(iii)

**Agency:**
U.S. Department of Commerce

**Product Description:**
Polyethylene Terephthalate Film

**Export Country:**
United Arab Emirates

**Date Filed:** 05/29/2013
**Jury Demand:** No

**Date Terminated:** 07/01/2014

**Date Reopened:**

**Does this action raise an issue of
constitutionality?:** N

**Plaintiff**

**JBF RAK LLC**

represented by **Jack David Mlawski**
Galvin & Mlawski
245 Fifth Avenue
Suite 1902 , New York NY
10016
USA
(212) 679-1500 (fax)
Fax: (212) 971-0417
Email: jm@customslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John Joseph Galvin**
Galvin & Mlawski
245 Fifth Avenue

**Jt. App.21**

Suite 1902 , New York NY
10016
USA
(212) 679-1500 (fax)
Fax: (212) 971-0417
Email: jjgalvin@hotmail.com *(Inactive)*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Defendant**

**United States**                    represented by  **Jane Chang Dempsey**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station, Washington DC
20044
USA
(202) 353-0897 (fax)
Fax: (202) 305-7644
Email: jane.dempsey@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Carrie Anna Dunsmore**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station, Washington DC
20044
USA
(202) 305-7576 (fax)
Fax: (202) 514-7969
Email: carrie.dunsmore@usdoj.gov
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Devin Scott Sikes**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Import
Administration
1401 Constitution Avenue, NW.
Room 3627, Washington DC
20230-0001
USA

**Jt. App.22**

(202) 482-4044 (fax)
Fax: (202) 482-4912
Email: devin.sikes@trade.gov
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Melissa Marion Devine**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station, Washington DC
20044
USA
(202) 616-0341 (fax)
Fax: (202) 514-8624
Email: melissa.m.devine@usdoj.gov
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**DuPont Teijin Films**    represented by    **David Moses Horn**
Wilmer, Cutler, Pickering, Hale & Dorr,
LLP
1875 Pennsylvania Avenue, NW. ,
Washington DC
20006-3642
USA
(202) 663-6749 (fax)
Fax: (202) 663-6363
Email: david.horn@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Jeffrey Ian Kessler**
Wilmer, Cutler, Pickering, Hale & Dorr,
LLP
1875 Pennsylvania Avenue, NW. ,
Washington DC
20006-3642
USA
(202) 663-6212 (fax)
Fax: (202) 663-6363
Email: jeffrey.kessler@wilmerhale.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Jt. App.23**

**Patrick James McLain**
Wilmer, Cutler, Pickering, Hale & Dorr,
LLP
1875 Pennsylvania Avenue, NW. ,
Washington DC
20006-3642
USA
(202) 663-6393 (fax)
Fax: (202) 663-6363
Email: patrick.mclain@wilmerhale.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Ronald Ira Meltzer**
Wilmer, Cutler, Pickering, Hale & Dorr,
LLP
1875 Pennsylvania Avenue, NW. ,
Washington DC
20006-3642
USA
(202) 663-6389 (fax)
Fax: (202) 663-6363
Email: ronald.meltzer@wilmerhale.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Mitsubishi Polyester Film, Inc.**          represented by     **David Moses Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Jeffrey Ian Kessler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Patrick James McLain**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Ronald Ira Meltzer**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Jt. App.24**

**SKC, Inc.**                              represented by **David Moses Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
*Bar Status: ACTIVE*

**Jeffrey Ian Kessler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Patrick James McLain**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Ronald Ira Meltzer**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/29/2013 | 1 | Summons . Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Certificate of Service) (Mlawski, Jack) (Entered: 05/29/2013) |
| 05/29/2013 | 2 | Form 5 Information Statement . Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Mlawski, Jack) (Entered: 05/29/2013) |
| 05/29/2013 | 3 | Form 13 Corporate Disclosure Statement . Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Mlawski, Jack) (Entered: 05/29/2013) |
| 05/29/2013 | 4 | Form 17 Business Proprietary Information Certification filed on behalf of *JBF RAK LLC*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Form 17)(Mlawski, Jack) (Entered: 05/29/2013) |
| 05/29/2013 | 5 | Amended Certificate of service *of summons*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Mlawski, Jack) (Entered: 05/29/2013) |
| 05/29/2013 | 6 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Goell, Geoffrey) (Entered: 05/29/2013) |
| 06/03/2013 | 7 | Consent Motion to alter/amend/correct *summons*. Responses due by 6/24/2013. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Summons Amended summons)(Mlawski, Jack) (Entered: 06/03/2013) |
| 06/04/2013 | 8 | Order entered on 6/4/2013, Granting consent motion to alter/amend/correct Summons. (Related Doc # 7 ). (Taronji, Steve) (Entered: 06/04/2013) |
| 06/04/2013 | 9 | Amended Summons *deemed filed*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Taronji, Steve) (Entered: 06/04/2013) |

**Jt. App.25**

| 06/04/2013 | 10 | Complaint against United States. Administrative Record due by 7/22/2013. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC.(Mlawski, Jack) (Entered: 06/04/2013) |
| 06/04/2013 | 11 | Application/Motion for temporary restraining order . Responses due by 6/24/2013. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Memorandum in support)(Mlawski, Jack) (Entered: 06/04/2013) |
| 06/04/2013 | 12 | Form 11 Notice of Appearance . Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 06/04/2013) |
| 06/04/2013 | 13 | Form 11 Notice of Appearance . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States.(Sikes, Devin) (Entered: 06/04/2013) |
| 06/05/2013 | 14 | Certificate of service *of amended summons*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Mlawski, Jack) (Entered: 06/05/2013) |
| 06/05/2013 | 15 | Order entered on 6/5/2013, ORDERED that plaintiff's motion for temporary restraining order is granted for a period of 14 days from the date of this order. ORDERED that the defendant show cause, if there is any, within the period of 14 days of this order why the suspension of liquidation of plaintiff's entries of goods ordered herein cannot continue for the duration of this action and any judicial appeals that emanate therefrom. (Related Doc # 11 ). (Taronji, Steve) (Entered: 06/05/2013) |
| 06/06/2013 | 16 | Motion to alter/amend/correct *or rescind the Court's June 5, 2013 Order*. Responses due by 6/25/2013. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) Modified on 6/7/2013 (Taronji, Steve). (Entered: 06/06/2013) |
| 06/07/2013 | 17 | Consent Application/Motion for preliminary injunction . Responses due by 6/26/2013. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Order, # 2 memorandum in support)(Mlawski, Jack) (Entered: 06/07/2013) |
| 06/07/2013 | 18 | Order entered on 6/7/2013, Granting plaintiff's consent motion for preliminary injunction. (Related Doc # 17 ). (Taronji, Steve) (Entered: 06/07/2013) |
| 06/21/2013 | 19 | Amended complaint against United States. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC.(Mlawski, Jack) (Entered: 06/21/2013) |
| 06/28/2013 | 20 | Consent Motion to Intervene as Defendant intervenor . Responses due by 7/17/2013. Filed by David Moses Horn of Wilmer Hale on behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc..(Horn, David) (Entered: 06/28/2013) |
| 06/28/2013 | 21 | Form 11 Notice of Appearance *on behalf of David M. Horn, Ronald I. Meltzer, Patrick J. McLain, and Jeffrey I. Kessler*. Filed by David Moses Horn of Wilmer Hale on behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc..(Horn, David) (Entered: 06/28/2013) |
| 06/28/2013 | 22 | Form 17 Business Proprietary Information Certification filed on behalf of *David M. Horn, Ronald I. Meltzer, Patrick J. McLain, and Jeffrey I. Kessler, as attorneys, and Susan Crawford and Susie Moyer, as consultants*. Filed by David Moses Horn of Wilmer Hale on behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc.. (Horn, David) (Entered: 06/28/2013) |

**Jt. App.26**

| 06/28/2013 | 23 | Form 13 Corporate Disclosure Statement . Filed by David Moses Horn of Wilmer Hale on behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc.. (Horn, David) (Entered: 06/28/2013) |
| --- | --- | --- |
| 06/28/2013 | 24 | Order entered on 6/28/2013 granting Motion to intervene as Defendant-Intervenors (Related Doc # 20 ).. (Goell, Geoffrey) (Entered: 06/28/2013) |
| 07/03/2013 | 25 | Order entered on 7/3/2013, assigning action to Judge Judith M. Barzilay.(Taronji, Steve) (Entered: 07/03/2013) |
| 07/16/2013 | 26 | Consent Motion for extension of time until 8/13/2013 to *File Administrative Record Indices and Supporting Documentation*. Responses due by 8/5/2013. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 07/16/2013) |
| 07/24/2013 | 27 | Order entered on 7/24/2013, Granting consent motion for extension of time (Related Doc # 26 ). Administrative Record due by 8/13/2013. (Taronji, Steve) (Entered: 07/24/2013) |
| 08/13/2013 | 28 | Administrative record for Department of Commerce filed . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Sikes, Devin) (Entered: 08/13/2013) |
| 09/10/2013 | 29 | Joint status report and proposed briefing schedule. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of All Parties. (Attachments: # 1 Proposed order) (Mlawski, Jack) (Entered: 09/10/2013) |
| 09/20/2013 | 30 | Joint Scheduling Order entered on 9/20/2013:Plaintiff shall file its Motion for Judgment on the Administrative Record by December 20, 2013; Defendant and Defendant-Intervenors shall file their responses to Plaintiff's motion within 60 days of service of Plaintiff's motion; Plaintiff shall file its reply within 28 days of service of Defendant's and Defendant-Intervenors' responses; In lieu of the appendix required by Rule 56.2(c)(3), the Parties shall file a tabbed and paginated Joint Appendix within 10 days of filing of Plaintiff's reply; Motions for oral argument on the motion for judgment on the agency record shall be made in accordance with Rule 56.2(e). (Love, Cynthia) (Entered: 09/20/2013) |
| 12/20/2013 | 31 | Confidential Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 2/18/2014. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Brief)(Mlawski, Jack) Modified on 12/20/2013 (Love, Cynthia). (Entered: 12/20/2013) |
| 12/20/2013 | 32 | Public Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 2/18/2014. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Attachments: # 1 Brief)(Mlawski, Jack) Modified on 12/20/2013 (Love, Cynthia). (Entered: 12/20/2013) |
| 01/09/2014 | 33 | Form 11 Notice of Appearance . Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 01/09/2014) |
| 02/18/2014 | 34 | Response *of Defendant-Intervenors* to motion *for judgment on the agency record* (related document(s) 31 , 32 ). Reply due by 3/24/2014. Filed by David Moses Horn of Wilmer, Cutler, Pickering, Hale & Dorr, LLP on behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc..(Horn, David) (Entered: 02/18/2014) |

**Jt. App.27**

| 02/18/2014 | 35 | Confidential Response *in opposition* to motion *for judgment upon the administrative record* (related document(s) 31 , 32 ). Reply due by 3/24/2014. Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 02/18/2014) |
| 02/18/2014 | 36 | Public Response *in opposition* to motion *for judgment upon the administrative record* (related document(s) 31 , 32 ). Reply due by 3/24/2014. Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 02/18/2014) |
| 03/11/2014 | 37 | Notice of Supplemental Authority filed. . Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 03/11/2014) |
| 03/24/2014 | 38 | Reply (related document(s) 36 , 34 , 35 ). Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC.(Mlawski, Jack) (Entered: 03/24/2014) |
| 04/03/2014 | 39 | Joint Confidential Appendix *filed on behalf of all parties.*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of DuPont Teijin Films, JBF RAK LLC, Mitsubishi Polyester Film, Inc., SKC, Inc.. (Attachments: # 1 Appendix, # 2 Appendix) (Mlawski, Jack) (Entered: 04/03/2014) |
| 04/03/2014 | 40 | Joint Public Appendix *filed on behalf of all parties.*. Filed by Jack David Mlawski of Galvin & Mlawski on behalf of DuPont Teijin Films, JBF RAK LLC, Mitsubishi Polyester Film, Inc., SKC, Inc.. (Attachments: # 1 Appendix) (Mlawski, Jack) (Entered: 04/03/2014) |
| 04/22/2014 | 41 | Form 11 Notice of Appearance . Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 04/22/2014) |
| 04/22/2014 | 42 | Amended Form 11 Notice of Appearance . Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 04/22/2014) |
| 06/26/2014 | 43 | Second Notice of Supplemental Authority filed. . Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 06/26/2014) |
| 06/30/2014 | 44 | Form 11 Notice of Appearance . Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 06/30/2014) |
| 07/01/2014 | 45 | Order entered on 7/1/2014, Slip Op. 14-78; Commerce's final results are sustained. (related document(s) 31 , 32 ).(Taronji, Steve) (Additional attachment(s) added on 7/1/2014: # 1 Web Pages Cited in the Opinion (Page 2), # 2 Page 10, Footnote 1) (Taronji, Steve). (Entered: 07/01/2014) |
| 07/01/2014 | 46 | Order entered on 7/1/2014, Judgment for Slip Op. 14-78; ORDERED that Commerce's Final Results are sustained. (related document(s) 45 ). (Taronji, Steve) (Entered: 07/01/2014) |
| 08/27/2014 | 47 | Notice of Appeal of Slip Op. 14-78 Judgment/Order of 7/1/2014 filed. (related document(s) 45 , 46 ). Filed by Jack David Mlawski of Galvin & Mlawski on behalf of JBF RAK LLC. (Mlawski, Jack) (Entered: 08/27/2014) |
| 08/28/2014 | 48 | *Plaintiff's* Appeal of *Slip Op. 14-78* docketed on 8/28/2014 by the USCAFC as appeal no. 2014-1774 (related document(s) 47 ). (Taronji, Steve) (Entered: 08/28/2014) |

**Jt. App.28**

**GALVIN & MLAWSKI**
*Attorneys at Law*
**245 Fifth Avenue**
**Suite 1902**
**New York, New York 10016**

**Tel: (212) 679-1500**
**Fax: (212) 971-0417**

November 30, 2011

A-520-803
Total Pages: 5
Request for Administrative Review
POR: November 1, 2010– October 31, 2011
Pursuant to Sec. 1675
AD/CVD Operations Office 6
**Public Document**

Honorable John E. Bryson
Secretary of Commerce
Attn: Import Administration
Dockets Center, Room 1870
U.S Department of Commerce
14th Street & Constitution Avenue, NW
Washington, DC 20230

Re: JBF RAK LLC / Request for A/D Adminstrative Review
    Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates (A-520-803)

Dear Mr. Secretary:

On behalf of our client, JBF RAK LLC ("JBF"), we request, in accordance with 19 U.S.C. §1675a(1), 19 C.F.R.§351.213(b)(2) and the November 1, 2011 Notice of Opportunity to Request Administrative Review (76 *Fed. Reg.* 67413), that administrative review be conducted for polyethylene terephthalate film, sheet, and strip from the United Arab Emirates subject to the antidumping order referenced above which was exported by JBF, for the administrative review period November 1, 2010 through October 31, 2011. JBF is an interested party as defined at 19 U.S.C.§1677(9), with the right to request review as an exporter of the covered products.

**Jt. App.29**

This also constitutes our notice of appearance and we request that we be included on the Department's service list for the proceeding as counsel for JBF. We will be filing under separate cover, following initiation, an application for access to Business Proprietary Treatment under an Administrative Protective Order. The *Federal Register* notice specifies that requestors serve the request for review, pursuant to 19 C.F.R. §351.303(f)(1)(i). JBF has served this request on the representatives identified as representing the petitioners.

Should service be required on additional parties, please let us know.

Respectfully submitted,

Galvin & Mlawski

Jack D. Mlawski
Counsel for JBF RAK LLC

**Jt. App.30**

WILMERHALE

+1 202 663 6000 (t)
+1 202 663 6363 (f)
wilmerhale.com

November 30, 2011

Case No. A-520-803
Total Number of Pages: 6
Administrative Review for the
Period 11/1/10-10/31/11

**PUBLIC DOCUMENT**

The Honorable John E. Bryson
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, NW.
Washington, DC 20230

      Re:    Polyethylene Terephthalate (PET) Film from the United Arab Emirates:
            Request for Administrative Review

Dear Secretary Bryson:

On behalf of DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray

Plastics (America), Inc., (collectively "Petitioners"), domestic producers of polyethylene

terephthalate film ("PET film") and interested parties under 19 U.S.C. § 1677(9)(C), we hereby

request that the Department of Commerce conduct an administrative review of the following

firms for sales of polyethylene terephthalate (PET) film from the United Arab Emirates ("UAE")

during the period November 1, 2010, through October 31, 2011: Flex Middle East FZE, and JBF

RAK LLC. This request is made in response to the Department's notice of Opportunity to

Request Administrative Review, 76 Fed. Reg. 67,413 (Dep't of Commerce, Nov. 1, 2011).

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006
Beijing    Berlin    Boston    Brussels    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

**Jt. App.34**

WILMERHALE

David M. Horn

+1 202 663 6749(t)
+1 202 663 6363(f)
david.horn@wilmerhale.com

November 16, 2012

Case No. A-520-803
Total No. of Pages: 49
Administrative Review (§ 1675)
POR: 11/1/2010-10/31/2011

**PROPRIETARY VERSION**

**Flex's Business Proprietary Information
contained on page 1**

**JBF's Business Proprietary Information
contained on page 5; and Exhibits 1-2**

**Bracketing of BPI is Final**

**Document May be Released Under APO**

The Honorable Rebecca M. Blank
Acting Secretary of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, NW.
Washington, DC 20230

    Re:   *Polyethylene Terephthalate (PET) Film, Sheet, and Strip from the United Arab
       Emirates: Pre-Preliminary Comments and Allegations of Targeted Dumping*

Dear Acting Secretary Blank:

    On behalf of Mitsubishi Polyester Film, Inc., SKC, Inc. and Toray Plastics (America),

Inc. (collectively, "Petitioners"), we hereby submit these comments to inform the Department's

preliminary results of the administrative review of the antidumping order on *Polyethylene*

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006
Beijing   Berlin   Boston   Brussels   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

**Jt. App.73**

WILMERHALE

November 16, 2012
Page 2

*Terephthalate (PET) Film, Sheet and Strip from the United Arab Emirates.* They include an

allegation that respondent JBF RAK LLC engaged in targeted dumping during the period of

review.

* * * * *

Copies of this submission have been served in accordance with the attached certificate of

service. Please contact us if you have any questions regarding this submission.

Sincerely,

Ronald I. Meltzer
Patrick J. McLain
David M. Horn
Jeffrey I. Kessler
*Counsel for Petitioners*

Attachments

cc: Andrew Huston

## REPRESENTATIVE CERTIFICATION

     I, **David M. Horn**, with **Wilmer Cutler Pickering Hale and Dorr LLP,** counsel to **Mitsubishi Polyester Film, Inc., SKC, Inc. andToray Plastics (America), Inc.,** certify that I have read the attached submission of ***Polyethylene Terephthalate (PET) Film, Sheet, and Strip from the United Arab Emirates: Pre-Preliminary Comments and Allegations of Targeted Dumping (November 16, 2012)*** pursuant to the **November 1, 2010 through October 31, 2011 POR ADMINISTRATIVE REVIEW UNDER THE ANTIDUMPING DUTY ORDER ON POLYETHYLENE TEREPHTHALATE (PET) FILM FROM the United Arab Emirates, A-520-803.** In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

*Signature:*

*Date:* 11/16/12

## COMPANY/GOVERNMENT CERTIFICATION

I, **Carlton Winn, Manager, Strategic Planning and Raw Materials,** currently employed by **Mitsubishi Polyester Film, Inc.,** certify that I prepared or otherwise supervised the preparation of the attached submission of *of Polyethylene Terephthalate (PET) Film from the United Arab Emirates: Petitioners' Pre-Preliminary Comments (November 16, 2012) pursuant to the November 1, 2010 through October 31, 2011 POR ADMINISTRATIVE REVIEW UNDER THE ANTIDUMPING DUTY ORDER ON POLYETHYLENE TEREPHTHALATE (PET) FILM FROM THE UNITED ARAB EMIRATES, A-520-803.* I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

*Signature:* _____

*Date:* 10/16/2012

*COMPANY/GOVERNMENT CERTIFICATION*

I, **Emmarine Byerson, Risk Manager,** currently employed by **SKC, Inc.,** certify that I prepared or otherwise supervised the preparation of the attached submission of *Polyethylene Terephthalate (PET) Film from the United Arab Emirates: Petitioners' Pre-Preliminary Comments (November 1**6**, 2012)* pursuant to the **November 1, 2010 through October 31, 2011 POR ADMINISTRATIVE REVIEW UNDER THE ANTIDUMPING DUTY ORDER ON POLYETHYLENE TEREPHTHALATE (PET) FILM FROM THE UNITED ARAB EMIRATES, A-520-803.** I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____

Date: _____

*COMPANY/GOVERNMENT CERTIFICATION*

I, **Todd Eckles, Director, Market Development,** currently employed by **Toray Plastics (America), Inc.,** certify that I prepared or otherwise supervised the preparation of the attached submission of *of Polyethylene Terephthalate (PET) Film from the United Arab Emirates: Petitioners' Pre-Preliminary Comments (November 16, 2012) pursuant to the November 1, 2010 through October 31, 2011 POR ADMINISTRATIVE REVIEW UNDER THE ANTIDUMPING DUTY ORDER ON POLYETHYLENE TEREPHTHALATE (PET) FILM FROM THE UNITED ARAB EMIRATES, A-520-803,* I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

*Signature:*  _____

*Date:*  11/15/12 _____

**APO CERTIFICATE OF SERVICE**
**Polyethylene Terephthalate (PET) Film from**
**United Arab Emirates**
**Case No. A-520-803**
**Admin. Rev. 11/1/10-10/31/11**

I, David M. Horn of Wilmer Cutler Pickering Hale and Dorr LLP, hereby certify that a copy of the attached submission was served via courier on this 16th day of November 2012.

Jack D. Mlawski, Esq.
Galvin & Mlawski
245 Fifth Avenue South
Suite 1902
New York, NY 10016

Mark P. Lunn, Esq.
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339

J. Michael Taylor, Esq.
King & Spalding LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006

David M. Horn

UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION
WASHINGTON, D.C.

|  |  |
|---|---|
| )<br>Polyethylene Terephthalate (PET) Film, )<br>Sheet, and Strip from the United Arab )<br>Emirates )<br>)<br>) | Case No. A-520-803<br>Administrative Review<br><br>POR: 11/1/2010-10/31/2011<br>Total Number of Pages: 43 |

**BUSINESS PROPRIETARY VERSION**

**Flex's Business Proprietary Information
contained on page 1 ; JBF's Business
Proprietary Information contained on
page 5 ; and Exhibits 1-2**

**Bracketing of BPI is Final**

**Document May be Released Under APO**

# PETITIONERS' PRE-PRELIMINARY COMMENTS

## November 16, 2012

Ronald I. Meltzer
Patrick J. McLain
David M. Horn
Jeffrey I. Kessler
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

*COUNSEL FOR PETITIONERS*

# TABLE OF CONTENTS

Page(s)

I.    The Department should use the earlier of shipment date or sale date for Flex's
      date of sale ................................................................................................................1

II.   The Department should calculate dumping margins for JBF by comparing weighted-
      average normal values to individual U.S. transaction prices ...........................................1

      A.    The Methodology for Identifying and Analyzing Targeted Dumping....................1

      B.    There is a Clear Pattern of Significant Price Differences in Respondent JBF's

            U.S. Sales ....................................................................................................5

      C.    The Targeted Dumping Cannot Be Taken into Account Using Another Margin
            Calculation Methodology...............................................................................5

      D.    The Department Must Apply the Average-to-Transaction Methodology to All
            Sales to Address Targeted Dumping.................................................................6

i

Confidential Information Deleted From Nonconfidential Appendix

CONTAINS PROPRIETARY INFORMATION
Bracketing of BPI is Final

## PETITIONER'S PRE-PRELIMINARY COMMENTS

On behalf of Mitsubishi Polyester Film, Inc., SKC, Inc. and Toray Plastics (America), Inc. (collectively, "Petitioners"), we submit these pre-preliminary comments to inform the Department's preliminary results of the administrative review of the antidumping order on *Polyethylene Terephthalate (PET) Film, Sheet and Strip from the United Arab Emirates.*

### I.    The Department should use the earlier of shipment date or sale date for Flex's date of sale

Respondent Flex Middle East FZE ("Flex") has indicated that the date of sale for its U.S. sales is the date of invoice.[1] However, the Department's practice has been to use the earlier of shipment date or sales date for the date of sale.[2] For Flex, its back-to-back transactions (*i.e.*, in instances where [ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ] evidence that the terms of sale have been determined *prior* to shipment thus making the date of shipment the appropriate date of sale the date. In the preliminary results, the Department should make the U.S. date of sale the earlier of shipment date (SHIPDATU) and invoice date (INVOICEU).

### II.    The Department should calculate dumping margins for JBF by comparing weighted-average normal values to individual U.S. transaction prices

#### A.    The Methodology for Identifying and Analyzing Targeted Dumping

Petitioners allege that during the period of review, respondent JBF RAK LLC ("JBF") engaged in targeted dumping of the subject merchandise. Therefore, the Department should

---

[1] Letter from Arent Fox to Secretary of Commerce Re: Polyethylene Terephthalate (Pet) Film, Sheet, and Strip from United Arab Emirates; Section C Response (Apr. 9, 2012), C-17-C-18.

[2] *E.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 F.R. 63791 (Dep't Commerce Oct. 17, 2012) and accompanying Issues and Decisions Memorandum at cmt. 3.

- 1 -

calculate dumping margins for JBF in the above-captioned review by comparing weighted-average normal values to individual U.S. transaction prices.

In the Federal Register notice entitled *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings; Final Modification* ("New Calculation Methodology"), the Department announced that a new margin calculation methodology—*i.e.*, the average-to-average methodology—will generally be applied to administrative reviews of an antidumping duty order.[3] However, the Department also stated that it may apply an alternative comparison methodology in administrative reviews where there is evidence of targeted dumping.[4] The Department added that this alternative comparison methodology would parallel the methodology it currently applies to investigations where there is evidence of targeted dumping.[5] Specifically, the Department stated:

> {S}imilar to the conduct of original investigations, when conducting reviews under the modified methodology, the Department will determine on a case-by-case basis whether it is appropriate to use an alternative comparison methodology by examining the same criteria the Department examines in original investigations pursuant to Section 777A(d)(1)(A) and (B) of the Act.[6]

In original investigations, the Department calculates a company's dumping margin by comparing weighted-average normal values to individual U.S. transaction prices if the following two criteria are met: (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differs significantly among customers, regions, or time periods; and (ii) such differences cannot be taken into account using another margin calculation

---

[3] *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012).

[4] *Id.* at 8,108.

[5] *Id.*

[6] *Id.* at 8,102.

methodology.[7]

To determine whether criterion (i) is met—*i.e.*, whether the requisite pricing pattern exists—the Department employs a two-stage statistical test. This two-stage statistical test was applied in *Certain Steel Nails from the People's Republic of China*[8] and was recently clarified in *Multilayered Wood Flooring from the People's Republic of China* (this test is referred to herein as the "Nails Test").[9] The first stage consists of a "standard deviation test," which requires that at least 33 percent of the allegedly targeted sales be at prices more than one standard deviation below the weighted-average price.[10] If the first test is met, the Department performs a second-stage "price gap test," which evaluates the price differential between the alleged targeted and non-targeted sales.[11]

For criterion (ii), to determine whether the pattern of price differences identified can be taken into account using another margin calculation methodology (*i.e.*, other than the weighted-average normal values to individual U.S. transaction prices), the Department examines the extent to which dumping margins may be "masked" when applying the average-to-average

---

[7] See 19 U.S.C. § 1677f-l(d)(l)(B) (Tariff Act of 1930, § 777A(d)(1)(B)).

[8] Issues and Decision Memorandum in *Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final determ.) at cmt. 3.

[9] Issues and Decision Memorandum in *Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011) (final determ.) ("*Wood Flooring from China*") at cmt. 4; *see also High Pressure Steel Cylinders From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 77,964, 77,968 (Dep't Commerce Dec. 15, 2011) (prelim. determ.) (applying the two-stage targeted dumping test clarified in *Wood Flooring from China*); *Certain Steel Nails from the United Arab Emirates*, 76 Fed. Reg. 68129, 68,133 (Dep't Commerce Nov. 3, 2011) (prelim. determ.) (same).

[10] Issues and Decision Memorandum in *Wood Flooring from China*, 76 Fed. Reg. 64,318, at cmt. 4.

[11] *Id.*

- 3 -

methodology.[12] The Department determines the extent of such masking by comparing the margin

results under the average-to-average and the average-to-transaction methodologies.[13] In

particular, if "each of the alternative approaches yields no difference in the margins or

differences that are so insignificant relative to the size of the resulting margins to be immaterial"

then the Department does not apply its targeted dumping methodology.[14] If, however, the

alternative approaches yield margin differences that are significant, then the Department will (i)

conclude that the average-to-average method masks dumping and cannot account for the

identified patterns of price differences and (ii) apply the average-to-transaction methodology to

---

[12] Issues and Decision Memorandum in *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010) (final determ.) ("OCTG from China") at cmt. 2 ("{T}he pattern of price differences identified cannot be taken into account using the standard average-to-average methodology because the average-to-average methodology conceals differences in price patterns between the targeted and non-targeted groups by averaging low-priced sales to the targeted group with high-priced sales to the non-targeted group. Thus, the Department finds, pursuant to Section 777A(d)(1)(B) of the Act, that application of the standard average-to-average comparison methodology would result in the masking of dumping that would be unmasked by application of the alternative average-to-transaction comparison method to all of TPCO's sales").

[13] *Polyethylene Retail Carrier Bags from Indonesia*, 75 Fed. Reg. 16,431 (Dep't Commerce Apr. 1, 2010) (final determ.) ("Carrier Bags from Indonesia").

[14] Issues and Decision Memorandum in *Carrier Bags from Indonesia*, 75 Fed. Reg. 16,431, at cmt. 1 ("In order to determine whether we could take these differences into account using the average-to-average comparison methodology, we evaluated the extent to which applying the alternative average-to-transaction methodology to all U.S. sales unmasked dumping not accounted for by using the standard average-to-average comparison methodology. Specifically, we applied the average-to-average methodology and the average-to-transaction methodology to all U.S. sales . . . We found that, in this investigation, the standard average-to-average methodology takes into account the price differences because each of the alternative approaches yields no difference in the margins or differences that are so insignificant relative to the size of the resulting margins to be immaterial").

- 4 -

Confidential Information Deleted From Nonconfidential Appendix

CONTAINS PROPRIETARY
INFORMATION
Bracketing of BPI is Final

all sales.[15]

**B.     There is a Clear Pattern of Significant Price Differences in Respondent JBF's U.S. Sales**

Petitioners subjected JBF's U.S. sales data to the Nails Test to determine whether there

was a pattern of significant price differences by customer, region, or time period. *See* **Exhibit 1.**

As described below, the results of the Nails Test show a pattern of significant price differences.

Thus, criterion (i) is satisfied.

Specifically, the results of the Nails Test show a pattern of significant price differences

for [ ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████ ]

**C.     The Targeted Dumping Cannot Be Taken into Account Using Another Margin Calculation Methodology**

The second criterion for the application of the targeted dumping methodology is also

satisfied here. That is, the targeted dumping cannot be taken into account using the Department's

normal average-to-average margin calculation methodology. Under the Department's current

average-to-average methodology, the Department applies offsets for non-dumped sales. Once

---

[15] *Polyethylene Retail Carrier Bags from Taiwan*, 75 Fed. Reg. 14,569 (Dep't Commerce Mar.
26, 2010) (final determ.) at cmt. 1; Issues and Decision Memorandum in *OCTG from China*, 75
Fed. Reg. 20,335, at cmt. 2; *Certain Coated Paper Suitable for High-Quality Print Graphics
Using Sheet-Fed Presses from Indonesia*, 75 Fed. Reg. 24,885, 24,888 (Dep't Commerce May 6,
2010) (prelim. determ.).

offsets are applied to non-dumped sales under the average-to-average methodology, the

Department simply cannot address and remedy targeted dumping like that engaged in here.

Indeed, the Statement of Administrative Action for the Uruguay Round Agreements Act

recognizes that "{i}n part, the reluctance to use an average-to-average methodology has been

based on a concern that such a methodology could conceal 'targeted dumping'. In such

situations, an exporter may sell at a dumped price to particular customers or regions, while

selling at higher prices to other customers or regions."[16] That is what is happening here, and the

Department's application of offsets for non-dumped sales in its current average-to-average

methodology precludes it from being able to address such targeting. The only way to account for

the targeting engaged in here is to use the targeted dumping methodology. In other words, JBF's

dumping margins should be calculated by comparing weighted-average normal values to

individual U.S. transaction prices without applying offsets for non-dumped sales.

### D.    The Department Must Apply the Average-to-Transaction Methodology to All Sales to Address Targeted Dumping

Where targeted dumping has been identified, the Department's established practice is to

apply the average-to-transaction methodology to all of the respondent's sales.[17] For instance, in

*OCTG from China*, the Department stated:

---

[16] Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H. R. Rep. No. 103-316 at 842 (1994); reprinted in 1994 U.S.C.C.A.N. 4040, 4177-78.

[17] See, *e.g.*, Issues and Decision Memorandum in *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't Commerce Mar. 23, 2012) (final determ.) at cmt. 4; Issues and Decision Memorandum in *Wood Flooring from China*, 76 Fed. Reg. 64,318, at cmt. 4; Issues and Decision Memorandum in *OCTG from China*, 75 Fed. Reg. 20,335, at cmt. 2; Issues and Decision Memorandum in *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China*, 75 Fed. Reg. 59,217 (Dep't Commerce Sept. 27, 2010) (final determ.) at cmt. 3.

- 6 -

**Jt. App.87**

> When the criteria for application of the alternative average-to-transaction methodology are satisfied, section 777A(d)(1)(B) of the Act does not limit application of the alternative average-to-transaction methodology to certain transactions. . . . Thus, if the criteria of section 777A(d)(1)(B) of the Act are satisfied, . . . the Department will apply the alternative average-to-transaction methodology *for all sales* in calculating the weighted-average dumping margin.[18]

Consistent with its decision in *OCTG from China*, in subsequent cases where targeted dumping has been identified, the Department has applied the alternative average-to-transaction methodology for all sales.[19]

Here, there is clear evidence of targeted dumping by JBF. In accordance with its established policy and practice, the Department should apply the average-to-transaction methodology (without applying offsets for non-dumped sales) to all of JBF's sales.

Respectfully Submitted,

Ronald I. Meltzer
Patrick J. McLain
David M. Horn
Jeffrey I. Kessler
*Counsel for Petitioners*

---

[18] Issues and Decision Memorandum in *OCTG from China*, 75 Fed. Reg. 20,335, at cmt. 2 (emphasis added).

[19] *See, e.g.*, Issues and Decision Memorandum in *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029, at cmt. 4; Issues and Decision Memorandum in *Wood Flooring from China*, 76 Fed. Reg. 64,318, at cmt. 4.

Jt. App. 89-122 Containing Confidential Information Subject to Administrative Protective Order Deleted



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-520-803
POR: 11/01/2010-10/31/2011
Public Document
O6: AH

DATE:                    November 30, 2012

MEMORANDUM TO:           Ronald K. Lorentzen
                         Acting Assistant Secretary
                           for Import Administration

FROM:                    Christian Marsh
                         Deputy Assistant Secretary
                           for Antidumping and Countervailing Duty Operations

SUBJECT:                 Decision Memorandum for the Preliminary Results of
                         Antidumping Duty Administrative Review:  Polyethylene
                         Terephthalate Film, Sheet, and Strip from the United Arab
                         Emirates

**Summary**

The Department of Commerce (the Department) is conducting an administrative review of the antidumping duty order of polyethylene terephthalate film (PET Film) from the United Arab Emirates (UAE).  This review covers two producer/exporters of the subject merchandise, JBF RAK LLC (JBF) and FLEX Middle East FZE (FLEX) (collectively, respondents).  The period of review (POR) is November 1, 2010, through October 31, 2011.  The Department preliminarily determines that sales of subject merchandise have been made below normal value (NV) by JBF and that FLEX did not make sales of subject merchandise below NV.

If these preliminary results are adopted in our final results of review, we will instruct U.S. Customs and Border Protection (CBP) to assess antidumping duties on all appropriate entries of subject merchandise during the POR.  Interested parties are invited to comment on these preliminary results.  We will issue final results no later than 120 days from the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act).

**Background**

On November 10, 2008, the Department published in the Federal Register the antidumping duty order on PET Film from the UAE.[1]  On November 1, 2011, the Department published a notice of opportunity to request an administrative review of the Order.[2]  In response, on November 30,

---

[1] See Polyethylene Terephthalate Film, Sheet, and Strip From Brazil, the People's Republic of China and the United Arab Emirates:  Antidumping Duty Orders and Amended Final Determination of Sales at Less Than Fair Value for the United Arab Emirates, 73 FR 66595 (November 10, 2008) (Order).
[2] See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 76 FR 67413 (November 1, 2011).

**Jt. App.123**

2011, Dupont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America) Inc. (collectively, the petitioners) requested administrative reviews of JBF and FLEX, and JBF requested a review of itself.[3]  As a consequence, we initiated this review of JBF and FLEX on December 30, 2011.[4]

Between February 21, 2012, and November 6, 2012, both JBF and FLEX submitted timely responses to our questionnaires.

On April 30, 2012, the petitioners filed an allegation that FLEX has made home market sales below the cost of production (COP).[5]  Based on this allegation, we initiated an investigation to determine whether Flex's sales of PET film products were made at prices below the COP during the POR.[6]

On July 6, 2012, we extended the deadline for these preliminary results by 120 days, to November 29, 2012.[7]  As explained in the Memorandum from the Assistant Secretary for Import Administration, the Department has exercised its discretion to toll deadlines for the duration of the closure of the Federal Government from October 29, through October 30, 2012.[8]  Thus, all deadlines in this segment of the proceeding have been extended by two days.  The revised deadline for the preliminary results of this review is now December 3, 2012.[9]

On November 16, 2012, the petitioners submitted pre-preliminary results comments and an allegation of targeted dumping, alleging that JBF engaged in targeting dumping during the period of review.[10]

**Scope of the Order**

The products covered by the order are all gauges of raw, pre-treated, or primed polyethylene terephthalate film, whether extruded or co-extruded.  Excluded are metalized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick.  Also

---

[3] See the November 30, 2011 Letters to the Secretary of Commerce from the petitioners and from JBF.
[4] See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 76 FR 82268 (December 30, 2011).
[5] See the April 30, 2012 Letter to the Secretary from the petitioners, "Polyethylene Terephthalate (PET) Film, Sheet, and Strip from the United Arab Emirates:  Allegation of Sales Below Cost."
[6] See the June 15, 2012 Memorandum from Barbara E. Tillman, Director, AD/CVD Operations, Office 6, Import Administration, "Petitioners' Allegation of Sales Below the Cost of Production for Flex Middle East FZE."
[7] See the July 6, 2012 Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Extension of Deadline for Preliminary Results of the Antidumping Duty Administrative Review."
[8] See Memorandum to the Record from Paul Piquado, Assistant Secretary for Import Administration, regarding "Tolling of Administrative Deadlines as a Result of the Government Closure During Hurricane Sandy," dated October 31, 2012.
[9] As the extended date of December 1, 2012, falls on a Saturday, the preliminary results are due the next business day of December 3, 2012.  See Notice of Clarification: Application of "Next Business Day" Rule for Administrative Determination Deadlines Pursuant to the Tariff Act of 1930, As Amended, 70 FR 24533 (May 10, 2005.
[10] See the petitioners' November 16, 2012 Letter to the Department, "Polyethylene Terephthalate (PET) Film, Sheet, and Strip from the United Arab Emirates: Pre-Preliminary Comments and Allegations of Targeted Dumping" (Pre-Preliminary Comments).

2

**Jt. App.124**

excluded is roller transport cleaning film which has at least one of its surfaces modified by application of 0.5 micrometers of SBR latex. Tracing and drafting film is also excluded. Polyethylene terephthalate film is classifiable under subheading 3920.62.00.90 of the Harmonized Tariff Schedule of the United States (HTSUS). While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

**Targeted Dumping**

The petitioners alleged that JBF engaged in targeted dumping during the POR, and submitted that the Department should calculate dumping margins for JBF in the above-captioned review by comparing weighted average normal values to individual U.S. transaction prices.[11] Although the petitioners' allegations were timely, the Department did not have sufficient time to fully analyze them for purposes of these preliminary results. Therefore, we will address the petitioners' targeted dumping allegation at a later date.

**Discussion of the Methodology**

Comparisons to Normal Value

To determine whether sales of PET Film to the United States by the respondents were made at less than NV, we compared the respondents' export prices (EP) or constructed export prices (CEP) to NV, as described in the "Normal Value" sections, below.

In calculating the preliminary weighted-average dumping margins for JBF and FLEX, the Department applied the calculation methodology adopted in the Final Modification for Reviews.[12] In particular, the Department compared monthly, weighted-average U.S. prices with monthly, weighted-average NVs, and granted offsets for negative comparison results in the calculation of the weighted-average dumping margins.[13]

Product Comparisons

Pursuant to section 771(16) of the Act, we determined that products sold by the respondents, as described in the "Scope of the Order" section, above, in the UAE during the POR, are foreign like products for purposes of determining appropriate product comparisons to U.S. sales. We have relied on five criteria to match U.S. sales of subject merchandise to comparison-market sales: grade, specification, thickness, thickness category, and surface treatment. Where there were no sales of identical merchandise in the home market to compare to U.S. sales, we compared U.S. sales to the most similar foreign like product based on the characteristics listed above.

---

[11] See Pre-Preliminary Comments at 2.
[12] See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings; Final Modification, 77 FR 8101 (February 14, 2012) (Final Modification for Reviews).
[13] See id. at 8102.

**Jt. App.125**

JBF has proposed changing the ranking of "surface treatment" values (i.e., one of the five model matching criteria) that were used in the last review.[14] JBF suggests ranking PET Film in the following order: (1) both sides plain; (2) one side plain, one side corona; (3) one side coated, one side either plain or corona; and (4) both sides coated. Within each of these four general categories, JBF's proposal would have us rank the surface treatments by cost. Based on our analysis of JBF's proposal, we have adopted this proposed ranking of surface treatment for these preliminary results.

JBF also has reported a surface treatment ("O" – one side polyurethane, one side plain) that was not included in the last review and suggested this treatment be ranked between two existing categories ("D" – one side acrylic, one side corona; and "E" – one side copolymer, one side plain) with which it is more similar based on cost and physical characteristics. Based on our analysis of JBF's proposal, we also have incorporated this additional surface treatment into our analysis for the preliminary results.

A more detailed discussion of our analysis can be found in the December 3, 2012 Memorandum to Mark Hoadley, Program Manager, AD/CVD Operations, Import Administration, "Preliminary Analysis for JBF RAK" (JBF Calculations Memorandum).

Arm's-Length Test

The Department may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the prices at which sales are made to parties not affiliated with the exporter or producer; i.e., sales to home market affiliates must be at arm's-length.[15] In this proceeding, neither FLEX nor JBF reported sales to affiliates in the home market. Therefore, it was not necessary to determine whether any home market sales were made at arm's length.

Level of Trade

To determine whether NV sales are at a different level of trade (LOT) than U.S. sales, we examine selling functions along the chain of distribution between the respondent and the unaffiliated customer for EP sales, and between the respondent and the affiliated U.S. importer for CEP sales. If the comparison market sales are at a different LOT, and the difference affects price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison market sales at the LOT of the export transaction, we make a LOT adjustment pursuant to section 773(a)(7)(A) of the Act.

In implementing these principles, we examined information provided by JBF and FLEX regarding the selling functions involved in their home market and U.S. sales, including a description of these selling functions, listed in FLEX's October 12, 2012 submission at 12-14, and in JBF's February 21, 2012 submission at Exhibit A-5. Our analysis revealed that there were not any significant differences in selling functions between the different channels of distribution

---

[14] See the September 12, 2012 Letter to the Secretary of Commerce, "Response to the Second Supplemental questionnaire by JBF RAK LLC."
[15] See 19 CFR 351.403(c).

**Jt. App.126**

or customer types in either the home or U.S. markets. Therefore, we preliminarily determine that FLEX and JBF each made all home-market sales at one LOT. Moreover, we preliminarily determine that all home-market sales by FLEX and JBF were made at the same LOT as their U.S. sales. Accordingly, a LOT adjustment is not warranted.

Date of Sale

The Department will normally use invoice date, as recorded in the exporter's or producer's records kept in the ordinary course of business, as the date of sale, but we may use a date other than the invoice date if it better reflects the date on which the material terms of sale are established.[16] For both JBF and FLEX, we preliminarily determine that no departure from our standard practice is warranted. Both companies reported invoice date as date of sale, and the record does not indicate that material terms of sale are established at a later or earlier date in the sales process. In instances where shipment took place prior to the invoice date, we have used shipment date to the customer as date of sale rather than invoice date, consistent with Department practice that assumes terms of sale are fixed at the time of shipment.[17]

*JBF's Margin Calculation*

Export Price

The Department based the price of all U.S. sales of subject merchandise by JBF on EP as defined in section 772(a) of the Act because the merchandise was sold by JBF to an unaffiliated purchaser in the United States before importation. We calculated EP based on the packed price to unaffiliated purchasers in the United States, as appropriate.[18] We made adjustments to price for billing adjustments, where applicable, and deducted all movement expenses reported by JBF. Details regarding calculation of JBF's EP, as well as other calculation detail can be found in the JBF Calculations Memorandum, and in the preliminary calculation SAS programs.

Normal Value

A.    Selection of Comparison Market

To determine whether there was a sufficient volume of sales of PET Film in the home market to serve as a viable basis for calculating NV, we compared the volume of JBF's home market sales of the foreign like product to the volume of its U.S. sales of the subject merchandise, in accordance with section 773(a)(1) of the Act. In accordance with section 773(a)(1)(B) of the Act, and 19 CFR 351.404(b), because JBF's aggregate volume of home market sales of the foreign like product was greater than five percent of its aggregate volume of U.S. sales of the

---

[16] See 19 CFR 351.401(i).
[17] See Light-Walled Rectangular Pipe and Tube From Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 76 FR 55352, at 55354 (September 7, 2011), unchanged in Light-Walled Rectangular Pipe and Tube From Mexico; Final Results of Antidumping Duty Administrative Review, 77 FR 1915 (January 12, 2012).
[18] See section 772(c) of the Act.

**Jt. App.127**

subject merchandise, we have determined that the home market was viable for comparison purposes.

B.    Cost of Production Analysis

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of JBF's cost of materials and fabrication for the foreign like product, plus amounts for selling, general and administrative expenses, interest expenses, and home market packing costs. We have examined JBF's reported cost data and determined that our quarterly cost methodology is not warranted. Therefore, we have applied our standard methodology of using annual costs based on reported cost data, adjusted as follows:

- We revised the reported costs to treat the non-recyclable film lumps generated during the POR as scrap.
- We adjusted the transfer price for super bright chips transferred from the chips division to the film division to reflect the cost of producing the super bright chips.
- We revised the reported overhead costs to exclude the cost of aluminum wire and other metalizing materials used only in the production of non-subject merchandise.
- We revised the consolidated financial expense rate to include losses on foreign currency translations and short-term interest income.

Details regarding the calculation of JBF's COP, as well as other calculation detail can be found in the December 3, 2012 Memorandum to Neal Halper, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Results – JBF RAK LLC," and in the preliminary calculation SAS programs.

C.    Cost of Production Test

On a product-specific basis, we compared JBF's revised COP figures to home market prices, net of applicable billing adjustments, discounts and rebates, movement charges, selling expenses, and packing, to determine whether home market sales had been made at prices below COP. In determining whether to disregard JBF's home market sales made at prices below COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether, within an extended period of time, such sales were made in substantial quantities, and whether such sales were made at prices which did not permit the recovery of all costs within a reasonable period of time in the normal course of trade. Because we are applying our standard annual-average cost test in these preliminary results, we have also applied our standard cost-recovery test with no adjustments.

In accordance with section 773(b) of the Act, where less than 20 percent of a given product was sold at prices less than COP, we did not disregard any below-cost sales of that product, because the below-cost sales were not made in "substantial quantities." However, we disregarded the below-cost sales that: (1) have been made within an extended period of time (within six months to one year) in substantial quantities (20 percent or more), as defined by section 773(b)(2)(B) and (C) of the Act; and (2) were not made at prices which permit recovery of all costs within a reasonable period of time, as prescribed by section 773(b)(2)(D) of the Act. Accordingly, we

Filed By: Andrew Huston, Filed Date: 12/3/12 1:47 PM, Submission Status: Approved

determined to disregard certain of JBF's sales in the determination of NV because (1) 20 percent or more of a given product was sold at prices less than COP, and (2) based on our comparison of prices to weighted-average COP figured for the POR, they were made at prices that would not permit recovery of all costs within a reasonable period of time. We used the remaining home market sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

D.     Constructed Value

After disregarding certain sales as below cost, as described above, home market sales of contemporaneous identical and similar products existed for JBF that allowed for price-to-price comparisons for all margin calculations. Therefore, the Department did not need to rely on constructed value for any calculations for these preliminary results.

E.     Price-to-Price Comparisons

We calculated JBF's NV based on packed prices to unaffiliated customers in the home market. We used JBF's adjustments and deductions as reported. We made deductions, where appropriate, for foreign inland freight pursuant to section 773(a)(6)(B) of the Act. We also made adjustments for differences in circumstances of sale (COS) in accordance with section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410. In so doing, we made COS adjustments for the cost of providing samples to customers. In addition, for comparisons involving similar merchandise, we made adjustments for cost differences attributable to the physical differences between the products compared, pursuant to section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. Finally, we added U.S. packing costs and deducted home market packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act, respectively.

*FLEX's Margin Calculation*

Constructed Export Price

In calculating the antidumping duty margins for FLEX, we used CEP, as defined in section 772(b) of the Act, because all sales to unaffiliated purchasers in the United States were made through Flex America, Inc. (FLEX America), a company affiliated with FLEX. For these sales, the Department based CEP on prices to the first unaffiliated purchaser in the United States. We made deductions from CEP for all movement expenses reported by FLEX, as well as imputed credit expenses, and several direct expenses, including documentation charges, credit insurance expenses, terminal handling charges, demurrage charges, and several other fees, like port security charges, incurred on U.S. sales. In addition, we deducted indirect selling expenses associated with economic activity in the United States and imputed inventory carrying costs incurred by FLEX America.[19] Finally, pursuant to section 772(d)(3) of the Act, we made an adjustment for CEP profit. Details regarding calculation of FLEX's CEP, as well as other calculation detail, can be found in the December 3, 2012 Memorandum to Mark Hoadley, Program Manager, AD/CVD Operations, Import Administration, "Preliminary Analysis Memorandum for Flex Middle East FZE and Flex America, Inc.," and in the preliminary calculation SAS programs for FLEX.

---

[19] See sections 772(c)(2)(A) and 772(d)(1) of the Act.

Filed By: Andrew Huston, Filed Date: 12/3/12 1:47 PM, Submission Status: Approved

Normal Value

A.    Selection of Comparison Market

To determine whether there was a sufficient volume of sales of PET Film in the home market to
serve as a viable basis for calculating NV, we compared the volume of FLEX's home market
sales of the foreign like product to the volume of its U.S. sales of the subject merchandise, in
accordance with section 773(a)(1) of the Act. In accordance with section 773(a)(1)(B) of the
Act, and 19 CFR 351.404(b), because FLEX's aggregate volume of home market sales of the
foreign like product was greater than five percent of its aggregate volume of U.S. sales of the
subject merchandise, we have determined that the home market was viable for comparison
purposes.

B.    Cost of Production Analysis

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of FLEX's
cost of materials and fabrication for the foreign like product, plus amounts for selling, general
and administrative expenses, interest expenses, and home market packing costs. We have
examined the cost data submitted by FLEX and determined that our quarterly cost methodology
is not warranted. Therefore, we have applied our standard methodology of using annual costs
based on reported cost data. As such, we have made no adjustments to FLEX's reported COP.[20]

C.    Cost of Production Test

On a product-specific basis, we compared FLEX's COP figures to home market prices, net of
applicable billing adjustments, discounts and rebates, movement charges, selling expenses, and
packing, to determine whether home market sales had been made at prices below COP. In
determining whether to disregard FLEX's home market sales made at prices below COP, we
examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether, within an
extended period of time, such sales were made in substantial quantities, and whether such sales
were made at prices which did not permit the recovery of all costs within a reasonable period of
time in the normal course of trade. Because we are applying our standard annual-average cost
test in these preliminary results, we have also applied our standard cost-recovery test with no
adjustments.

In accordance with section 773(b) of the Act, where less than 20 percent of a given product was
sold at prices less than COP, we did not disregard any below-cost sales of that product, because
the below-cost sales were not made in "substantial quantities." However, we disregarded the
below-cost sales that: (1) have been made within an extended period of time (within six months
to one year) in substantial quantities (20 percent or more), as defined by section 773(b)(2)(B) and
(C) of the Act; and (2) were not made at prices which permit recovery of all costs within a
reasonable period of time, as prescribed by section 773(b)(2)(D) of the Act. Accordingly, we
determined to disregard certain of FLEX's sales in the determination of NV because (1) 20
percent or more of a given product was sold at prices less than COP and (2) based on our

---

[20] See the December 3, 2012 Memorandum to Neal M. Halper, Director of Accounting, "Cost of Production and
Constructed Value Calculation Adjustments for the Preliminary Results – Flex Middle East FZE."

**Jt. App.130**

comparison of prices to weighted-average COP figured for the POR, they were made at prices that would not permit recovery of all costs within a reasonable period of time. We used the remaining home market sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

D.      Constructed Value

After disregarding certain sales as below cost, as described above, home market sales of contemporaneous identical and similar products existed for FLEX that allowed for price-to-price comparisons for all margin calculations. Therefore, the Department did not need to rely on constructed value for any calculations for these preliminary results.

E.      Price-to-Price Comparisons

We calculated FLEX's NV based on packed prices to unaffiliated customers in the home market. We made deductions for foreign inland freight pursuant to section 773(a)(6)(B) of the Act. In addition, for comparisons involving similar merchandise, we made adjustments for cost differences attributable to the physical differences between the products compared, pursuant to section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. Finally, we deducted home market packing costs and added U.S. packing costs in accordance with sections 773(a)(6)(A) and (B) of the Act.

Currency Conversions

Pursuant to section 773A(a) of the Act and 19 CFR 351.415, we made currency conversions into U.S. dollars for FLEX's and JBF's sales based on the daily exchange rates in effect on the dates of the relevant U.S. sales as certified by the Federal Reserve Bank of New York.

Conclusion

We recommend applying the above methodology for these preliminary results.

Agree ___✓___        Disagree _____

Ronald K. Lorentzen

Ronald K. Lorentzen
Acting Assistant Secretary
  for Import Administration

November 30, 2012

Date

9

**Jt. App.131**

Signed at Washington, DC, this 30th day of November 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary of Commerce for Import Administration, Alternate Chairman, Foreign-Trade Zones Board.*

Attest:

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2012–29655 Filed 12–6–12; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[A–520–803]**

**Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates; Preliminary Results of Antidumping Duty Administrative Review; 2010–2011**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) is conducting an administrative review of the antidumping duty order on polyethylene terephthalate film, sheet, and strip (PET Film) from the United Arab Emirates (UAE). The period of review (POR) is November 1, 2010, through October 31, 2011. The review covers two producer/exporters of the subject merchandise—JBF RAK LLC (JBF) and FLEX Middle East FZE (FLEX). The Department preliminarily determines that sales of subject merchandise have been made below normal value by JBF and that FLEX did not make sales of subject merchandise below normal value.

**DATES:** *Effective Date:* December 7, 2012

**FOR FURTHER INFORMATION CONTACT:** Andrew Huston, or Gene Calvert, AD/CVD Operations, Office 6, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4261 or (202) 482–3586, respectively.

**SUPPLEMENTARY INFORMATION:**

**Scope of the Order**

The products covered by the order are all gauges of raw, pre-treated, or primed polyethylene terephthalate film, whether extruded or co-extruded. Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick. Also excluded is roller transport cleaning film which has at least one of its surfaces modified by application of 0.5 micrometers of SBR latex. Tracing and drafting film is also excluded. Polyethylene terephthalate film is classifiable under subheading 3920.62.00.90 of the Harmonized Tariff Schedule of the United States (HTSUS). While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

**Methodology**

The Department is conducting this review in accordance with section 751(a)(2) of the Tariff Act of 1930, as amended (the Act). Constructed export price is calculated in accordance with section 772 of the Act. Normal value is calculated in accordance with section 773 of the Act.

For a full description of the methodology underlying our conclusions, *see* the Memorandum from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Ronald K. Lorentzen, Acting Assistant Secretary for Import Administration, ''Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates'' (Preliminary Decision Memorandum), dated concurrently with these results and hereby adopted by this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Import Administration's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). IA ACCESS is available to registered users at *http://iaaccess.trade.gov* and in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly on the Internet at *http://www.trade.gov/ia/.* The signed Preliminary Decision Memorandum and the electronic versions of the Preliminary Decision Memorandum are identical in content.

**Preliminary Results of Review**

As a result of our review, we preliminarily determine the following weighted-average dumping margins exist for the period November 1, 2010, through October 31, 2011:

| Manufacturer/exporter | Weighted-average margin (percent) |
|---|---|
| JBF RAK LLC ......................... | 5.31 |
| FLEX Middle East FZE ........... | 0.00 |

**Disclosure and Public Comment**

The Department intends to disclose the calculations used in our analysis to parties in this review within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b). Interested parties are invited to comment on the preliminary results of this review. Pursuant to 19 CFR 351.309(c)(1)(ii), interested parties may submit case briefs not later than 30 days after the date of publication of this notice. Rebuttal briefs, limited to issues raised in the case briefs, may not be filed later than five days after the time limit for filing case briefs.[1] Parties who submit case briefs or rebuttal briefs in this review are requested to submit with each brief: (1) A statement of the issue, (2) a brief summary of the argument, and (3) a table of authorities.[2] Executive summaries should be limited to five pages total, including footnotes.[3]

Pursuant to 19 CFR 351.310(c), any interested party may request a hearing within 30 days of the publication of this notice in the **Federal Register**. If a hearing is requested, the Department will notify interested parties of the hearing schedule. Interested parties who wish to request a hearing, or to participate if one is requested, must submit a written request to the Assistant Secretary for Import Administration, filed electronically via IA ACCESS within 30 days after the date of publication of this notice. Requests should contain: (1) The party's name, address, and telephone number; (2) the number of participants; and (3) a list of the issues to be discussed. Issues raised in the hearing will be limited to those raised in the respective case briefs.

We intend to issue the final results of this administrative review, including the results of our analysis of issues raised by the parties in the written comments, within 120 days of publication of these preliminary results in the **Federal Register**, unless otherwise extended.[4]

**Assessment Rates**

Upon issuing the final results of the review, the Department shall determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties

---

[1] *See* 19 CFR 351.309(d)(1).
[2] *See* 19 CFR 351.309(c)(2), (d)(2).
[3] *See id.*
[4] *See* section 751(a)(3)(A) of the Act.

**Federal Register**/Vol. 77, No. 236/Friday, December 7, 2012/Notices

on all appropriate entries. The Department intends to issue assessment instructions to CBP 15 days after the date of publication of the final results of review.

For any individually examined respondents whose weighted-average dumping margin is above *de minimis,* we will calculate importer-specific *ad valorem* duty assessment rates based on the ratio of the total amount of dumping calculated for the importer's examined sales to the total entered value of those same sales in accordance with 19 CFR 351.212(b)(1).[5] We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific assessment rate calculated in the final results of this review is above *de minimis.* Where either the respondent's weighted-average dumping margin is zero or *de minimis,* or an importer-specific assessment rate is zero or *de minimis,* we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by the final results of this review and for future deposits of estimated duties, where applicable.

### Cash Deposit Requirements

The following deposit requirements will be effective for all shipments of PET Film from the UAE entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review, as provided for by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for the companies under review will be the rate established in the final results of this review (except, if the rate is zero or *de minimis,* no cash deposit will be required); (2) for previously reviewed or investigated companies not listed above, the cash deposit rate will continue to be the company-specific rate published for the most recent period; (3) if the exporter is not a firm covered in this review, a prior review, or the less-than-fair-value investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent period for the manufacturer of the merchandise; and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 4.05

percent, the all-others rate established in the investigation.[6] These cash deposit requirements, when imposed, shall remain in effect until further notice.

### Notification to Importers

This notice also serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

These preliminary results of administrative review are issued and published in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: November 30, 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Import Administration.*

### Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

1. Comparisons to Normal Value
2. Product Comparisons
3. Arm's-Length Test
4. Date of Sale
5. JBF's Margin Calculation
6. FLEX's Margin Calculation
7. Currency Conversions

[FR Doc. 2012–29643 Filed 12–6–12; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–908]**

### Sodium Hexametaphosphate From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011–2012

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** In response to requests from interested parties, the Department of Commerce (the "Department") is conducting the third administrative review of the antidumping duty order on sodium hexametaphosphate ("sodium hex") from the People's

Republic of China ("PRC") for the period of review ("POR") March 1, 2011, through February 29, 2012. The Department has preliminarily determined that there are no reviewable entries during the POR.

**DATES:** *Effective Date:* December 7, 2012.

**FOR FURTHER INFORMATION CONTACT:** Paul Walker, AD/CVD Operations, Office 9, Import Administration, International Trade Administration, Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone 202.482.0413.

**SUPPLEMENTARY INFORMATION:**

### Scope of the Order

The scope of this order consists of sodium hexametaphosphate.[1] The merchandise subject to this order is currently classifiable in the Harmonized Tariff Schedule of the United States ("HTSUS") statistical reporting number 2835.39.5000. However, it may also be imported as a blend or mixture under heading 3824.90.3900. Although the HTSUS subheadings are provided for convenience and customs purposes, the written product description, available in the *Order* remains dispositive.[2]

### Preliminary Finding of No Shipments

Hubei Xingfa Chemical Group Co., Ltd. ("Hubei Xingfa") and Sichuan Mianzhu Norwest Phosphate Co. ("Norwest") submitted timely-filed certifications that they had no sales of subject merchandise to the United States during the POR.[3] The Department also received information from U.S. Customs and Border Protection ("CBP") indicating that there were no reviewable transactions from Hubei Xingfa or Norwest during the POR. Therefore, we preliminarily determine that Hubei Xingfa and Norwest had no reviewable transactions of subject merchandise during the POR. Because Hubei Xingfa and Norwest submitted timely no-shipment certifications and CBP data indicated that there were no reviewable transactions for these companies during the POR, we preliminarily determine that these two companies will retain their separate rate from the previous

---

[5] In these preliminary results, the Department applied the assessment rate calculation methodology adopted in *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings: Final Modification,* 77 FR 8101 (February 14, 2012).

[6] *See Polyethylene Terephthalate Film, Sheet, and Strip from Brazil, the People's Republic of China and the United Arab Emirates: Antidumping Duty Orders and Amended Final Determination of Sales at Less Than Fair Value for the United Arab Emirates,* 73 FR 66595, 66597 (November 10, 2008).

[1] *See* "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Sodium Hexametaphosphate from the People's Republic of China," ("Preliminary Decision Memorandum") from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations to Paul Piquado, Assistant Secretary for Import Administration, dated concurrently with these results and hereby adopted by this notice.

[2] *See Notice of Antidumping Duty Order: Sodium Hexametaphosphate from the People's Republic of China,* 73 FR 14772 (March 19, 2008) ("*Order*").

[3] *See* Hubei Xingfa's letter dated May 4, 2012; *see also* Norwest's letter dated June 29, 2012.

### Jt. App.133

# GALVIN & MLAWSKI

*Attorneys at Law*
**245 Fifth Avenue, Suite 1902**
**New York, New York 10016**

**Tel: (212) 679-1500**
**Fax: (212) 971-0417**

January 14, 2013

Hon. Rebecca Blank
Assistant Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
Central Records Unit
Room 1870
14th and Constitution Aves., N.W.
Washington, DC 20230

Attn: Mark Hoadley,
      Program Manager
      Office 6

Case No. A-520-803
Total Pages: 25
Administrative Review
November 1, 2010 to October 31, 2011
AD/CVD Operations, Office 6

Business            Proprietary
Information removed from pages 9, 12 13

*PUBLIC VERSION*

*DISCLOSURE PERMITTED UNDER AN ADMINISTRATIVE            PROTECTIVE ORDER*

Re: Polyethylene Terephthalate (PET) Film, Sheet and Strip
    from the United Arab Emirates (A-520-803); Case Brief
    of JBF RAK, LLC

Dear Assistant Sec. Blank:

On behalf of JBF RAK LLC and pursuant to 19 C.F.R. §351.309 we hereby submit the attached case brief regarding the preliminary determination in *Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review,* at 77 *Fed. Reg.* 73010, et seq. (December 7, 2012).

Certain information contained in this submission is the highly confidential, business proprietary data of JBF. This information is indicated by single brackets ("[]"). JBF

## Jt. App.134

respectfully requests proprietary treatment for this information pursuant to 19 C.F.R. §351.304. JBF agrees to permit disclosure of confidential information under an Administrative Protective Order pursuant to 19 C.F.R. §351.304(b)(1). Information marked as business proprietary has been so marked for one or more of the following reasons, in accordance with 19 C.F.R. §351.105(c):

(1)  Business or trade secrets concerning the nature of a product or production process;

(2)  Production costs (but not the identity of the production components unless a particular component is a trade secret);

(3)  Distribution costs (but not channels of distribution);

(4)  Terms of sale (but not terms of sale offered to the public);

(5)  Prices of individual sales, likely sales, or other offers (but not components of prices, such as transportation, if based on published schedules, dates of sale, product descriptions except business or trade secrets described in item 1 above, or order numbers);

(6)  Names of particular customers, distributors, or suppliers (but not destination of sales or designation of type of customer, distributor, or supplier, unless the designation or designations would reveal the name);

(7)  The exact amount of the dumping margin on individual sales;

(9)  The names of particular persons from whom business proprietary information was obtained; and

(11) Any other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter.

Proprietary treatment is, therefore, requested pursuant to 19

## Jt. App.135

January 14, 2013
Page 3

C.F.R. §351.304.  Following is a list of the pages in which the business proprietary information appears and the reason (referenced by the number of the reason listed above) that proprietary treatment is requested for such information:

| Page | Reason |
|------|--------|
| Pages 9, 12 ,13 | 1,3-5, 7, 11 |

The proprietary information is not susceptible to summarization, and release of even a summary would work substantial competitive harm on JBF. As even a summary of these documents would reveal confidential internal business secrets of the submitter, no summary has been provided.

In accordance with 19 C.F.R. §351.303, a copy of this brief is being served on the interested parties listed in the Department's official service lists for this proceeding, in the 19 C.F.R. §351.303.

If there are any questions, please do not hesitate to contact the undersigned.

Respectfully submitted,

GALVIN & MLAWSKI

Jack D. Mlawski

Counsel for JBF RAK LLC

**Jt. App.136**

# COMPANY CERTIFICATION

I, Praveen Chandalia, General Manager, Finance, currently employed by JBF RAK LLC, certify that I prepared or otherwise supervised the preparation of the attached case brief, *Polyethylene Terephthalate (PET) Film from the United Arab Emirates, Case No., A-520-803, for the period November 1, 2010 to October 31, 2011,* certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate by the U.S. Department of Commerce. I am also aware that U.S. law including, but not limited to, 18 USC 1001 imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____

Date: 3/1/2013

**Jt. App.137**

## REPRESENTATIVE CERTIFICATION

I, JACK D. MLAWSKI, with GALVIN & MLAWSKI, counsel or representative to JBF RAK LLC, certify that I have read the attached case brief, pursuant to the antidumping administrative review under the antidumping duty order on Polyethylene Terephthalate (PET) Film from the United Arab Emirates, Case No. A-520-803, for the period of November 1, 2010 to October 31, 2011. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____

Jack D. Mlawski

**Jt. App.138**

## Certificate of Service
### Service List: A-520-803
### Polyethylene Terephthalate (Pet) Film, Sheet, and Strip from United Arab Emirates
### Admin. Review 11/1/10-10/31/11

I, Jack D. Mlawski, on behalf of JBF RAK LLC hereby certify that copies of the foregoing document were served upon the following on January 14, 2013 in the manner noted:

David Horn, Esq.*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006


Mark P. Lunn, Esq.**
Arent Fox LLP
1050 Connecticut Ave., NW
Washington, DC 20036-5339

J. Michael Taylor, Esq.***
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

Jack D. Mlawski

* As agreed by the parties, by email.
**By overnight mail
***As agreed by the parties, by email of the public versions and documents.

## Jt. App.139

**Before The**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

In The Matter of:

Polyethylene Terephthalate (PET) Film
from the United Arab Emirates

PUBLIC VERSION

**CASE BRIEF OF JBF RAK LLC ("JBF")**

Jack D. Mlawski
Galvin and Mlawski
245 Fifth Avenue
Ste. 1902
New York, NY 10016
(212)679-1500

Counsel for JBF RAK LLC

January 14, 2013

**Jt. App.140**

# EXECUTIVE SUMMARY

• The Department should not consider Petitioners' allegation of targeted dumping because:

  -Unlike antidumping investigations where the statute specifically provides for targeted dumping allegations, there is no statutory authority that provides for such allegations in administrative reviews;

  -Petitioners' targeted dumping allegation is improperly submitted information and should be rejected as Petitioners' submission is untimely submitted factual information filed some two months after JBF submitted the information upon which the allegation is based and some two weeks prior to the scheduled preliminary determination. Further, acceptance of Petitioners' allegation at this time would require the Department to issue an unauthorized post- preliminary determination.

  - Petitioners do not provide a sufficient basis for its targeted dumping allegation and the allegation does not demonstrate a pattern of prices that differ significantly since its allegation exhibits only a de minimis percentage of respondent's total U.S. sales that may technically satisfy the Nails test.

• JBF's prime and non prime sales should not be distinguished and both should be matched to US sales as there is no exhibited price distortion when comparing sales in the home market of prime and non prime film.

• The Department's stated intention to issue assessment instructions prior to expiration of the time interested parties may commence an action in the United States Court of International Trade to contest the final determination is contrary to law.

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 1/14/13 9:53 AM, Submission Status: Approved

## TABLE OF CONTENTS

# I. INTRODUCTION AND SUMMARY

1. INTRODUCTION..........................................................................................1

2. SUMMARY OF ARGUMENT....................................................................1

# II. ARGUMENT

1. COMMERCE CAN NOT LAWFULLY CONSIDER THE TARGETED DUMPING ALLEGATION ................................................................................2

   A. There is No Statutory or Regulatory Authority to Consider an Allegation of Targeted Dumping in Administrative Reviews.......................................2

   B. Petitioners' Targeted Dumping Allegation is Improperly Submitted Information and Should be Rejected

       1. Petitioners' submission is untimely................................................5

       2. Acceptance of Petitioners' allegation at this time would require the Department to issue an unauthorized "post- preliminary determination"............................6

   C. Petitioners Do Not Provide A Sufficient Basis For Its Targeted Dumping Allegation...................................................................................................7

   D. Petitioners' Allegation Does Not Demonstrate A Pattern Of Prices That Differ Significantly..................................................................................................9

2. THE DEPARTMENT SHOULD NOT DISTINGUISH JBF'S PRIME FROM ITS NON PRIME SALES......................................................................................10

3. THE DEPARTMENT'S STATED INTENTION TO ISSUE ASSESSMENT INSTRUCTIONS WITHIN 15 DAYS OF THE FINAL DETERMINATION IS CONTRARY TO LAW...............................................................................13

# III. CONCLUSION...........................................................................................14

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 1/14/13 9:53 AM, Submission Status: Approved

## TABLE OF AUTHORITIES

**CASES**

*Brown v. Gardner*, 513 U.S. 115, 120 (1994)...........................................................................4

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)....4

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002).................................4

*Nken v. Holder*, 556 U.S. 418, 430 (2009)...................................................................4

**STATUTES**

19 U.S.C. § 1675(a)(2)(B)(iv), (C).............................................................................6

19 U.S.C. § 1677f-1(d).............................................................................................7

19 U.S.C. § 1516a(a)(2)(A)(i)(I)............................................................................13

19 U.S.C. § 1516a(a)(2)(B)(iii).............................................................................13

28 U.S.C. § 1581(c)................................................................................................13

**OTHER AUTHORITIES**

19 C.F.R. § 351.213(h) ............................................................................................6

19 CFR 351.302

Certain Stilbenic Optical Brightening Agents from Taiwan, 77 Fed. Reg. 17,027, 17,028 (Mar. 23, 2012)..............................................................................................................9

Memorandum from Susan H. Kuhbach to Christian Marsh, Less-Than-Fair Value Investigation on Certain Stilbenic Optical Brightening Agents from Taiwan: Targeted Dumping – The Fong Min International Co., Ltd. (Case No. A-583-848) at 5 (Oct. 27, 2011).....................................................................................................................9

Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Polyethylene Terephthalate Film, Sheet and Strip from India: July 1, 2004, through June 30, 2005 at 5 dated August 17, 2006.........10

Memo to Ronald K. Lorentzen November 30, 2012, Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates..................................................................................................................................2

Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review, at 77 Fed. Reg. 73010, et seq. (December 7, 2012)........................1

Uruguay Round Agreements Act, H.R. 103-826, Oct. 3, 1994, p. 98............................7

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 1/14/13 9:53 AM, Submission Status: Approved

**Before The**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

| | |
|---|---|
| In The Matter of: | |
| | Public |
| | Document |
| Polyethylene Terephthalate (PET) Film | |
| from the United Arab Emirates | |

**CASE BRIEF OF JBF RAK LLC ("JBF")**

## I.  INTRODUCTION AND SUMMARY

### A.  INTRODUCTION

**JBF RAK LLC ("JBF")** hereby submits this case brief.  This brief comments on the Department's Preliminary Results as reflected in *Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review,* at 77 *Fed. Reg.* 73010, et seq. (December 7, 2012).  This brief is submitted pursuant to 19 C.F.R. §351.309 and the Department's revised scheduling dated January 4, 2013.  As discussed herein, the Department should modify its determination from the preliminary results with regard to JBF.

### B.  SUMMARY OF ARGUMENT

- Commerce can not lawfully consider the petitioners' allegation of targeted dumping.

- The Department should match JBF's sales of prime to non prime film.

**Jt. App.145**

Case Brief of JBF RAK LLC
January 14, 2013
Page 2

- The assessment instructions can not be issued prior to 30 days after the date of publication of the final determination.

## II.  ARGUMENT

### 1. COMMERCE CAN NOT LAWFULLY CONSIDER THE TARGETED DUMPING ALLEGATION

In the preliminary determination, the Department stated that the petitioners' allegation dated November 16, 2012, of targeted dumping was timely but would be considered after the preliminary determination as the Department did not have sufficient time to analyze the allegation. Memo to Ronald K. Lorentzen November 30, 2012, Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates. JBF submits that the allegation was untimely and can not otherwise be considered.

### A. There is No Statutory or Regulatory Authority to Consider an Allegation of Targeted Dumping in Administrative Reviews.

19 U.S.C. § 1677f-1(d) provides with respect to antidumping investigations an *exception* to the calculation methodology. Section 1677f-1(d)(1)(A) states:

### (1) Investigations

### (A) In general

In an investigation under part II of this subtitle, the administering authority shall determine

**Jt. App.146**

Case Brief of JBF RAK LLC
January 14, 2013
Page 3

> whether the subject merchandise is being sold in
> the United States at less than fair value –
>
>> (i)        by comparing the weighted
>> average of the normal values to the
>> weighted average of the export prices
>> (and constructed export prices) for
>> comparable merchandise, or
>>
>> (ii)       by comparing the normal
>> values of individual transactions to the
>> export prices (or constructed export
>> prices) of individual transactions for
>> comparable merchandise.
>> 19 U.S.C. § 1677f-1(d)(1)(A).

The calculation methodology in reviews is provided in a separate provision -

Section 1677f-1(d)(2):

> **(2) Reviews**
>
> In a review under section 1675 of this title, when
> comparing export prices (or constructed export prices) of
> individual transactions to weighted average price of sales of
> the foreign like product, the administering authority shall
> limit its averaging of prices to a period not exceeding the
> calendar month that corresponds most closely to the
> calendar month of the individual export sale.

The above statutory provision with respect to reviews does not provide

Commerce with the authority to consider a targeted dumping allegation.

Unlike the specific authority granted in investigations, there is an absence of

any reference to targeted dumping or exceptions to the calculation

methodology. Any claim that Commerce has the authority in reviews to

consider the allegation by virtue of the statutory authority in investigations

must fail. *See, e.g., FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir.

2002).

**Jt. App.147**

Case Brief of JBF RAK LLC
January 14, 2013
Page 4

Further, Commerce can not consider the allegation by relying on the statutory provision for investigations to fill in a presumed gap in the statutory authority. "But no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority." *FAG Italia*, 291 F.3d at 816. It is well settled that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotes omitted); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994). Here, the statute creates an exception for investigations and the provisions immediately after applicable to reviews, do not, and, thus, refute any asserted ambiguity. Clearly, the statute creates the authority to consider the allegation in investigations and the explicit absence thereof in reviews refutes any such authority in reviews. Any attempt by regulation or otherwise to create the authority where the statute omits such authority is unlawful. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "The Supreme Court has noted that 'an agency literally has no power to act ... unless and until Congress confers power upon it." *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002). Congress has not granted such authority here and, as such, the Department can not consider Petitioners' allegation.

**Jt. App.148**

Case Brief of JBF RAK LLC
January 14, 2013
Page 5

**B. Petitioners' Targeted Dumping Allegation is Improperly Submitted Information and Should be Rejected**

    **1. Petitioners' submission is untimely.**

    Untimely or unsolicited information is to be returned to the submitter pursuant to 19 CFR 351.302. Petitioners' allegation is both unsolicited and untimely. Factual information to rebut factual information must be submitted within 10 days of service pursuant to 19 CFR 351.301(c)(1). Here, Petitioners' allegation is based upon JBF's US sales database. This database was first submitted (and served on Petitioners) on April 19, 2012. The second version in response to the first supplemental was filed on July 5, 2012 and the last in response to the second supplemental on September 12, 2012. In all three cases, Petitioners' had an opportunity to timely rebut or request an extension of time to rebut the US sales data. Instead, Petitioners filed its allegation here, over two months after the last and final US sales data was submitted and served, and some two weeks before the scheduled preliminary determination. Petitioners had all the information it needed to make its allegation over two months prior to its submission and has not provided any excuse as to why it waited until right before the scheduled preliminary determination.[1]

---

[1] Any asserted argument that Petitioners 'allegation is not factual information subject to the 10 day rebuttal deadline is without merit. See *e.g.* Certain Appliance Shelving from the People's Republic of China, , Letter from Department dated June 17, 2009, Redaction of New Information, New King Shan and submission of request by New King Shan for reconsideration of rejection of brief dated June 19, 2009. There, the Department rejected as new factual information spreadsheets analyzing verification exhibits. Here, the department should similarly reject Petitioners' allegation creating alleged facts based upon JBF's sales data.

**Jt. App.149**

Case Brief of JBF RAK LLC
January 14, 2013
Page 6

## 2. Acceptance of Petitioners' allegation at this time would require the Department to issue an unauthorized "post- preliminary determination"

Under the statute, Commerce is required to issue two determinations in an administrative review - preliminary and a final determinations. 19 U.S.C. § 1675(a)(2)(B)(iv), (C) ("The administering authority shall make a preliminary determination in a review ... within 180 days ..., and a final determination within 90 days ...; "The determination under this paragraph shall be the basis for the assessment of ... antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties.").

Commerce's regulations also provide for the two determinations and deadlines pursuant to 19 C.F.R. § 351.213(h) ("*Time limits* —(1) *In general.* The Secretary will issue preliminary results of review (*see* § 351.221(b)(4)) within 245 days after the last day of the anniversary month of the order or suspension agreement for which the administrative review was requested, and final results of review (*see* § 351.221(b)(5)) within 120 days after the date on which notice of the preliminary results was published in the FEDERAL REGISTER."). There is no authority for Commerce to issue post - preliminary determinations. However, due to the late and untimely submission of Petitioners' allegation, this is exactly what must occur if Petitioners' allegation is not rejected as there is no possibility that the Department could review, allow JBF an opportunity to comment and consider the allegation before the preliminary determination is required to be issued by statute and regulation. Petitioners' failure to timely submit its allegation does not allow any possible lawful consideration of the allegation. A post- preliminary determination is a third determination not authorized by statute or regulation. As

## Jt. App.150

Petitioner had the opportunity to submit its allegation at the latest some two months ago and failed to do so, and consideration now would require an unlawful post-preliminary determination, Petitioners' allegation, whether considered factual or otherwise, should be rejected.[2]

## C.  PETITIONER DOES NOT PROVIDE A SUFFICIENT BASIS FOR ITS TARGETED DUMPING ALLEGATION

The Petitioners' allegation does not meet the requirements of the statute even assuming arguendo that the Department does have the legal authority to consider the allegation. Petitioners' targeted dumping allegation blindly applies the Nails test to JBF's sales. The allegation does not attempt to provide any explanation as to why and how the alleged targeted customers, time periods, and region were selected and thus allegedly resulted in targeted dumping. Such explanation is necessary for the Department to initiate a targeted dumping inquiry, because it is required to determine whether any observed pricing pattern is the result of an intentional targeted dumping strategy.

Congress explained its concerns regarding masked dumping and attempted to address them in section 1677f-1(d)(1)(B): "[i]n such situations, the exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions." Uruguay Round

___

[2] Acceptance of this late stage allegation could be precedent of allowing submission of such allegations on the date of, or even after, the preliminary determination. Time limits for submission of certain allegations are provided in 19 CFR 351.301(d). All provide deadlines that are a reasonable time after filing of information needed as a basis for the allegation. No deadline is provided some two months after the information necessary as a basis for the allegation is of record, and in no case does a deadline allow consideration and a determination after the preliminary determination.

Case Brief of JBF RAK LLC
January 14, 2013
Page 8

Agreements Act, H.R. 103-826, Oct. 3, 1994, p. 98. Finding "patterns" based on minor differences, without an explanation for how or why those differences masked dumping is not what Congress contemplated.

Petitioners' allegation fails to provide any information on the market for the subject merchandise or the effect of specific time periods on pricing in the U.S. market." Nor does it explain "what regions may be targeted for a particular product, or what time periods are most signiflcant.' and how those time perinds 'can impact prices in the U.S. market.' Petitioners' allegation attempts to technically satisfy the targeted dumping test but provides no explanation of what these customers have in common, the significance of the grouping, or how and why the particular combination of customers were targeted. The same is true of the alleged targeted time periods. There is no connection provided between the alleged customers, time periods, and region, and any evidence that targeted dumping has occurred. Instead, the minor statistical differences found are the result of JBF's pricing reflecting market conditions during the POR. PET film is a world wide commodity and JBF's prices reflect the volatility in the prices during the POR. As demonstarted by Exhibit 1 to JBF's response to petitioners' targeted dumping allegatron, JBF letter of November 29, 2012, prices during the POR, decreased over the POR by approximately a third and the minor differences alleged by Petitioners' allegation, therefore, can be explained purely by the volatility of pricing during the POR and does exhibit targeted or masked dumping. Accordingly, the Department should reject Petitioner's targeted dumping allegation, as it provides no factual basis for the allegation.

**Jt. App.152**

Case Brief of JBF RAK LLC                                      **PUBLIC VERSION**
January 14, 2013
Page 9

### D. Petitioners' Allegation Does Not Demonstrate A Pattern Of Prices That Differ Significantly

Notwithstanding the above, Petitioners' allegation does not demonstrate a prima fascia case of targeted dumping as it alleges only [      ] percent of US sales by value and [      ] percent by volume were targeted. Petitioners' Exhibit 2 at 39. Commerce has recently held that it is inappropriate to impose the targeted dumping remedy even if certain sales technically satisfy the <u>Nails</u> test. In <u>Certain Stilbenic Optical Brightening Agents from Taiwan,</u> Commerce continued to use its normal average-to-average comparison methodology even though certain sales satisfied the targeted dumping test, because those sales were too small as a percentage of the respondent's total U.S. sales. <u>See Certain Stilbenic Optical Brightening Agents from Taiwan,</u> 77 Fed. Reg. 17,027, 17,028 (Mar. 23, 2012) (finding that "the overall proportion of TFM's U.S. sales during the POI that satisfy the criteria of section 777A(d)(1)(B)(i) of the Act was insufficient to establish a pattern of export prices for comparable merchandise that differ significantly among certain customers or regions."). Technical satisfaction of the <u>Nails</u> test can not establish targeted dumping within the meaning of the statute. Even though certain sales technically satisfied that test, Commerce stated that "the criteria established in 777A(d)(1)(B)(i) of the Act have not been met with respect to the allegation of customer and regional targeted dumping by TFM." Memorandum from Susan H. Kuhbach to Christian Marsh, <u>Less-Than-Fair Value Investigation on Certain Stilbenic Optical Brightening Agents from Taiwan: Targeted Dumping – The Fong Min International Co., Ltd.</u> (Case No. A-583-848) at 5 (Oct. 27, 2011).

**Jt. App.153**

Case Brief of JBF RAK LLC
January 14, 2013
Page 10

It would be inappropriate to impose the targeted dumping remedy if only a de minimis percentage of a respondent's total U.S. sales technically satisfy the Nails test. A comparison of the level of sales found to be targeted to total U.S. sales in order to determine whether any observed pattern of price variations must be "significant." Here a low level of supposedly targeted sales is alleged and is insufficient to establish significance.

JBF submits that that there can be only one conclusion from the allegation submitted by Petitioners, JBF's U.S. sales do not reflect a pattern of export prices that differs significantly among certain purchasers. Accordingly, Petitioners' allegation should be rejected.

## 2. THE DEPARTMENT SHOULD NOT DISTINGUISH JBF'S PRIME FROM ITS NON PRIME SALES

JBF reported under field "GRADEH" prime and non prime sales of film. In its model match, the Department failed to match any home market sale of non prime to a US sale even where the products were contemporaneous or otherwise identical. We respectfully submit this is incorrect.

In response to a similar request that there should be no distinction between sales of prime and non prime film, the Department stated in its Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Polyethylene Terephthalate Film, Sheet and

**Jt. App.154**

Case Brief of JBF RAK LLC
January 14, 2013
Page 11

Strip from India: July 1, 2004, through June 30, 2005 at 5 dated August 17, 2006

(Emphasis added):

> Department's Position:
> Given the difference in the physical characteristics between prime and
> non-prime merchandise, as reflected in MTZ's own records,[7] and the
> potential distortion resulting from comparing sales of prime merchandise
> in the U.S. market to sales of non-prime merchandise sold in India, we
> continue to find that it was appropriate for the Department to distinguish
> between MTZ's sales of prime and non-prime merchandise.
>
> x  x  x

---

[7] MTZ explained that **"A" grade film is ". . . film
which meets all specifications, whereas, non-"A" grade film is film
which has some physical defects and does not meet all of the
specifications for the film."** See MTZ's March 16, 2006, submission at
1.

In sharp contrast to the record in the above that formed the basis of the

Department's treatment of prime and non prime, is the record in this review. This

very issue was raised by the Department and addressed by JBF in Supplement 1 to

the sales questionnaire (JBF's response dated July 5, 2012):

> ```
> 3. Please provide a definition of "prime" and
> "non prime" film. How does JBF determine which
> film is prime and which is non prime?
> ```
>
> Prime grade films are those whose parameters are as per the specifications
> required by the **customer**. Non Prime grade are those whose parameters
> deviate from the **customer's** specifications.

Because JBF distinguishes prime from non prime on the basis of the customer's

specification, where a customer's specifications exceed or are different from JBF's

specifications (as reported in response to Section A), the sale would be

Case Brief of JBF RAK LLC                                **PUBLIC VERSION**
January 14, 2013
Page 12

characterized as non prime although the product could meet JBF's specification.

This is clearly different from the record in the above noted review of PET film

from India where the Department held that based on those facts, there exist "the

potential distortion resulting from comparing sales of prime merchandise in the

U.S. market to sales of non-prime merchandise." The record here does not

support the same conclusion as the difference between prime and non prime is

based upon the customer's specification.

That there is no potential distortion resulting from comparing prime with non

prime sales is reflected by the pricing of these films. For example, JBF reported

[

]³

---

³ JBF is [

Case Brief of JBF RAK LLC                          **PUBLIC VERSION**
January 14, 2013
Page 13

As there is no potential distortion resulting from comparing JBF's sales of prime

and non prime product, we request that the model match treat prime and non

prime in the same manner.

### 3. THE DEPARTMENT'S STATED INTENTION TO ISSUE ASSESSMENT INSTRUCTIONS WITHIN 15 DAYS OF THE FINAL DETERMINATION IS CONTRARY TO LAW

In the preliminary determination, the Department states that "... intends to issue

assessment instructions to CBP 15 days after the date of publication of the

final results of review."

Interested parties may bring an action in the Court of International Trade to

contest a final determination in an antidumping administrative review within

30 days of publication of the final results pursuant to the authority of 19U.S.C.

§1516a(a)(2)(A)(i)(I),   19   U.S.C.   §1516a(a)(2)(B)(iii),   and   28   U.S.C.

§1581(c).

Commerce's 15-day policy unlawfully "forces plaintiffs to prepare and file a

summons, a complaint, and a motion for a preliminary injunction, all within

the fifteen-day period following publication. During that period, a plaintiff also

must engage the defendant (and, possibly, a defendant-intervenor) in discussions

concerning consent to an injunction and, should consent not be forthcoming,

]

**Jt. App.157**

Case Brief of JBF RAK LLC
January 14, 2013
Page 14

must prepare to litigate the injunction issue expeditiously. "*SKF USA Inc. v. United States*, 659 F. Supp. 2d 1338, 1351, Slip Op. 09 121 (Ct. Int'l Trade October 2009).

The Department should state that it intends to issue assessment instructions no earlier than the day after expiration of the time interested parties may commence an action contesting the final results; that is, 30 days after publication of the final determination.

## III.   CONCLUSION

In conclusion, the Department should make the following adjustments to the antidumping calculations in the final results:

- Reject petitioners' allegation of targeted dumping.

- The Department should adjust the margin calculations so that JBF's sales of non prime and prime films are matched.

- The assessment instructions should not be issued, and the Department's final determination should state that it will not be issued, until 30 days after publication of the final determination.

Respectfully submitted,

**Galvin and Mlawski**

By:

Jack D. Mlawski
Galvin and Mlawski
Counsel for JBF RAK LLC

January 14, 2013

**Jt. App.158**

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-520-803
POR: 11/1/2010 - 10/31/2011
**Public Document**
O6: AH

March 8, 2013

**MEMORANDUM TO:**    Paul Piquado
Assistant Secretary
for Import Administration

**FROM:**    Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:**    2010-2011 Administrative Review of the Antidumping Duty Order
on Polyethylene Terephthalate Film, Sheet, and Strip from the
United Arab Emirates:  Post-Preliminary Analysis and Calculation
Memorandum of JBF RAK LLC.

---

**Background**

This memorandum provides additional analysis following the Department of Commerce's ("the
Department") preliminary results[1] in the above-captioned administrative review.

On November 16, 2012, Petitioners[2] filed a targeted dumping allegation, requesting that the
Department use an alternative comparison method, making average-to-transaction comparisons
of normal value to export price (EP) or constructed export price (CEP) with respect to one
respondent in the above referenced review, JBF RAK LLC (JBF).  On November 29, 2012, JBF
contested the allegation and offered several reasons as to why the Department should reject the
allegation.

Pursuant to 19 CFR 351.414(c)(1), the Department may determine that in particular
circumstances it is appropriate to calculate individual dumping margins by comparing weighted-
average normal values to the EPs (or CEPs) of individual transactions (average-to-transaction
method).  For purposes of the Preliminary Results, the Department did not address the targeted
dumping allegation for JBF, but noted that the Department intended to continue to consider,
pursuant to 19 CFR 351.414(c), whether an alternative comparison method is appropriate in this
administrative review.[3]  In calculating the weighted-average dumping margin for JBF in the
Preliminary Results, the Department compared monthly weighted-average export prices with

---

[1] See Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates:  Preliminary Results of
Antidumping Duty Administrative Review, 77 FR 73010 (December 7, 2012) (Preliminary Results).
[2] Petitioners are DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc.
[3] See Preliminary Results, and accompanying Preliminary Decision Memorandum at 3.



INTERNATIONAL
**TRADE**
ADMINISTRATION

**Jt. App.159**

monthly weighted-average normal values (average-to-average method) pursuant to 19 CFR 351.414(c).[4]  The Department noted that the <u>Preliminary Results</u> afforded parties an opportunity to meaningfully comment on the application of this methodology in the context of this administrative review.[5]

Petitioners urged the Department to conduct the targeted dumping analysis, as currently applied in antidumping investigations, in the instant administrative review to ascertain whether JBF engaged in targeted dumping.  Petitioners contended that the Department would find that JBF engaged in targeted dumping, and argued that the Department should calculate the weighted-average dumping margin for JBF using an alternative method (<u>i.e.</u>, the average-to-transaction method) and not allow offsets for sales with negative comparison results.  JBF subsequently argued that the Department should not apply the alternative method and should continue to use the average-to-average method to calculate its weighted-average dumping margin.

**Application of An Alternative Methodology**

In antidumping investigations, the Department examines whether to use an alternative comparison method by using a targeted dumping analysis consistent with section 777A(d)(l)(B) of the Tariff Act of 1930, as amended (the Act).  Although section 777A(d)(1)(B) of the Act does not strictly govern the Department's examination of this question in the context of administrative reviews, the Department nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in antidumping investigations.  Accordingly, the Department finds the analysis that has been used in antidumping investigations may be instructive for purposes of examining whether to apply an alternative comparison method in the instant administrative review.

In recent antidumping investigations where the Department has addressed targeted dumping allegations, the Department has employed the <u>Nails</u> test[6] for each respondent subject to an allegation to determine whether a pattern of export prices which differ significantly existed within the U.S. market.[7]  The Department has now taken the <u>Preliminary Results</u> of this administrative review and applied the <u>Nails</u> test, a two-step process as described below, in order to consider, separately for JBF, whether to use an alternative comparison method (<u>i.e.</u>, the average-to-transaction method) so that parties may comment on this approach.

---

[4] <u>See</u> <u>id.</u> at 73011 n.5.
[5] <u>See</u> <u>id.</u> at 73010.
[6] <u>See</u> <u>Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination  of Critical Circumstances</u>, 73 FR 33977 (June 16, 2008) and <u>Certain Steel Nails from the United Arab Emirates:  Notice of Final Determination of Sales at Not Less Than Fair Value</u>, 73 FR 33985 (June 16, 2008) (collectively, "<u>Nails</u>"), as modified in more recent investigations, <u>e.g.</u>, <u>Multilayered Wood Flooring From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value</u>, 76 FR 64318 (October 18, 2011); <u>see</u> <u>also</u> <u>Mid Continent Nail Corp. v. United States</u>, Slip. Op. 2010-47 (Ct. Int'l  Trade May 4, 2010) and <u>Mid Continent Nail Corp. v. United States</u>, Slip. Op. 2010-48 (Ct. Int'l Trade May 4, 2010).
[7] <u>See</u>, <u>e.g.</u>, <u>Polyethylene Retail Carrier Bags from Taiwan:  Final Determination of Sales at Less Than Fair Value</u>, 75 FR 14569 (March 26, 2010); <u>Certain Oil Country Tubular Goods from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping</u>, 75 FR 20335 (April 19, 2010); <u>Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value</u>, 75 FR 59217 (September 27, 2010).

**Jt. App.160**

Filed By: Andrew Huston, Filed Date: 3/8/13 6:14 PM, Submission Status: Approved

In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's sales of subject merchandise that are at prices more than one standard deviation below the weighted-average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the weighted-average sales prices to the allegedly targeted groups and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of a respondent's sales of subject merchandise to the allegedly targeted group, then we did not conduct the second stage of the Nails test. If that volume exceeded 33 percent of the total volume of a respondent's sales of subject merchandise to the allegedly targeted group, on the other hand, then we proceeded to the second stage of the Nails test.

In the second stage, we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price to the allegedly targeted group and the next higher weighted-average price to a non-targeted group exceeds the average price gap (weighted by sales volume) between the non-targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted sales were not included in the non-targeted groups; the allegedly targeted group's weighted-average sales price was compared only to the weighted-average sales prices to the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred.

If the Department's two-step analysis confirmed the allegation of targeting and sufficient sales were found to have passed the Nails test, then the Department considered whether the average-to-average method could take into account the observed price differences. To do this, the Department evaluated the difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method. Where there was a meaningful difference between the results of the average-to-average method and the average-to-transaction method, the average-to-average method would not be able to take into account the observed price differences, and the average-to-transaction method would be used to calculate the weighted-average dumping margin for the respondent in question. Where there was not a meaningful difference in the results, the average-to-average method would be able to take into account the observed price differences, and the average-to-average method would be used to calculate the weighted-average dumping margin for the respondent in question.

## Results of the Targeted Dumping Analysis

We have applied the above described targeted dumping analysis for determining whether the circumstances of this administrative review are such that it is appropriate to apply the average-to-average method.

Based on this analysis, the Department preliminarily finds, for JBF, that a pattern of EPs (or CEPs) for comparable merchandise that differs significantly among purchasers, regions or time

3

## Jt. App.161

periods does exists.  Further, the Department finds that the average-to-average method cannot take into account the observed price differences because there is a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average method and the average-to-transaction method.  Therefore, the Department has used the average-to-transaction method to calculate the weighted-average dumping margin for JBF in this post-preliminary analysis.[8]

**Comments**

The Department will disclose the calculations that it used in its post-preliminary analysis to parties in this administrative review.  The Department is now inviting parties to comment on the application of the analysis described above for determining whether the circumstances of this administrative review is such that it is appropriate to apply an average-to-transaction method as an alternative to the average-to-average method, and if so, how such an alternative method should be applied.  The Department will address all comments on the Preliminary Results, and this post-preliminary analysis in the final results of this administrative review.

Comments from interested parties may be submitted no later than seven days from the date of issuance of this memorandum.  Rebuttals to these comments, limited to the issues raised, may be submitted no later than five days from the deadline for the submission of the comments.

Parties who submit comments or rebuttal comments in this review are requested to submit with each argument:  (1) a statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.  Executive summaries should be limited to five pages total, including footnotes.  The Department intends to issue the final results of this administrative review, including the results of its analysis of issues raised in the case and rebuttal briefs as well as these comments and rebuttal comments, no later than June 5, 2013.

---

[8] See Memorandum to the File from Andrew Huston, International Trade Compliance Analyst, "Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates – Post-Preliminary Results Analysis Memo for JBF RAK LLC," dated concurrently with this post-preliminary analysis.

4

**Jt. App.162**

**Recommendation**

Based on the foregoing analysis and discussion, we recommend you approve the positions described above.

AGREE _____✓_____    DISAGREE _____

_____
Paul Piquado
Assistant Secretary
  for Import Administration

_____8 MARCH 2013_____
(Date)



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-520-803
Administrative Review
POR: 11/01/2010-10/31/2011
O6: AH
~~Proprietary Document~~ Public Version

March 8, 2013

MEMORANDUM TO:    The File


THROUGH:    Mark Hoadley
            Program Manager
            AD/CVD Operations, Office 6
            Import Administration


FROM:    Andrew Huston
         International Trade Compliance Analyst
         AD/CVD Operations, Office 6
         Import Administration

SUBJECT:    Polyethylene Terephthalate Film, Sheet, and Strip from the United
            Arab Emirates – Post-Preliminary Results Analysis Memo for JBF
            RAK LLC.


## I.    Final Margin Statistics

| | |
|---|---|
| Total U.S. Quantity Sold | [          ] KG |
| Total Value U.S. Sales | $[        ] |
| Total Amount of Dumping | $[        ] |
| Weighted Average Margin | 9.80% |


## II.    Background

On November 16, 2012, Petitioners[1] filed targeted dumping allegations for JBF RAK LLC.  On
December 7, 2012, we published in the *Federal Register* our Preliminary Results[2] for the 2010-
2011 administrative review of the antidumping duty order on Polyethylene Terephthalate Film,
Sheet, and Strip from the United Arab Emirates.  For purposes of the Preliminary Results, the
Department of Commerce (the Department) did not address the targeted dumping allegations for

---

[1] Petitioners are DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc.
[2] See Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates:  Preliminary Results of
Antidumping Duty Administrative Review (Preliminary Results), 77 FR 73010(December 7, 2012).

**Jt. App.164**

Confidential Information Deleted From Nonconfidential Appendix

Nan Ya but noted that the Department intended to continue to consider, pursuant to 19 CFR 351.414(c), whether an alternative comparison method is appropriate in these administrative reviews.

III.   Changes to the Programs

We made no changes to the comparison-market program that we used for the preliminary results. For the margin program, we set the program to run the targeted-dumping analysis on a time-specific basis and customer specific basis (section 1-E-iv-a of the program) and defined the target group based on the petitioner's allegations (section 11-A and 11-C of the program):

```
%LET  TARGET_ALLEGATION   = YES
%LET  RUN_CUSTOMER         = YES
%LET  RUN_REGION           = NO;

%MACRO CUSTOMER_SETUP;
CUSTOMER      = CUSCODU;
IF CUSTOMER IN[('F5230205' 'F5230449' 'F5230456' 'F5230466'
'F5230551')] THEN TARGET_TYPE = "AT";
ELSE TARGET_TYPE = "NT";
%MEND CUSTOMER_SETUP;%

MACRO TIME_SETUP;
TIME          = USMONTH;
              IF TIME IN [■■■■■■■■■] THEN TARGET_TYPE = "AT";
              ELSE TARGET_TYPE = "NT";
%MEND TIME_SETUP;
```

IV.   Targeted Dumping Determination

Based on our application of the targeted-dumping test, we found that [■■■] percent of U.S. sales by value and [■■■■] percent of U.S. sales by volume were targeted. Of the U.S. sales targeted, [■] percent by value and [■] percent by volume were dumped. Based on these percentages, we find that there is a pattern of prices for JBF's U.S. sales of comparable merchandise that differs significantly among [■■■■■■■■■■■■]. Accordingly, we have calculated JBF's margin using the alternative methodology (i.e., average-to-transaction comparisons).

V.   Attachments

Electronic copies of the following documents will be released as disclosure materials to the respondent and domestic parties' counsel who have access to the respondent's business-proprietary materials under the Administrative Protective Order:

   A. Antidumping duty margin-calculation program (business-proprietary document only)
   B. Antidumping duty margin-calculation log and output (business-proprietary documents only).

2

**Jt. App.165**

# GALVIN & MLAWSKI

*Attorneys at Law*

**245 Fifth Avenue, Suite 1902**

**New York, New York 10016**

**Tel: (212) 679-1500**
**Fax: (212) 971-0417**

March 18, 2013

Hon. Rebecca Blank                     Case No. A-520-803
Assistant Secretary of Commerce        Total Pages: 22
U.S. Department of Commerce            Administrative Review
Attn: Import Administration            November 1, 2010 to October
Central Records Unit                   31, 2011
Room 1870                              AD/CVD Operations, Office 6
14th and Constitution Aves., N.W.
Washington, DC 20230                   ***PUBLIC DOCUMENT***


Attn: Mark Hoadley,
     Program Manager
     Office 6


     Re: Polyethylene Terephthalate (PET) Film, Sheet and Strip
        from the United Arab Emirates (A-520-803); Response of
        JBF RAK LLC to the Post-Preliminary Results

Dear Assistant Sec. Blank:

On behalf of JBF RAK LLC and pursuant we hereby submit the
attached Response of JBF RAK LLC to the Post-Preliminary Results
dated March 8, 2013. This submission is timely pursuant to the
Department's letter of March 12, 2013.

If there are any questions, please do not hesitate to contact the undersigned.

Respectfully submitted,

GALVIN & MLAWSKI

Jack D. Mlawski

Counsel for JBF RAK LLC

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 3/18/13 3:04 PM, Submission Status: Approved

### Certificate of Service
### Service List: A-520-803
### Polyethylene Terephthalate (Pet) Film, Sheet, and Strip from United Arab Emirates
### Admin. Review 11/1/10-10/31/11

I, Jack D. Mlawski, on behalf of JBF RAK LLC hereby certify that copies of the foregoing document were served upon the following on March 18, 2013 in the manner noted:

David Horn, Esq.*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006


John M. Gurley, Esq.**
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339

J. Michael Taylor, Esq.***
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

_____
Jack D. Mlawski


* As agreed by the parties, by email.
**By first class mail
***As agreed by the parties, by email of the public versions and documents.


### Jt. App.168

March 18, 2013
Page 4

## COMPANY CERTIFICATION

I, Praveen Chandalia, General Manager, Finance, currently employed by JBF RAK LLC, certify that I prepared or otherwise supervised the preparation of the attached response to the post-preliminary results, *Polyethylene Terephthalate (PET) Film from the United Arab Emirates, Case No., A-520-803, for the period November 1, 2010 to October 31, 2011,* certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate by the U.S. Department of Commerce. I am also aware that U.S. law including, but not limited to. 18 USC 1001 imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may he withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____

Date: __16 | 3 | 2013__

Jt. App.169

## REPRESENTATIVE CERTIFICATION

I, JACK D. MLAWSKI, with GALVIN & MLAWSKI, counsel or representative to JBF RAK LLC, certify that I have read the attached response to the post-preliminary results pursuant to the antidumping administrative review under the antidumping duty order on Polyethylene Terephthalate (PET) Film from the United Arab Emirates, Case No. A-520-803, for the period of November 1, 2010 to October 31, 2011. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.


Signature: _____

Jack D. Mlawski

**Before The**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

In The Matter of:

Polyethylene Terephthalate (PET) Film
from the United Arab Emirates

Public Document

### RESPONSE OF JBF RAK LLC ("JBF") TO THE POST-PRELIMINARY RESULTS

Jack D. Mlawski
Galvin and Mlawski
245 Fifth Avenue
Ste. 1902
New York, NY 10016
(212)679-1500

Counsel for JBF RAK LLC

March 18, 2013

# EXECUTIVE SUMMARY

- The Department improperly determined targeted dumping because:

-Unlike antidumping investigations where the statute specifically provides for targeted dumping allegations, there is no statutory authority that provides for such allegations in administrative reviews. If Congress intended to provide the authority to the Department it would not have created an exception only with respect to investigations without providing within the same provision an exception for reviews. As stated by the US Supreme Court, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." ;

-Petitioners' targeted dumping allegation is improperly submitted information and should be rejected as Petitioners' submission is untimely submitted factual information filed some two months after JBF submitted the information upon which the allegation is based and some two weeks prior to the scheduled preliminary determination. Further, acceptance of Petitioners' allegation required the Department to issue an unauthorized post- preliminary determination. There is no statute or regulation that allows for a post preliminary determination.;

-JBF can not create a pattern of US sales to mask dumping. JBF sells to customers in the US on a sale by sale basis at individually negotiated prices reflecting market conditions at the time of sale. There are no short or long term supply contracts, or obligation by the buyer to purchase additional product, or any obligation to sell to any customer. JBF therefore is not aware of the price or timing of its next sale as each sale is individually negotiated. In contrast, exporters having at least some term supply contracts for US sales can use future sales to mask dumping. If an exporter is aware of the price of its future sales, it can target sales at a lower dumped price to the US as it can use the sales subject to the term agreement to mask the dumped sales. It can offer lower prices to some customers as it has term supply contracts that will allow it to mask any dumping. JBF has no ability to do this. It can not target sales as it has no assurance that future sales are at prices that will mask dumped sales. It is not as if it can negotiate a sale with a buyer at a price greater than the customer is willing to pay in order to use that sale to mask JBF's dumped sales. JBF's buyers do not have any obligation to, and certainly will not, purchase product at prices to satisfy JBF's alleged need to use the sale to mask dumped sales. Instead, the pattern that the Department found in the post preliminary result was not the consequence of any attempt to mask dumping as JBF does not have the ability to target prices to mask dumping. The patterns discovered are caused by the fact that the sales were during a period of extreme price volatility or statistical anomalies or the consequence of selling at individually negotiated prices. PET film is a world wide commodity and JBF's prices reflect the volatility in the prices during the POR. Prices during the POR, decreased over the POR by approximately a third and price differences or gaps, therefore, can be explained purely by the volatility of pricing during the POR and does not exhibit targeted or masked dumping. That the price

differences or gaps found by the Department are not the result of masking but the consequence of JBF's selling at negotiated transactaction based prices in a volatile market can be demonstrated by a review of the contemporaneous sale price differences for identical products in home market sales. These UAE sale price differences could, if these sales were to the United States, exhibit a pattern amounting to targeting. However, as these are UAE sales and targeting is irrelevant and can not exist for the purpose of masking dumped sales, the pricing pattern is merely a consequence of JBF's individual transaction sales practice and nothing more. It demonstrates that if, sales prices are negoitated individually in a volatile market by customer, and time, a pattern may result that may create price gaps but are not targeted. Technical satisfaction of the <u>Nails</u> test can not establish targeted dumping within the meaning of the statute without considering whether, as here, the exporter demonstrates that its pricing practice does not allow it to target within the meaning of the statute. Therefore, assuming arguendo, that DoC has no obligation to explain why the patterns exist, it must nevertheless consider JBF's pricing practice that do not allow it to create patterns for the purpose of masking dumped sales.

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 3/18/13 3:04 PM, Submission Status: Approved

## TABLE OF CONTENTS

# I. INTRODUCTION AND SUMMARY

1. INTRODUCTION..................................................................................................1

2. SUMMARY OF ARGUMENT...............................................................................1

# II. ARGUMENT

1. There is No Statutory Authority in Administrative Reviews to Consider an Allegation of Targeted Dumping.................................................................................................2

2. Commerce Unlawfully Considered the Targeted Dumping Allegation.................................................................................................................4

a. Petitioners' Targeted Dumping Allegation is Improperly Submitted Information and Should be Rejected. Petitioners' submission is untimely..................................................5

b. Department issued an unauthorized "post- preliminary determination"...................6

3. There is no evidence that the pattern found is an attempt to mask dumping. To the contrary, JBF selling practice does not allow it to create a pattern to mask dumping..............7

# III. CONCLUSION

III. CONCLUSION...................................................................................................10

# TABLE OF AUTHORITIES

## CASES

*Brown v. Gardner*, 513 U.S. 115, 120 (1994)..................................................................3

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)....4

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002)................................3,4

*GPX International Tire Corp. v. United States*, 666 F3d 732, 745 (Fed. Cir. 2011)..........4

*Nken v. Holder*, 556 U.S. 418, 430 (2009).....................................................................3

## STATUTES

19 U.S.C. § 1675(a)(2)(B)(iv), (C)................................................................................6

19 U.S.C. § 1677f-1(d)...................................................................................................2

19 U.S.C. §1516a(a)(2)(A)(i)(I)....................................................................................13

19 U.S.C. §1516a(a)(2)(B)(iii).....................................................................................13

28 U.S.C. §1581(c).....................................................................................................13

## OTHER AUTHORITIES

19 C.F.R. § 351.213(b) and (h).....................................................................................6

19 CFR 351.301(c)(1)..................................................................................................5

19 CFR 351.301(d).......................................................................................................7

19 CFR 351.302............................................................................................................5

Certain Appliance Shelving from the People's Republic of China, , Letter from
Department dated June 17, 2009, Redaction of New Information, New King Shan and
submission of request by New King Shan for reconsideration of rejection of brief dated
June 19, 2009...............................................................................................................5

**Jt. App.175**

Barcode:3124543-01 A-520-803 REV - Admin Review 11/1/10 - 10/31/11 PET Film

Memo to Ronald K. Lorentzen November 30, 2012, Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates....................................................................................................................................................5


Uruguay Round Agreements Act, H.R. 103-826, Oct. 3, 1994, p. 98............................7

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 3/18/13 3:04 PM, Submission Status: Approved

**Before The**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

|  |  |  |
|---|---|---|
| In The Matter of: | : | |
| | : | Public |
| | : | Document |
| Polyethylene Terephthalate (PET) Film | : | |
| from the United Arab Emirates | : | |
| | : | |
| | : | |

**RESPONSE OF JBF RAK LLC ("JBF") TO THE POST-PRELIMINARY RESULTS**

## I. INTRODUCTION AND SUMMARY

### A. INTRODUCTION

**JBF RAK LLC ("JBF")** hereby submits this response to the post-preliminary results dated
March 8, 2013. As discussed herein, the Department should modify its post-preliminary results
with regard to JBF.

### B. SUMMARY OF ARGUMENT

-Commerce does have the statutory authority to consider in reviews, allegations of targeted
dumping.

- Petitioners' targeted dumping allegation is improperly submitted information and should be
rejected. Petitioners' submission is untimely and Department issued an unauthorized "post-
preliminary determination.

- There is no evidence that the pattern found is an attempt to mask dumping. To the
contrary, JBF selling practice does not allow it to create a pattern to mask dumping.

**Jt. App.177**

Case Brief of JBF RAK LLC
March 18, 2013
Page 2

## II.   ARGUMENT

**1. There is No Statutory Authority in Administrative Reviews to Consider an Allegation of Targeted Dumping.**

19 U.S.C. § 1677f-1(d) authorizes the method of calculation of antidumping duty

margins in antidumping investigations and reviews and specifically provides for an *exception*

to the calculation methodology in investigations without providing for such exception in

reviews. Section 1677f-1(d)(1)(A) states:

.

> TITLE 19—CUSTOMS DUTIES
> § 1677f-1
>                       *         *         *
> (d) Determination of less than fair value
> **(1) Investigations**
> (A) In general
> In an investigation under part II of this subtitle, the
> administering authority shall determine whether the subject
> merchandise is being sold in the United States at less than
> fair value -
> (i) by comparing the weighted average of the normal values
> to the weighted average of the export prices (and constructed
> export prices) for comparable merchandise, or
> (ii) by comparing the normal values of individual
> transactions to the export prices (or constructed export
> prices) of individual transactions for comparable
> merchandise.
> **(B) Exception**
> *The administering authority may determine whether the subject*
> *merchandise is being sold in the United States at less than*
> *fair value by comparing the weighted average of the normal*
> *values to the export prices (or constructed export prices) of*
> *individual transactions for comparable merchandise, if -*
> *(i) there is a pattern of export prices (or constructed*
> *export prices) for comparable merchandise that differ*
> *significantly among purchasers, regions, or periods of time,*
> *and*

### Jt. App.178

Case Brief of JBF RAK LLC
March 18, 2013
Page 3

> *(ii) the administering authority explains why such*
> *differences cannot be taken into account using a method*
> *described in paragraph (1)(A)(i) or (ii).*
> **(2) Reviews**
> In a review under section 1675 of this title, when comparing
> export prices (or constructed export prices) of individual
> transactions to the weighted average price of sales of the
> foreign like product, the administering authority shall limit its
> averaging of prices to a period not exceeding the calendar month
> that corresponds most closely to the calendar month of the
> individual export sale. [Emphasis added]
>
> *              *              *

The above statutory provision does not provide Commerce with the authority to consider a targeted dumping allegation. Unlike the specific authority granted in investigations, there is an absence of any reference to targeted dumping or exception to the calculation methodology. Any claim that Commerce has the authority in reviews to consider the allegation by virtue of the statutory authority in investigations therefore, must fail. *See, e.g., FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002).

Commerce improperly considered the targeting allegation by relying on the statutory provision for investigations to fill in what Commerce presumes is a gap in the statutory authority. "But no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority." *FAG Italia*, 291 F.3d at 816. It is well settled that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotes omitted); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994). Here, the statute creates an exception for investigations and the provisions immediately after applicable to reviews, do not, and, thus, refute

Case Brief of JBF RAK LLC
March 18, 2013
Page 4

any asserted ambiguity or silence. Clearly, the statute creates the authority to consider the allegation

in investigations and the explicit absence thereof in reviews denies any such authority in reviews.

Any attempt by regulation or otherwise to create the authority where the statute omits such

authority is unlawful. "If the intent of Congress is clear, that is the end of the matter; for the

court, as well as [an] agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43

(1984). "The Supreme Court has noted that 'an agency literally has no power to act ... unless

and until Congress confers power upon it." *FAG Italia S.p.A. v. United States*, 291 F.3d 806,

816 (Fed. Cir. 2002). "...Although Commerce has wide discretion in administrating

countervailing and antidumping law, it cannot exercise this discretion contrary to congressional

intent." *GPX International Tire Corp. v. United States*, 666 F3d 732, 745 (Fed. Cir. 2011). If, as

it asserts, the Department has the discretionary authority in reviews to conduct targeting inquiries

and impose alternative calculation methods, that discretionary authority would apply to

investigations as well and there would have been no need for Congress to provide for the

exception in Section 1677f-1. By providing a specific exception in investigations for such

authority, Congress clearly indicates that without the specific exception it did not intend to

provide that authority to the Department. Congress has granted such authority by the specific

exception in investigations and not in reviews and, therefore, the Department improperly

considered Petitioners' allegation.


**2. Commerce Unlawfully Considered the Targeted Dumping Allegation**

In the preliminary determination, the Department stated that the petitioners' allegation dated

November 16, 2012, of targeted dumping was timely but would be considered after the

preliminary determination as the Department did not have sufficient time to analyze the

Case Brief of JBF RAK LLC
March 18, 2013
Page 5

allegation. Memo to Ronald K. Lorentzen November 30, 2012, Decision Memorandum for

the Preliminary Results of Antidumping Duty Administrative Review: Polyethylene

Terephthalate Film, Sheet, and Strip from the United Arab Emirates. JBF submits that the

allegation was untimely and can not otherwise be considered.

**a. Petitioners' Targeted Dumping Allegation is Improperly Submitted Information and Should be Rejected. Petitioners' submission is untimely.**

Untimely or unsolicited information is to be returned to the submitter pursuant to 19 CFR

351.302. Petitioners' allegation is both unsolicited and untimely. Factual information to rebut

factual information must be submitted within 10 days of service pursuant to 19 CFR

351.301(c)(1). Here, Petitioners' allegation is based upon JBF's US sales database. This database

was first submitted (and served on Petitioners) on April 19, 2012. The second version in

response to the first supplemental was filed on July 5, 2012 and the last in response to the second

supplemental on September 12, 2012. In all three cases, Petitioners' had an opportunity to timely

rebut or request an extension of time to rebut the US sales data. Instead, Petitioners filed its

allegation here, over two months after the last and final US sales data was submitted and served,

and some two weeks before the scheduled preliminary determination. Petitioners had all the

information it needed to make its allegation over two months prior to its submission and has not

provided any excuse as to why it waited until right before the scheduled preliminary

determination.[1]

---

[1] Any asserted argument that Petitioners 'allegation is not factual information subject to the 10 day rebuttal deadline is without merit. See *e.g.* Certain Appliance Shelving from the People's Republic of China, , Letter from Department dated June 17, 2009, Redaction of New Information, New King Shan and submission of request by New King Shan for reconsideration

Case Brief of JBF RAK LLC
March 18, 2013
Page 6

### b..Department issued an unauthorized "post- preliminary determination".

Under the statute, Commerce is required to issue two determinations in an administrative review - preliminary and a final determinations. 19 U.S.C. § 1675(a)(2)(B)(iv), (C) ("The administering authority shall make a preliminary determination in a review ... within 180 days ..., and a final determination within 90 days ...; "The determination under this paragraph shall be the basis for the assessment of ... antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties.").

Commerce's regulations also provide for the two determinations and deadlines pursuant to 19 C.F.R. § 351.213(h) ("*Time limits* —(1) *In general.* The Secretary will issue preliminary results of review (*see* § 351.221(b)(4)) within 245 days after the last day of the anniversary month of the order or suspension agreement for which the administrative review was requested, and final results of review (*see* § 351.221(b)(5)) within 120 days after the date on which notice of the preliminary results was published in the FEDERAL REGISTER."). There is no authority for Commerce to issue post - preliminary determinations. However, due to the late and untimely submission of Petitioners' allegation, this is exactly what occurred as there was no possibility that the Department could review, allow JBF an opportunity to comment and consider the allegation before the preliminary determination was required to be issued by statute and regulation. Petitioners' failure to timely submit its allegation does not allow any possible lawful consideration of the allegation. A post- preliminary determination is a third determination not

---

of rejection of brief dated June 19, 2009. There, the Department rejected as new factual information spreadsheets analyzing verification exhibits. Here, the department should similarly reject Petitioners' allegation creating alleged facts based upon JBF's sales data.

### Jt. App.182

Case Brief of JBF RAK LLC
March 18, 2013
Page 7

authorized by statute or regulation. The Department should have rejected the allegation as
untimely.[2]

3.      **There is no evidence that the pattern found is an attempt to mask
        dumping. To the contrary, JBF selling practice does not allow it to create
        a pattern to mask dumping**

        Assuming arguendo that the Department does have the legal authority to consider

the allegation, Petitioners' targeted dumping allegation and the post preliminary results blindly

apply the Nails test to JBF's sales. The results do not attempt to provide any explanation as to why

and how the alleged targeted customers, and time periods were selected and thus allegedly resulted

in targeted dumping. Such explanation is necessary for the Department to initiate a targeted

dumping inquiry, because it is required to determine whether any observed pricing pattern is the

result of an intentional targeted dumping strategy.

        The results fail to provide any information on the market for the subject

merchandise or the effect of specific time periods on pricing in the U.S. market. Nor does it

explain what time periods are most significant and how those time periods can impact prices in

the U.S. market. Petitioners' allegation and the results technically satisfy the targeted dumping

test but provide no explanation of what these customers have in common, the significance of the

grouping, or how and why the particular combination of customers were targeted. The same is

true of the alleged targeted time periods. There is no connection provided between the alleged

customers, and time periods, and any evidence that targeted dumping has occurred. Instead,

---

[2] Acceptance could be precedent of allowing submission of such allegations on the date of,
or even after, the preliminary determination. Time limits for submission of certain
allegations are provided in 19 CFR 351.301(d). All provide deadlines that are a reasonable
time after filing of information needed as a basis for the allegation. No deadline is provided
some two months after the information necessary as a basis for the allegation is of record,
and in no case does a deadline allow consideration and a determination after the
preliminary determination.

**Jt. App.183**

the statistical differences found are the result of JBF's selling practices on a transaction by transaction basis.

JBF is aware that the Department asserts that it has no statutory obligation to determine any connect between the patterns and the exporter's intent to mask dumping notwithstanding Congress explained its concerns regarding masked dumping and attempted to address them in section 1677f-1(d)(1)(B): "[i]n such situations, the exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions." Uruguay Round Agreements Act, H.R. 103-826, Oct. 3, 1994, p. 98. While the Department asserts that it has no obligation to explain why the patterns exist, the Department has not held that it can and will ignore the case where, as here, the sales subject to an alleged pattern by the exporter can not be an attempt to mask dumped sales.

JBF sells to customers in the US on a sale by sale basis at individually negotiated prices reflecting market conditions at the time of sale. There are no short or long term supply contracts, or obligation by the buyer to purchase additional product, or any obligation to sell to any customer. JBF therefore is not aware of the price or timing of its next sale as each sale is individually negotiated. See JBF response to Section A, dated February 21, 2012 at 13, 14, 16, 17. In contrast, exporters having at least some term supply contracts for US sales can use future sales to mask dumping. If an exporter is aware of the price of its future sales, it can target sales at a lower dumped price to the US as it can use the sales subject to the term agreement to mask the dumped sales. It can offer lower prices to some customers as it has term supply contracts that will allow it to mask any dumping. JBF has no ability to do this. It can not target sales as it has no assurance that future sales are at prices that will mask dumped sales. It is not as if it can negotiate a sale with a buyer at a price greater than the

**Jt. App.184**

Case Brief of JBF RAK LLC
March 18, 2013
Page 9

customer is willing to pay in order to use that sale to mask JBF's dumped sales. JBF's buyers

do not have any obligation to, and certainly will not, purchase product at prices to satisfy

JBF's alleged need to use the sale to mask dumped sales.

Instead, the pattern that the Department found in the post preliminary result was

not the consequence of any attempt to mask dumping as JBF does not have the ability to

target prices to mask dumping. The patterns discovered are caused by the fact that the sales

were during a period of extreme price volatility or statistical anomalies or the consequence of

selling at individually negotiated prices. PET film is a world wide commodity and JBF's prices

reflect the volatility in the prices during the POR. As demonstrated by Exhibit 1 to JBF's response

to petitioners' targeted dumping allegation, JBF letter of November 29, 2012, prices during the

POR, decreased over the POR by approximately a third and price differences or gaps, therefore,

can be explained purely by the volatility of pricing during the POR and does not exhibit targeted

or masked dumping. That the price differences or gaps found by the Department are not the result

of masking but the consequence of JBF's selling at negotiated transactaction based prices can be

demonstrated by a review of the contemporaneous sale price differences for identical products in

home market sales. Compare prices (GRUPHAED) for the following examplars of

contemporaneous UAE sales having large price percentage differences found in JBFHS04

database:

| SEQH | with | SEQH |
|------|------|------|
| B15 |  | 2 |
| B4 |  | B15 |
| 95 |  | 111 |
| 190 |  | 206 |

**Jt. App.185**

Case Brief of JBF RAK LLC
March 18, 2013
Page 10

| 334 | 340 |
| 344 | 346 |
| B87 | 461 |

The price differences in the above sales could, if these sales were to the United States, exhibit a pattern amounting to targeting. However, as these are UAE sales and targeting is irrelevant and can not exist for the purpose of masking dumped sales, the pricing pattern is merely a consequence of JBF's individual transaction sales practice and the volitility of market prices during the POR and nothing more. It demonstrates that if, sales prices are negoitated individually in a volatile market by customer, and time, a pattern may result that may create price gaps but are not targeted. Technical satisfaction of the <u>Nails</u> test can not establish targeted dumping within the meaning of the statute without considering whether, as here, the exporter demonstrates that its pricing practice does not allow it to target within the meaning of the statute. Therefore, assuming arguendo, that DoC has no obligation to explain why the patterns exist, it must nevertheless consider JBF's pricing practice that do not allow it to create patterns for the purpose of masking dumped sales.

## III. CONCLUSION

The Department should reject petitioners' allegation of targeted dumping and apply the average to average method in determining JBF's dumping margin..

**Jt. App.186**

Case Brief of JBF RAK LLC
March 18, 2013
Page 11

Respectfully submitted,

**Galvin and Mlawski**

By:

Jack D. Mlawski
Galvin and Mlawski
Counsel for JBF RAK LLC

Filed By: JM@CUSTOMSLAW.COM, Filed Date: 3/18/13 3:04 PM, Submission Status: Approved

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-520-803

POR:  11/01/2010-10/31/2011
Public Document
O6:  AH

DATE:                    May 13, 2013

MEMORANDUM TO:     Paul Piquado
                   Assistant Secretary
                     for Import Administration

FROM:                  Christian Marsh
                   Deputy Assistant Secretary
                     for Antidumping and Countervailing Duty Operations

SUBJECT:               Antidumping Duty Administrative Review of Polyethylene
                   Terephthalate Film, Sheet, and Strip from the United Arab
                   Emirates:  Issues and Decision Memorandum for the Final Results

## I.     **Summary**

We have analyzed the comments of the interested parties in the administrative review of the
antidumping duty order on polyethylene terephthalate film, sheet, and strip (PET Film) from the
United Arab Emirates (UAE) covering the period of review (POR), November 1, 2010, through
October 31, 2011.  As a result, we have made changes to the margin calculation for the
respondent, JBF RAK LLC (JBF).  For FLEX Middle East FZE (FLEX), we have corrected
minor SAS programming errors; however, these changes had no effect on FLEX's final margin.
We recommend that you approve the positions described in the "Discussion of the Issues"
section of this memorandum.

## II.    **Background**

On November 16, 2012, the Department of Commerce (the Department) received pre-
preliminary comments and an allegation of targeted dumping[1] from Mitsubishi Polyester Film,
Inc., SKC, Inc., and Toray Plastic (America), Inc. (collectively, Petitioners).  JBF filed a
response to Petitioners' allegation of targeted dumping on November 29, 2012.

On December 7, 2012, the Department published the preliminary results of the administrative
review of the antidumping duty order on PET Film from the UAE.[2]  The Department did not
address the allegation of targeted dumping in the Preliminary Results because it did not have

---

[1] See "Polyethylene Terephthalate (PET) Film, Sheet, and Strip from the United Arab Emirates: Pre-Preliminary
Comments and Allegations of Targeted Dumping," November 16, 2012.
[2] See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Preliminary Results of
Antidumping Duty Administrative Review; 2010-2011, 77 FR 73010 (December 7, 2012) (Preliminary Results), and
accompanying Preliminary Decision Memorandum.

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

sufficient time to fully analyze the allegation for purposes of the preliminary results. The Department stated its intention to address this allegation at a later date.[3]

The Department received timely filed case briefs from Petitioners and JBF on January 14, 2013. Petitioners filed a timely rebuttal brief on January 22, 2013. We received no briefs from FLEX.

On March 8, 2013, the Department released a post-preliminary analysis memorandum of JBF which addressed Petitioners' targeted dumping allegation.[4] JBF submitted comments on the Department's Post-Preliminary Analysis on March 18, 2013; Petitioners submitted rebuttal comments on March 25, 2013.

Based on our analysis of all the comments received, the weighted average margin for JBF has not changed from the margin calculated in the Post-Preliminary Analysis. The revised margin is published in the accompanying Federal Register notice. We also have changed the margin calculation for FLEX to account for certain minor errors in the SAS programming; however, the weighted average margin for FLEX remains zero.

## III.    Discussion of the Issues

### Comment 1:  Targeted Dumping

Petitioners allege that, during the POR, JBF engaged in targeted dumping and submit that the Department should calculate the weighted-average dumping margin for JBF using the average-to-transaction (A-T) methodology.

In its case brief submitted prior to the Post-Preliminary Analysis, JBF argued that the Department should reject Petitioners' targeted dumping allegation and apply the average-to-average (A-A) methodology for the following reasons:

- There is no statutory or regulatory authority for the Department to consider an allegation of targeted dumping in the context of an administrative review. JBF alleges that FAG Italia S.p.A. v. United States, 291 F.3d 806 (Fed. Cir. 2002) (FAG Italia) demonstrates that any claim that the Department has authority in reviews to consider the allegation by virtue of the statutory authority in investigations must fail. Citing Nken v. Holder, 556 U.S. 418, 430 (2009) (Nken) and Brown v. Gardner, 513 U.S. 115, 120 (1994) (Brown), JBF contends further that the Department cannot consider the statutory provisions for investigations to fill in a presumed gap in the statutory authority.
- Petitioners' allegation is untimely rebuttal factual information pursuant to 19 CFR 351.301(c)(1). New factual information to rebut previously submitted factual information must be submitted 10 days after the original factual information and Petitioners' allegation was submitted long after the 10-day time period. The Department previously has found such an allegation to be untimely new factual information. Further,

---

[3] See Preliminary Decision Memorandum at 3.
[4] See Memorandum to Paul Piquado, "2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Post-Preliminary Analysis and Calculation Memorandum of JBF RAK LLC," March 8, 2013 (Post-Preliminary Analysis).

due to the late submission of Petitioners' allegation the Department would have to issue an unauthorized post-preliminary determination.

- Assuming that the Department has the authority to consider the allegation, the allegation does not provide a sufficient basis for the purported targeting. The allegation does not provide any explanation as to why and how the alleged targeted purchasers, regions, and time periods, were selected and, thus, resulted in targeted dumping. The allegation must provide this explanation because it is necessary for the Department to determine whether any observed pricing pattern is the result of an intentional targeted dumping strategy. The supposed pattern of targeted dumping can be explained purely by the volatility of the market during the POR.

- The allegation does not demonstrate a pattern of prices that differ significantly because it only covers a small percentage, by value and by volume, of JBF's U.S. sales. Citing Certain Stilbenic Optical Brightening Agents from Taiwan: Final Determination of Sales at Less Than Fair Value, 77 FR 17027, 17028 (March 23, 2012) (Certain Stilbenic Optical Brightening Agents from Taiwan), JBF contends that in other proceedings the Department has declined to apply the A-T methodology if the allegation concerned a small portion of U.S. sales.

In its comments on the Post-Preliminary Analysis, JBF reiterates the arguments that it raised in its case brief. JBF further argues that:

- The Department has not held that it can and will ignore the question of why the pattern exists where, as here, the sales subject to an alleged pattern cannot be an attempt to masked dumped sales.

- Because there are no short-term or long-term supply contracts, there is no way for JBF to have knowledge of the price or timing of its next sale as each sale is individually negotiated. As such, the prices reflect market conditions at the time of sale and, thus, JBF cannot have any assurance that its future sales will mask dumped sales.

In their rebuttal brief filed prior to the Post-Preliminary Analysis, Petitioners maintain that the Department should reject JBF's arguments for the following reasons:

- The Department has the authority to consider targeted dumping in an administrative review. This has been addressed in several recent determinations.[5] Further, JBF has not demonstrated that Congress has spoken clearly on the issue and left no "gap for the Department to fill," nor that the Department's methodology to fill such a gap is unreasonable.

- Petitioners' allegation was timely. Petitioners point to Circular Welded Carbon Steel Pipes and Tubes from Turkey, where the Department similarly found a targeted dumping allegation timely. Moreover, the targeted dumping allegation is not untimely rebuttal factual information pursuant to 19 CFR 351.301(c)(1), but instead is similar to other

---

[5] See, e.g., Circular Welded Carbon Steel Pipes and Tubes from Turkey: Final Results of Antidumping Duty Administrative Review; 2010 to 2011, 77 FR 72818 (December 6, 2012) (Circular Welded Carbon Steel Pipes and Tubes from Turkey), and accompanying Issues and Decision Memorandum (IDM) at Comment 1; Stainless Steel Plate in Coils from Belgium: Antidumping Duty Administrative Review, 2010-2011, 77 FR 73013 (December 7, 2012), and accompanying IDM at Comment 2.

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

allegations under 19 CFR 351.301(d). Further, the Department is not barred from issuing a post-preliminary determination. JBF did not cite any statutory or regulatory provision prohibiting the Department from considering a targeted dumping allegation after the preliminary results.

- There is no requirement in the statute or Statement of Administrative Action (SAA) that a targeted dumping allegation show intent. Petitioners note that the Department rejected a similar argument in Circular Welded Carbon Steel Pipes and Tubes from Turkey.
- The allegation demonstrates a pattern of prices that differ significantly. JBF's assertion that the allegation does not demonstrate a pattern of prices that differ significantly rests on an incomplete understanding of the allegation. JBF's argument in this regard is improperly focused on the customer-specific allegation. When the time-basis allegation is considered as well, the allegations, as a whole, are well-founded.

Petitioners repeated these arguments in their rebuttal to JBF's comments on the Post-Preliminary Analysis. Petitioners also noted that the Department's targeted dumping analysis is specifically designed to exclude the anomalies and impact of individually priced sales that JBF claims were the cause of the instances of targeted dumping identified by the Department.

**Department's Position:**

We disagree with JBF and continue to find that, for JBF, a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or time periods does exist and, therefore, the Department has considered whether the A-A comparison method can account for such differences. Further, the Department finds that the A-A comparison method cannot account for such differences because there is a meaningful difference in the weighted-average dumping margins calculated using the A-A and A-T comparison methodologies. Therefore, the Department has continued to use the A-T comparison methodology applied in the Post-Preliminary Analysis to calculate the weighted-average dumping margin for JBF in these final results.

**A.    Application of Alternative Methodology**

Although JBF claims that the Department does not have the statutory authority to employ an alternative comparison method and to use the targeted dumping analysis in administrative reviews, we disagree.

Section 771(35)(A) of the Tariff Act of 1930, as amended (the Act), defines "dumping margin" as the "amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." The definition of "dumping margin" calls for a comparison of normal value and export price or constructed export price. Before making the comparison called for, it is necessary to determine how to make the comparison.

Section 777A(d)(1) of the Act describes three methods by which the Department may compare normal value and export price (or constructed export price) and places certain restrictions on the Department's selection of a comparison method in antidumping investigations. The statute places no such restrictions on the Department's selection of a comparison method in

administrative reviews. The Department's regulations at 19 CFR 351.414(b) describe the methods by which normal value may be compared to export price or constructed export price in antidumping investigations and administrative reviews, i.e., A-A, Transaction-to-Transaction (T-T), and A-T. These comparison methods are distinct from each other. When using T-T or A-T comparisons, a comparison is made for each export transaction to the United States. When using A-A comparisons, a comparison is made for each group of comparable export transactions for which the export prices, or constructed export prices, have been averaged together (i.e., for an averaging group). The Department's regulations at 19 CFR 351.414(c)(1) address the ambiguity in the statute concerning the choice of a comparison method in the context of administrative reviews. In particular, the Department has determined that in both antidumping investigations and administrative reviews, the A-A method will be used "unless the Secretary determines another method is appropriate in a particular case."

The Act, the SAA, and the Department's regulations do not address directly whether the Department should use an alternative comparison method in an administrative review based upon a targeted dumping analysis conducted pursuant to section 777A(d)(1)(B) of the Act.[6] In light of the statute's silence on this issue, the Department indicated that it would consider whether to use an alternative comparison method in administrative reviews on a case-by-case basis, but declined to "speculate as to either the case-specific circumstances that would warrant the use of an alternative methodology in future reviews, or what type of alternative methodology might be employed."[7] At that time, the Department also indicated that it would look to practices employed by the Department in antidumping investigations for guidance on this issue.[8]

In antidumping investigations, the Department has examined whether to use an A-T method by using a targeted dumping analysis consistent with section 777A(d)(1)(B) of the Act:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if:
>
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

Although section 777A(d)(1)(B) of the Act does not strictly govern the Department's examination of this question in the context of an administrative review, the Department nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in antidumping investigations. Accordingly, the Department

---

[6] See section 777A(d)(1)(B) of the Act; SAA at 842-43; 19 CFR 351.414.
[7] See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings: Final Modification, 77 FR 8101, 8107 (February 14, 2012 ) (Final Modification for Reviews).
[8] See id. 77 FR at 8102.

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

finds the analysis that has been used in antidumping investigations instructive for purposes of examining whether to apply an alternative comparison method in this administrative review.

The SAA does not demonstrate that the Department should conduct targeted dumping analysis in investigations only. The SAA discusses section 777A(d)(1)(A)(i) of the Act, concerning the types of comparison methods that the Department may use in investigations. That provision, however, is silent on the question of choosing a comparison method in administrative reviews. Section 777A(d)(1)(A) of the Act does not require or prohibit the Department from adopting a similar or a different framework for choosing a comparison method in administrative reviews as compared to the framework required by the statute in investigations. The SAA states that "section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction comparison methodology cannot account for a pattern of prices that differ significantly among purchasers, regions or time periods."[9] Like the statute, the SAA does not limit the proceedings in which the Department may undertake such an examination.

The silence of the statute with regard to application of an alternative comparison methodology in administrative reviews does not preclude the Department from applying such a practice. Indeed, the Court of Appeals for the Federal Circuit (Federal Circuit) has stated that courts "must, as we do, defer to Commerce's reasonable construction of its governing statute where Congress 'leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill or implicitly delegates legislative authority, as evidenced by the agency's generally conferred authority and other statutory circumstances.'"[10] Further, the Court of International Trade has stated that this "silence has been interpreted as 'an invitation' for an agency administering unfair trade law to 'perform its duties in the way it believes most suitable' and courts will uphold these decisions '{s}o long as the {agency}'s analysis does not violate any statute and is not otherwise arbitrary and capricious.'"[11] We find that the above discussion of the extension of the statute with respect to investigations is a logical, reasonable, and deliberative method to fill the silence with regard to administrative reviews.

Further, the Department's revision of its practice with regard to administrative reviews, and to follow its World Trade Organization (WTO)-consistent practice for investigations, was a deliberate decision on the part of the Executive Branch pursuant to the authority provided in section 123 of the Uruguay Round Agreements Act. Specifically, the Executive Branch solicited public comments, consulted with the appropriate congressional committees, and issued a preliminary and final determination. This decision was made in order to implement several adverse WTO reports in which it was found that the United States was not meeting its WTO obligations. As such, the wisdom of the Department's legitimate policy choices in this situation is not subject to judicial review.[12]

JBF's arguments on this issue are unavailing. With respect to FAG Italia, JBF mischaracterizes the Federal Circuit's holding. In that case, and unlike the instant review, the Federal Circuit

---

[9] See section 777A(d)(1)(B) of the Act; SAA at 842-43; 19 CFR 351.414.
[10] See U.S. Steel Corp. v. United States, 621 F.3d 1351, 1357 (Fed. Cir. 2010) (citation omitted).
[11] See PSC VSMPO-AVISMA Corp. v. United States, 755 F. Supp. 2d 1330, 1338 (CIT 2011) (citation omitted).
[12] See Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

6

## Jt. App.193

determined that the statute unambiguously did not provide the Department with the authority to take action because the "absence of a statutory probation cannot be the source of agency authority."[13]  In administrative reviews, section 751(a)(2)(A) of the Act directs the Department to determine the normal value and export price (or constructed export price) of each entry of subject merchandise and the resulting dumping margin for each entry.  Thus, the Act provides the Department with the authority to engage in comparisons between normal value and export price to calculate dumping margins; however, as explained above, in the context of an administrative review, the Act does not state explicitly which method the Department must use in so doing.  The Department has reasonably filled that gap to allow it to use the A-T comparison method when it encounters certain patterns of export prices.  Thus, <u>FAG Italia</u> is inapposite to the current proceeding.  Similarly, in <u>Brown</u>, the Supreme Court found the relevant statutory language at issue to include express terms that resolved the inquiry.  513 U.S. at 120.  However, as explained above, the provision at issue in this proceeding does not expressly resolve the issue.  Consequently, <u>Brown</u> does not support JBF's arguments.  Finally, as to <u>Nken</u>, that case did not involve an interpretation of a statute under the <u>Chevron</u>[14] framework by which the Department also must interpret the Act and, thus, concerns a different scenario than that faced by the Department in this proceeding.[15]

## B.     Timeliness of Allegation & the Department's Authority to Issue the Post-Preliminary Analysis

The Department disagrees with JBF's argument that Petitioners' allegation was untimely.  Neither section 777A(d)(1)(B) of the Act nor the SAA provide any deadline as to when an interested party must file a targeted dumping allegation in either an investigation or an administrative review.[16]  Similarly, the Department's regulations do not provide for such a deadline in an investigation or an administrative review.  Moreover, when the Department recently announced that it would consider whether to use an alternative comparison method in administrative reviews on a case-by-case basis, the announcement contained no guidelines on the filing of a request to apply an alternative comparison method.[17]  By permitting JBF to comment on the Post-Preliminary Analysis, the Department has preserved JBF's right to comment upon the targeted dumping allegation.[18]  For these reasons, the Department finds that Petitioners' allegation was timely filed.

JBF's arguments on the timeliness of the allegation are unpersuasive.  While 19 CFR 351.301(c)(1) pertains to rebuttal factual information, Petitioners' targeted dumping allegation cannot reasonably be characterized as rebuttal factual information, as JBF claims.  Rather, Petitioners used the information on the record of this review for purposes of advocating that the Department consider using a different method to compare normal value and export price (or constructed export price).  However, that does not transform Petitioners' allegation into the submission of facts, for the facts that served as the basis for Petitioners' claim already were on

---

[13] See <u>FAG</u> Italia, 291 F.3d at 815-16.
[14] See <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984) (<u>Chevron</u>).
[15] See Nken, 556 U.S. at 430.
[16] SAA, at 842-43.
[17] See generally <u>Final Modification for Reviews.</u>
[18] See Post-Preliminary Analysis at 4.

## Jt. App.194

the record. In other words, Petitioners did not submit additional facts to disprove anything that JBF previously submitted; instead, Petitioners relied upon the very facts submitted by JBF to make an allegation. Moreover, in its regulations, the Department explicitly has delineated factual submissions from documents containing allegations similar to Petitioners' targeted dumping allegation.[19] Because the nature of the filings listed in 19 CFR 351.301(d) closely resemble Petitioners' targeted dumping allegation, (and in fact the now-withdrawn targeted dumping allegation was listed under that very provision),[20] it stands to reason that the Department properly considered Petitioners' submission as an allegation and not rebuttal factual information.

Further, while the Act and the regulations provide deadlines for preliminary and final determinations in administrative reviews,[21] the Department is not limited by any statutory or regulatory provision to issuing only preliminary and final results in such a proceeding. In this proceeding, the Department issued its Preliminary Results by the applicable deadline and is issuing these final results by the applicable deadline. Moreover, the Department enjoys wide discretion in conducting its proceeding, including the allocation of resources to develop suitable approaches for new policies such as the Final Modification for Reviews.[22] Issuing a Post-Preliminary Analysis and providing all parties with an opportunity to comment on that analysis embodies the principles of transparency and openness underlying the Act and administrative law in general. For example, when issues arise or information is submitted too late in a proceeding to be considered for the preliminary results, issuing a Post-Preliminary Analysis ensures that parties are aware of all issues before the Department releases final results and that they have an adequate opportunity to provide comments to the Department. Because all parties were provided an opportunity to comment on the Post-Preliminary Analysis (the same opportunity they were provided to comment on the Preliminary Results), JBF was not disadvantaged by this approach.

## C.  Targeted Dumping Analysis

In recent antidumping investigations and administrative reviews where the Department has addressed targeted dumping allegations, the Department has employed the Nails Test[23] for each respondent subject to an allegation to determine whether a pattern of export prices or constructed export prices for comparable merchandise that differ significantly among purchasers, regions or

---

[19] See 19 CFR 351.301(d).

[20] See 19 CFR 351.301(d)(5).

[21] See section 751(a)(2)(B)(iv) of the Act.

[22] See, e.g., Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001) ("In antidumping cases, this court has previously recognized 'Commerce's special expertise,' and it has 'accord{ed} substantial deference to its construction of pertinent statutes.'" (citation omitted)); Michron Tech., Inc. v. United States, 117 F.3d 1386, 1394 (Fed. Cir. 1997) (same); accord Corus Staal BV v. United States, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (same).

[23] See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 FR 33977 (June 16, 2008) and Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value, 73 FR 33985 (June 16, 2008) (collectively, Nails), as modified in more recent investigations, e.g., Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 76 FR 64318 (October 18, 2011); see also Mid Continent Nail Corp. v. United States, Slip. Op. 2010-47 (Ct. Int'l Trade May 4, 2010) and Mid Continent Nail Corp. v. United States, Slip. Op. 2010-48 (Ct. Int'l Trade May 4, 2010).

time periods existed within the U.S. market.  The <u>Nails</u> Test involves a two-step process, as described below, that determines whether the Department should consider whether the A-A method is appropriate in a particular situation.  In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's (<u>i.e.</u>, purchaser, region or time period) sales of subject merchandise (by sales volume) that are at prices more than one standard deviation below the weighted- average price of all sales under review, targeted and non-targeted.  We calculated the standard deviation on a product-specific basis (<u>i.e.</u>, by CONNUM) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted.  If that volume did not exceed 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the <u>Nails</u> Test.  If that volume exceeded 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the <u>Nails</u> Test.

In the second stage, the "gap test," we examined all sales of identical merchandise (<u>i.e.</u>, by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test.  From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for allegedly targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non- targeted groups.  We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the price gap.  In doing this analysis, the allegedly targeted group's sales were not included in the non-targeted groups; the allegedly targeted group's average price was compared only to the average prices for the non-targeted groups.  If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the <u>Nails</u> Test.

As explained in the Post-Preliminary Analysis, if the Department determined that a sufficient volume of U.S. sales were found to have passed the <u>Nails</u> Test, then the Department considered whether the A-A method could take into account the observed price differences.  To do this, the Department evaluated the difference between the weighted-average dumping margin calculated using the A-A method and the weighted-average dumping margin calculated using the A-T method.  Where there is a meaningful difference between the results of the A-A method and the A-T method, the A-A method would not be able to take into account the observed price differences, and the A-T method would be used to calculate the weighted- average margin of dumping for the respondent in question.  Where there is not a meaningful difference in the results, the A-A method would be able to take into account the observed price differences and the A-A method would be used to calculate the weighted-average dumping margin for the respondent in question.

With respect to JBF, the Department continues to find that a pattern of export prices (or constructed export prices) for comparable merchandise, that differ significantly among purchasers, regions, or time periods, does exists, and has considered whether the A-A method can account for the observed price differences.  Further, the Department continues to find that there is a meaningful difference between the weighted-average dumping margins calculated

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

using the A-A method and the A-T method. As a result, the Department continues to find that it is appropriate to use the A-T method to calculate the weighted-average margin of dumping for JBF in these final results.[24]

The Department disagrees with JBF's claim that Petitioners' allegation did not demonstrate a pattern of prices that differ significantly. Petitioners' targeted dumping allegation included customer- and time-based allegations.[25] The Department agrees with Petitioners that JBF based its argument on an incomplete understanding of the allegation. An examination of the statistics discussed in JBF's case brief reveals that JBF considered Petitioners' customer-based allegation only and did not account for Petitioners' analysis of the time-period allegation. Both Petitioners' allegation and the Department's own analysis show a pattern of prices that differ significantly.[26] Moreover, when the time- and customer-specific allegations are considered together, the Department's analysis covers a large number of sales, in contrast to the situation faced by the Department in Certain Stilbenic Optical Brightening Agents from Taiwan.

We reject JBF's arguments that the findings in the Post-Preliminary Analysis should not be used in these final results because they are the result of statistical anomalies – i.e., sales during a time of extreme price volatility, or the results of individually negotiated prices. As the Department recently stated in Circular Welded Carbon Steel Pipes and Tubes from Turkey, and accompanying IDM at Comment 1:

> The Act and the regulations do not provide detailed guidance on comparing different sets of U.S. prices for purposes of determining the existence of targeted dumping. The only obligations imposed on the Department in its analysis appear in section 777A(d)(1)(B) of the Act. Section 777A(d)(1)(B) of the Act requires the Department (1) to examine whether there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and, if such a pattern exists, (2) to explain why such differences cannot be taken into account using the average-to-average or transaction-to-transaction comparison methods. The Act does not require the Department to discern why such patterns arise. Instead, the Act asks the Department to focus on U.S. sales prices alone; i.e., export price or constructed export price.

In other words, the Act does not require the Department to establish that a particular respondent intended to target certain purchasers, regions, or time periods before the Department may find that such a pattern of export prices exists. Moreover, and contrary to JBF's claim, neither the Act nor the Department's regulations provide for any consideration of price fluctuations caused by market conditions. The Department has reached these same conclusions in several other proceedings.[27] Therefore, for these reasons, we reject JBF's arguments.

---

[24] See Post-Preliminary Analysis at 3 and 4.
[25] See Petitioners' allegation at Exhibit 2.
[26] See Post-Preliminary Analysis at 3 and 4.
[27] See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from India: Final Results of Administrative Review of Antidumping Duty Order: 2010-2011, 78 FR 9670 (February 11, 2013), and accompanying IDM at Comment 1; Stainless Steel Plate in Coils from Belgium: Antidumping Duty Administrative Review, 2010-2011, 77 FR 73013 (December 7, 2012), and accompanying IDM at Comment 2.

**Comment 2: Grade A and Grade B Sales**

JBF argues in its case brief that the Department erred by not matching any home market sales of grade B film to U.S. sales of grade A film. JBF contends that, because JBF distinguishes grade A film from grade B film based on customer specifications, rather than some "physical defect," there is no potential for distortion from comparing grade A film with grade B film, which was a concern for the Department in Certain Polyethylene Terephthalate Film, Sheet and Strip from India: Final Results of Antidumping Duty Administrative Review, 71 FR 47485 (August 17, 2006) (PET Film from India), and accompanying IDM at Comment 4. JBF notes several instances where grade B film home market sales were priced higher than sales of grade A film of the same CONNUM. JBF requests that the Department not distinguish between grade A and grade B film in the final results.

In their rebuttal brief, Petitioners argue that JBF failed to document the extent of differences or similarities between grade A and grade B and, therefore, there is no basis not to distinguish between grade A and grade B film. To the contrary, Petitioners observe that products either meet specifications or do not meet specifications. Failing to meet specifications is an indication that there is a physical or chemical defect in the product that prevents the product from being used as intended. For this reason, the Department has long distinguished between products based upon specifications in its margin analysis. Petitioners also point to numerous other cases in which the Department has explained its practice of distinguishing sales based on whether they satisfied certain specification criteria, such as Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod from Taiwan, 63 FR 40461 (July 7, 1998), and accompanying IDM at Comment 22.

**Department Position:**

Consistent with the Department's established practice to consider grade when matching PET Film products,[28] and previous segments of this proceeding,[29] the Department has not made JBF's suggested changes. The product characteristics identify grade as the first and most important criterion.[30] The Department is not persuaded by JBF's argument that instances where home market sales of grade B film were priced higher than sales of grade A film of the same CONNUM shows that difference in grade is not significant. Because many factors can determine the price for individual sales, instances of grade B film priced higher than grade A film are not evidence that grade is insignificant. For example, some grade A film may be priced lower than grade B film due to the longstanding relationship between the producer and the

---

[28] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From India, 67 FR 34899 (May 16, 2002) and accompanying IDM at Comment 5; PET Film from India, and accompanying IDM at Comment 4.

[29] See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value, 73 FR 55036 (September 24, 2008); Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review, 77 FR 20357 (April 4, 2012).

[30] See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review, 76 FR 76365, 76366 (December 7, 2011) ("We have relied on five criteria to match U.S. sales of subject merchandise to comparison-market sales: grade, specification, thickness, thickness category, and surface treatment.").

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

purchaser. JBF states in its case brief that it distinguishes grade A PET Film from grade B PET Film on the basis of "customer's specification" (i.e., grade B PET Film is film that does not meet a particular customer's specifications), but that grade B PET Film "could" meet JBF's own specifications for PET Film. As an initial matter, JBF has failed to document the extent of the differences or similarities between grade A PET Film and grade B PET Film. Moreover, while JBF indicates that it has its own specifications for PET Film, it does not cite to any record evidence that discusses the parameters of its specifications.[31] Furthermore, there is no information on the record whether any of the PET Film JBF has identified as grade B in its questionnaire responses meets its own specifications. Without more, JBF has failed to substantiate its claim.

JBF also has not demonstrated that the products it identifies as grade B PET Film are similar to products identified as grade A PET Film. As JBF notes in its case brief, the Department asked JBF to define grade in a supplemental questionnaire. In its response, JBF did not indicate that the difference between grade A PET Film and grade B PET Film was insignificant or that either of these grades closely resembles the specifications for its own film.[32] Thus, JBF has failed to carry its burden of building an adequate record that demonstrates the similarities between grade A PET Film and grade B PET Film.[33]

Therefore, because JBF has not identified evidence on the record in support of its claim, the Department finds no compelling reason to depart from its practice in PET Film proceedings and to change the matching criteria for these final results.

**Comment 3:  15-Day Liquidation Policy**

In its case brief, JBF noted that, in the Preliminary Results, the Department stated its intention to send assessment instructions to U.S. Customs and Border Protection fifteen days after publication of the final results, while section 516A(a)(2)(A)(i)(I) of the Act allows parties thirty days to bring an action in the Court of International Trade. JBF maintains that the Department's 15-day policy is unlawful, citing to SKF USA Inc. v. United States, 659 F. Supp. 2d 1338, 1351 (CIT 2009) (SKF USA Inc.) in support of its position. Consequently, JBF avers that the Department should state that it intends to issue assessment instructions no earlier than the day after the expiration of time to commence action contesting the final results; that is, 30 days after the publication of the final results.

No other party commented on this issue.

---

[31] See "Polyethylene Terephthalate (PET) Film, Sheet and Strip from the United Arab Emirates (A-520-803); Case Brief of JBF RAK," January 14, 2013 at 11 and 12.
[32] See "Polyethylene Terephthalate (PET) Film, Sheet and Strip from the United Arab Emirates (A-520-803); Response to the first Supplemental questionnaire by JBF RAK LLC." July 5, 2012, at 1.
[33] See, e.g., QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations omitted) (explaining that "the burden of creating an adequate record lies with {interested parties} and not with Commerce").

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

**Department Position:**

The Department disagrees with JBF's claim that the 15-day policy is unlawful. The statute establishes a period within which entries must be liquidated, but is silent regarding a minimum amount of time to refrain from liquidation.[34] In light of this statutory silence, the Department has established a practice of issuing "liquidation instructions 15 days after publication unless we are aware that an injunction has been filed or is imminent."[35] Indeed, as we have stated previously:

> {o}ur practice of issuing liquidation instructions 15 days after publication of the final results is based upon administrative necessity, namely that we must provide CBP with sufficient time to liquidate all entries, particularly in large and complex cases like the instant reviews, before the entries are deemed liquidated. Extreme consequences follow from deemed liquidation, specifically the government's inability to collect duties calculated. Furthermore, our current policy is in accordance with the CIT's statement that we must provide "some reasonable opportunity in which a plaintiff may seek to obtain the specific type of injunction described in {section 516A(c)(2)}.[36]

The instant review similarly involves a number of entries and complex issues, and we continue to harbor the same concerns about deemed liquidation. Finally, through the 15-day policy, we continue to provide interested parties with a reasonable opportunity to obtain injunctive relief. The 15-day policy affords interested parties a reasonable amount of time to study the Department's final results, to determine whether it intends to appeal those determinations, and to inform the Government that it imminently seeks to protect its entries from liquidation.

With regard to JBF's other arguments on the 15-day policy, we also disagree. As an initial matter, the opinion to which JBF cites – SKF USA Inc., concerns a practice no longer followed by the Department. In that case, the Court of International Trade addressed the Department's former practice of issuing liquidation instructions within 15 days.[37] As explained above, that practice has changed, and the Department now issues liquidation instructions 15 days after publication absent an injunction or notice that such request for injunction relief is imminent. And while the Department recognizes that the Court of International Trade subsequently has issued decisions after SKF USA Inc. that find our current 15-day policy unlawful, we recognize that the same issue remains pending in other cases and, thus, has not been resolved finally. Compare, e.g., SKF USA Inc. v. United States, 800 F. Supp. 2d 1316, 1326-28 (CIT 2011), with JBF RAK LLC v. United States, No. 11-00141, CM/ECF Docket No. 30 (CIT filed Oct. 12, 2011). With respect to JBF's argument that the Department should wait 30 days to issue liquidation instructions because section 516A(a)(2)(A)(i)(I) of the Act allows parties thirty days to bring an action in the Court of International Trade, this claim finds no support in the text of section 751(a)(3)(B) of the Act. We reached a similar conclusion in Ball Bearings, explaining

---

[34] See section 751(a)(3)(B) of the Act.
[35] See, e.g., Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Revocation of an Order in Part, 74 FR 44819 (August 31, 2009) (Ball Bearings), and accompanying IDM at Comment 3.
[36] See id.
[37] See SKF USA Inc., 659 F. Supp. 2d at 1361.

13
**Jt. App.200**

that the Court of International Trade in <u>SKF USA Inc.</u> rejected a similar argument.[38]  Finally, we note that the Department's prior policy of issuing liquidation instructions within 15 days of publication of its final results has been sustained by the Court of International Trade as a reasonable interpretation of the statute.[39]  Consequently, it stands to reason that the Department's interpretation of the statute allowing for the issuance of liquidation instructions after that time similarly is reasonable.

**Comment 4:**  Correction of Certain Errors in FLEX's SAS Program

In their case brief, Petitioners identify five errors in the SAS programming related to FLEX's margin calculation.  Specifically, Petitioners contend that the Department should: (1) correct the beginning and ending date range of U.S. sales reviewed; (2) recalculate home market prices to account for missing values and to recognize fields reported in the home market currency; (3) converted currencies for certain values in the cost of production; (4) re-convert certain U.S. sales variables denominated in pounds to kilograms; and (5) deduct indirect selling expenses incurred in the United States from U.S. price.

No other party commented on this issue.

**Department Position:**

The Department agrees with Petitioners' comments.  Accordingly, the Department has made these changes to the SAS programming for FLEX to correct these errors.[40]

**IV.     Recommendation**

We recommend adopting the above positions.  If these recommendations are accepted, we will publish the final results of this review and the final dumping margin for the reviewed companies in the <u>Federal Register</u>.

Agree _____✓_____          Disagree_____

_____
Paul Piquado
Assistant Secretary
   for Import Administration

_____
      13 MAY 2013
Date

_____
[38] <u>Ball Bearings</u>, and accompanying IDM at Comment 3.
[39] <u>Mittal Steel Galati S.A. v. United States</u>, 502 F. Supp. 2d 1295, 1313-14 (Ct. Int'l Trade 2007).
[40] <u>See</u> Memorandum to Mark Hoadley, "Final Analysis Memorandum for Flex Middle East FZE," dated concurrently with this memorandum.

Filed By: gene calvert, Filed Date: 5/14/13 3:33 PM, Submission Status: Approved

Dated: May 16, 2013.

**Calvin N. Joyner,**

*Associate Deputy Chief, National Forest System.*

[FR Doc. 2013–12155 Filed 5–20–13; 8:45 am]

**BILLING CODE 3410–11–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### President's Export Council; Subcommittee on Export Administration; Notice of Open Meeting

The President's Export Council Subcommittee on Export Administration (PECSEA) will meet on June 4, 2013, 9:30 a.m. (pacific daylight time), at Boeing Defense, Space and Security, Space and Intelligence Systems, Building S24, Conference Center, 2020 East Imperial Highway, El Segundo, California 90245 and via video teleconferencing at the Herbert C. Hoover Building, Room 3884, 14th Street between Constitution and Pennsylvania Avenues NW., Washington, DC at 12:30 p.m. (eastern daylight time). The PECSEA provides advice on matters pertinent to those portions of the Export Administration Act, as amended, that deal with United States policies of encouraging trade with all countries with which the United States has diplomatic or trading relations and of controlling trade for national security and foreign policy reasons.

### Agenda (Subject to Change)

*Tuesday, June 4*

Open Session

1. Welcome and remarks by Chairman and Vice Chair
2. Export Control Reform Update
3. Panel Discussions on Reform of Controls on Satellites
4. Presentation of Papers or Comments by the Public
5. Subcommittee Updates

The open session will be accessible via teleconference to 20 participants on a first come, first served basis. To join the conference, submit inquiries to Ms. Yvette Springer at *Yvette.Springer@bis.doc.gov,* no later than May 29, 2013.

A limited number of seats will be available for the public. Reservations are not accepted. If attending in person, please forward your name (to appear on badge), Title, Citizenship, Organization Name, Organization Email, and Phone to Ms. Springer no later than May 29, 2013. Early arrival (30 minutes)

is requested for entry into the facility. Name and citizenship will be verified at Boeing upon entry. Verification requires a driver's license or a passport.

To the extent time permits, members of the public may present oral statements to the PECSEA. Written statements may be submitted at any time before or after the meeting. However, to facilitate distribution of public presentation materials to PECSEA members, the PECSEA suggest that these materials or comments be forwarded before the meeting to Ms. Springer via email.

For more information, contact Yvette Springer on 202–482–2813.

Dated: May 15, 2013.

**Kevin J. Wolf,**

*Assistant Secretary for Export Administration.*

[FR Doc. 2013–12082 Filed 5–20–13; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–520–803]

### Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2010–2011

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On December 7, 2012, the Department of Commerce (the Department) published the preliminary results of administrative review of the antidumping duty order on polyethylene terephthalate film (PET Film) from the United Arab Emirates.[1] This review covers two producers/ exporters of subject merchandise: JBF RAK LLC (JBF) and FLEX Middle East FZE (FLEX). Based on our analysis of the comments received, we have made changes to the preliminary results which are discussed below. The final weighted-average dumping margins are listed below in the section titled "Final Results of Review."

**DATES:** *Effective Date:* May 21, 2013.

**FOR FURTHER INFORMATION CONTACT:** Andrew Huston, or Gene Calvert, AD/ CVD Operations, Office 6, Import Administration, International Trade Administration, U.S. Department of

Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4261, or (202) 428–3586, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

Since the preliminary results, the following events have taken place. The Department received timely case briefs from Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc. (collectively, Petitioners) and JBF on January 14, 2013. Petitioners filed a timely rebuttal brief with the Department on January 22, 2013.

On March 8, 2013, the Department released a post-preliminary analysis memorandum of JBF which addressed Petitioners' targeted dumping allegation.[2] At that time, we invited interested parties to comment on the Post-Preliminary Analysis.[3] JBF submitted comments on the Post- Preliminary Analysis on March 18, 2013, and Petitioners submitted rebuttal comments on March 25, 2013.

### Period of Review

The period of review is November 1, 2010, through October 31, 2011.

### Scope of the Order

The products covered by the order are all gauges of raw, pre-treated, or primed polyethylene terephthalate film (PET Film), whether extruded or co-extruded. Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick. Also excluded is roller transport cleaning film which has at least one of its surfaces modified by application of 0.5 micrometers of SBR latex. Tracing and drafting film is also excluded. PET Film is classifiable under subheading 3920.62.00.90 of the Harmonized Tariff Schedule of the United States (HTSUS). While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

### Analysis of Comments Received

All issues raised by parties in the case and rebuttal briefs, as well as in the comments and rebuttal comments related to the Post-Preliminary Analysis,

---

[1] *See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2010–2011,* 77 FR 73010 (December 7, 2012), and accompanying Preliminary Decision Memorandum.

---

[2] *See* Memorandum to Paul Piquado, "2010–2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Post- Preliminary Analysis and Calculation Memorandum of JBF RAK LLC" ("Post-Preliminary Analysis), dated March 8, 2013.

[3] *See id.* at 4.

---

## Jt. App.202

**Federal Register** / Vol. 78, No. 98 / Tuesday, May 21, 2013 / Notices                    **29701**

are addressed in the Memorandum to Paul Piquado, Assistant Secretary for Import Administration, from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, ''Antidumping Duty Administrative Review of Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Issues and Decision Memorandum for the Final Results'' (Decision Memorandum), dated concurrently with, and hereby adopted by, this notice. A list of the issues addressed in the Decision Memorandum is appended to this notice. The Decision Memorandum is a public document and is available electronically via Import Administration's Antidumping and Countervailing Duty Centralized Electronic Services System (IA ACCESS). IA ACCESS is available to registered users at *http:// iaaccess.trade.gov* and is available in the Central Records Unit of the main Commerce Building, Room 7046. In addition, a complete version of the Decision Memorandum is also accessible on the internet at *http:// ia.ita.doc.gov/frn/index.html*. The signed Decision Memorandum and the electronic versions of the Decision Memorandum are identical in content.

## Changes Since the Preliminary Results

Based on our analysis of the comments received, we have made adjustments to our margin calculations for JBF and FLEX. Specifically, in response to Petitioners' targeted dumping allegation and consistent with the Post-Preliminary Analysis, we have adopted the alternative average-to-transaction methodology for JBF.[4] Moreover, in response to comments by Petitioners, we have made changes to the SAS programming to correct certain clerical errors in FLEX's margin calculation.

## Final Results of Review

As a result of this review, we determine that the following weighted-average dumping margins exist for the period November 1, 2010, through October 31, 2011:

| Manufacturer/exporter | Weighted average margin |
|---|---|
| JBF RAK LLC ........... | 9.80 percent *ad valo-rem.* |
| FLEX Middle East FZE. | 0.00 percent *ad valo-rem (i.e., de mini-mis.)* |

[4] *See id.* at 2 and 3.

## Disclosure

We will disclose to interested parties the calculations performed in connection with these final results within five days of the publication of this notice, consistent with 19 CFR 351.224(b).

## Assessment Rates

The Department shall determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise in accordance with the final results of this review.[5] The Department intends to issue appropriate assessment instructions directly to CBP 15 days after the date of publication of these final results of review.

For assessment purposes, where the respondent reported the entered value for its sales, we calculated importer-specific (or customer-specific) *ad valorem* assessment rates based on the ratio of the total amount of the dumping duties calculated for the examined sales to the total entered value of those same sales. *See* 19 CFR 351.212(b)(1). However, where the respondent did not report the entered value for its sales, we have calculated importer-specific (or customer-specific) per-unit assessment rates by aggregating the total amount of antidumping duties calculated for the examined sales and dividing this amount by the total quantity of those sales. We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review if any importer-specific assessment rate calculated in the final results of this review is above *de minimis* (*i.e.,* at or above 0.50 percent). Pursuant to 19 CFR 351.106(c)(2), we will instruct CBP to liquidate, without regard to antidumping duties, any entries for which the assessment rate is *de minimis*.

The Department clarified its ''automatic assessment'' regulation on May 6, 2003.[6] This clarification applies to entries of subject merchandise during the period of review produced by companies under review in these final results for which the reviewed companies did not know their merchandise was destined for the United States. In such instances, we will instruct CBP to liquidate non-reviewed entries at the all-others rate of 4.05

[5] The Department applied the assessment rate calculation method adopted in *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings: Final Modification*, 77 FR 8101 (February 14, 2012).

[6] *See Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 FR 23954 (May 6, 2003).

percent from the investigation if there is no rate for the intermediate company(ies) involved in the transaction.[7]

## Cash Deposit Requirements

The following deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of these final results, as provided by section 751(a)(2)(C) of the Tariff Act of 1930, as amended (the Act): (1) For the companies covered by this review, the cash deposit rate will be the rate listed above in the section ''Final Results of Review''; (2) for merchandise exported by producers or exporters not covered in this review but covered in a previous segment of this proceeding, the cash deposit rate will continue to be the company-specific rate published in the most recent final results in which that producer or exporter participated; (3) if the exporter is not a firm covered in this review or in any previous segment of this proceeding, but the producer is, the cash deposit rate will be that established for the producer of the merchandise in these final results of review or in the most recent final results in which that producer participated; and (4) if neither the exporter nor the producer is a firm covered in this review or in any previous segment of this proceeding, the cash deposit rate will be 4.05 percent, the all-others rate established in the less than fair value investigation.[8] These cash deposit requirements, when imposed, shall remain in effect until further notice.

## Notification Regarding Administrative Protective Order

This notice is the only reminder to parties subject to the administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under the APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

[7] *See id.*; see also *Polyethylene Terephthalate Film, Sheet, and Strip From Brazil, the People's Republic of China and the United Arab Emirates: Antidumping Duty Orders and Amended Final Determination of Sales at Less Than Fair Value for the United Arab Emirates*, 73 FR 66595, 66596 (November 10, 2008).

[8] *See id.*

Filed By: gene calvert, Filed Date: 5/21/13 8:48 AM, Submission Status: Approved

## Notification to Importers

This notice also serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties occurred and in the subsequent assessment of double antidumping duties.

We are issuing and publishing these final results and this notice in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: May 13, 2013.

**Paul Piquado,**

*Assistant Secretary for Import Administration.*

### Appendix

**Issues in the Decision Memorandum**

*Comment 1:* Targeted Dumping
*Comment 2:* Grade A and Grade B Sales
*Comment 3:* 15-Day Liquidation Policy
*Comment 4:* Correction of Certain Errors in FLEX's SAS Program

[FR Doc. 2013–12086 Filed 5–20–13; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–428–801]

### Ball Bearings and Parts Thereof From Germany: Final Results of Antidumping Duty Administrative Review; 2011–2011

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On February 11, 2013, the Department of Commerce (the Department) published the preliminary results and partial rescission of its administrative review of the antidumping duty order on ball bearings and parts thereof from Germany. The period of review (POR) is May 1, 2011, through September 14, 2011.[1] We received no comments from interested parties. Accordingly, for the final results we continue to find that subject

---

[1] On September 15, 2011, the Department revoked the order on ball bearings and parts thereof from Germany as the conclusion of a sunset review. *See Ball Bearings and Parts Thereof From France, Germany and Italy: Final Results of Sunset Reviews and Revocation of Antidumping Duty Orders,* 76 FR 57019, (September 15, 2011) (*Third Sunset Review*). Therefore, the POR ends on September 14, 2011.

merchandise has not been sold at less than normal value.

**DATES:** *Effective Date:* May 21, 2013.

**FOR FURTHER INFORMATION CONTACT:** Catherine Cartsos or Minoo Hatten, AD/ CVD Operations, Office 1, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, telephone: (202) 482–1757 or (202) 482–1690, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On February 11, 2013, the Department published the preliminary results of its administrative review and partial rescission of the antidumping duty order on ball bearings and parts thereof from Germany. *See Ball Bearings and Parts Thereof from Germany: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission; 2011–2011,* 78 FR 9764 (February 11, 2013) (*Preliminary Results*). We invited interested parties to comment on the *Preliminary Results.* We received no comments from interested parties.

The Department has conducted this administrative review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act).

### Scope of the Order

The products covered by the order are ball bearings and parts thereof. These products include all antifriction bearings that employ balls as the rolling element. Imports of these products are classified under the following categories: antifriction balls, ball bearings with integral shafts, ball bearings (including radial ball bearings) and parts thereof, and housed or mounted ball bearing units and parts thereof.

Imports of these products are classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 3926.90.45, 4016.93.10, 4016.93.50, 6909.19.50.10, 8414.90.41.75, 8431.20.00, 8431.39.00.10, 8482.10.10, 8482.10.50, 8482.80.00, 8482.91.00, 8482.99.05, 8482.99.35, 8482.99.25.80, 8482.99.65.95, 8483.20.40, 8483.20.80, 8483.30.40, 8483.20.80, 8483.50.90, 8483.90.20, 8483.90.30, 8483.90.70, 8708.50.50, 8708.60.50, 8708.60.80, 8708.93.30, 8708.93.60.00, 8708.99.06, 8708.99.31.00, 8708.99.40.00, 8708.99.49.60, 8708.99.58, 8708.99.80.15, 8708.99.80.80, 8803.10.00, 8803.20.00, 8803.30.00, 8803.90.30, 8803.90.90, 8708.30.50.90, 8708.40.75.70, 8708.40.75.80,

8708.50.79.00, 8708.50.89.00, 8708.50.91.50, 8708.50.99.00, 8708.70.60.60, 8708.80.65.90, 8708.93.75.00, 8708.94.75, 8708.95.20.00, 8708.99.55.00, 8708.99.68, and 8708.99.81.80. Although the HTSUS item numbers above are provided for convenience and customs purposes, the written descriptions of the scope of the order remain dispositive.

The size or precision grade of a bearing does not influence whether the bearing is covered by one of the order. The order covers all the subject bearings and parts thereof (inner race, outer race, cage, rollers, balls, seals, shields, etc.) outlined above with certain limitations. With regard to finished parts, all such parts are included in the scope of the order. For unfinished parts, such parts are included if they have been heat-treated or if heat treatment is not required to be performed on the part. Thus, the only unfinished parts that are not covered by the order are those that will be subject to heat treatment after importation. The ultimate application of a bearing also does not influence whether the bearing is covered by the order. Bearings designed for highly specialized applications are not excluded. Any of the subject bearings, regardless of whether they may ultimately be utilized in aircraft, automobiles, or other equipment, are within the scope of the order.

### Changes Since the Preliminary Results

We have not revised our calculations since our publication of the *Preliminary Results.* Thus, the weighted-average dumping margins for the companies under review for our final results remain unchanged.

### Final Results of the Review

As a result of the administrative review, we determine that the following weighted-average dumping margins exist for the respondents for the period May 1, 2011, through September 14, 2011.

| Manufacturer/exporter | Weighted-average dumping margin (percent) |
|---|---|
| Audi AG ....................................... | 0.00 |
| Bayerische Motoren Werke AG .. | 0.00 |
| myonic GmbH ............................. | 0.00 |
| Volkswagen AG ........................... | 0.00 |
| Volkswagen Zubehor GmbH ...... | 0.00 |
| W&H Dentalwerk Burmoos GmbH ....................................... | 0.00 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-520-803
Administrative Review
POR: 11/01/2010-10/31/2011
Office 6:  GHC
**Public Document**

May 13, 2013

| | |
|---|---|
| MEMORANDUM TO: | The File |
| FROM: | Gene H. Calvert<br>International Trade Compliance Analyst<br>AD/CVD Operations, Office 6<br>Import Administration |
| SUBJECT: | Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates Administrative Review for the Period November 1, 2010 through October 31, 2011 |
| RE: | Final Analysis Memorandum for JBF RAK LLC |

JBF RAK LLC (JBF RAK) is a respondent in the administrative review of the antidumping duty order on polyethylene therepthalate film, sheet, and strip from the United Arab Emirates for the period of review November 1, 2010 through October 31, 2011.  On March 8, 2013, the Department of Commerce (the Department) issued its Post-Preliminary Analysis with respect to JBF RAK.[1]  In this Post-Preliminary Analysis, the Department calculated a weighted-average margin of 9.80 percent for JBF RAK.[2]

On May 13, 2013, the Department issued the final results in the subject antidumping duty administrative review.  In the Decision Memorandum accompanying the Federal Register notice for these final results, we explained that the weighted-average margin calculated for JBF RAK has not changed from the margin that was calculated in the Department's Post-Preliminary Analysis.[3]

Because we have not changed our post-preliminary margin calculations for JBF RAK, the comparison-market and antidumping duty margin calculation programs, logs, and outputs, which we released for the Post-Preliminary Analysis, are the programs, logs, and outputs for the final results of this review for JBF RAK.  As such, we have not attached those documents to this memorandum.

---

[1] See the March 8, 2013 Department Memorandum, "2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Post-Preliminary Analysis and Calculation Memorandum of JBF RAK LLC" (Post-Preliminary Analysis).

[2] See the March 8, 2013 Department Memorandum, "Polyethylene Terepthalate Film, Sheet, and Strip from the United Arab Emirates – Post-Preliminary Results Analysis Memo for JBF RAK LLC."

[3] See the May 13, 2013 Department Memorandum, "Antidumping Duty Administrative Review of Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Issues and Decision Memorandum for the Final Results," at 2.

**Jt. App.205**

finding recalculating JBF's weighted average margin found in the preliminary determination to 9.80%. This increase was based solely on the Department's finding of targeted dumping. MEMO FROM IA TO AS/IA PERTAINING TO JBF POST PRELIM ANALYSIS, P.R. Doc. 123 at 1, TAB 5

On May 21,, 2013, Commerce published its final results in Polyethylene Terephthalate Film from the United Arab Emirates. *See Polyethylene Terephthalate Film from the United Arab Emirates*, 78 Fed. Reg. 29700 (Dep't Commerce May 21, 2013) (Final results antidumping duty review) (the "Final Results"). In the Final Results, calculated a weighted average dumping margin of 9.80% for Plaintiff. Commerce did not change its calculation methodology from that of the post preliminary memorandum and finding dated March 8, 2013. In the Issues and Decisions Memorandum, Commerce explains its rejection of Plaintiff's arguments on the issues raised herein. MEMO FROM IA TO AS/IA PERTAINING TO INTERESTED PARTIES FINAL I&D MEMO, P.R. Doc. 134. TAB 6

### III. SUMMARY OF ARGUMENT

-Commerce does not have the statutory authority under 19 U.S.C. § 1677f-1(d) to consider in reviews, allegations of targeted dumping. By providing for a specific exception in investigations under Section 1677f-1(d)(1)(B) for such authority, Congress clearly indicates that without the specific exception it did not intend to provide that authority to the Department. Congress has granted such authority by the specific exception in investigations and not in reviews and, therefore, the Department improperly considered Petitioners' allegation.

4

rejected. Petitioners' submission is untimely as allegations of targeted dumping are defined as "factual information" under 19 CFR 351.301 and subject to the time limits under 19 CFR 351.301(b), (c) or (d). The allegation failed to meet any of these regulatory deadlines and, as such was improperly submitted information. Further, the Department issued an unauthorized "post- preliminary determination".

- There is no evidence that the pattern found is an attempt to mask dumping. To the contrary, JBF selling practice does not allow it to create a pattern to mask dumping. Commerce's failure to consider JBF's pricing practice, was contrary to law.

- The record established there is no potential price distortion resulting when comparing JBF's US sales of prime film with non prime home market sales of identical film. Therefore, the Department unlawfully excluded such matches.

- The Department's statement in the Final Determination that it would issue liquidation instructions  within 15 days is unlawful. Commerce's 15-day policy unlawfully forces plaintiffs to prepare and file a summons, a complaint, and a motion for a preliminary injunction, all within the fifteen-day period following publication.

## IV. STANDARD OF REVIEW

The Court reviews Commerce's final determination to determine whether any aspect of that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Tariff Act of 1930 § 516A(b)(1)(B)(i), 19 U.S.C. § 1516a(b)(1)(B)(i). Where a question of law is presented, the Court determines whether the language of the statute is clear on its face. If the statutory language is clear, "that is the end of

5

expressed intent of Congress." *Chevron, USA, Inc. v. NRDC,* 467 U.S. 837, 842-43 (1984).

If the statutory language is not clear on its face, the Court reviews Commerce's interpretation of the statute. "If the statute is silent or ambiguous with respect to the specific issue," the court determines "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also Corning Glass Works v. USITC,* 799 F.2d 1559, 1565 (Fed. Cir. 1986) (agency's definitions must be *"reasonable* in light of the language, policies and legislative history of the statute").

The substantial evidence standard requires the Court to "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951). The Court has recognized that this standard reflects "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 985 (Fed. Cir. 1994), (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). Stated differently, when reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether Commerce's action is "unreasonable" given the record as a whole. *See Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

## V.   ARGUMENT

### 1. There is No Statutory Authority in Administrative Reviews to Consider an Allegation of Targeted Dumping.

19 U.S.C. § 1677f-1(d) authorizes the method of calculation of antidumping duty

*exception* to the calculation methodology in investigations without providing for such exception in reviews. Section 1677f-1(d)(1) and (2) states:

TITLE 19—CUSTOMS DUTIES
§ 1677f–1

            \*        \*        \*

(d) Determination of less than fair value
**(1) Investigations**
(A) In general
In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value -
(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or
(ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.
**(B) Exception**
*The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if -*
*(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and*
*(ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).*
**(2) Reviews**
In a review under section 1675 of this title, when comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale. [Emphasis added]

            \*        \*        \*

7

The above statutory provision does not provide Commerce with the authority to consider a targeted dumping allegation. Unlike the specific authority granted in investigations, there is an absence of any reference to targeted dumping or exception to the calculation methodology. Any claim that Commerce has the authority in reviews to consider the allegation by virtue of the statutory authority in investigations therefore, must fail. *See, e.g., FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002).

Commerce improperly considered the targeting allegation by relying on the statutory provision for investigations to fill in what Commerce presumes is a gap in the statutory authority. "But no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority." *FAG Italia*, 291 F.3d at 816. It is well settled that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotes omitted); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994). Here, the statute creates an exception for investigations and the provisions immediately after applicable to reviews, do not, and, thus, refute any asserted ambiguity or silence. Clearly, the statute creates the authority to consider the allegation in investigations and the explicit absence thereof in reviews denies any such authority in reviews. Any attempt by regulation or otherwise to create the authority where the statute omits such authority is unlawful. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "The Supreme Court has noted that 'an agency literally has no power to act ... unless and until Congress confers power upon it." *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002). "...Although

cannot exercise this discretion contrary to congressional intent." *GPX International Tire Corp. v. United States*, 666 F3d 732, 745 (Fed. Cir. 2011). If, as it asserts, the Department has the discretionary authority in reviews to conduct targeting inquiries and impose alternative calculation methods, that discretionary authority would apply to investigations as well and there would have been no need for Congress to provide for the exception in Section 1677f-1. By providing a specific exception in investigations for such authority, Congress clearly indicates that without the specific exception it did not intend to provide that authority to the Department. Congress has granted such authority by the specific exception in investigations and not in reviews and, therefore, the Department improperly considered Petitioners' allegation.

## 2. Commerce Unlawfully Considered the Targeted Dumping Allegation

In the preliminary determination, the Department stated that the petitioners' allegation dated November 16, 2012, of targeted dumping was timely but would be considered after the preliminary determination as the Department did not have sufficient time to analyze the allegation. MEMO FROM IA TO AS/IA PERTAINING TO INTERESTED PARTIES FINAL I&D MEMO, P. R. 105 at 3, TAB 7. JBF submits that the allegation was untimely and cannot otherwise be considered.

### a. Petitioners' Targeted Dumping Allegation is Improperly Submitted Information and Should be Rejected. Petitioners' submission is untimely.

#### A. Petitioners' submission is untimely pursuant to 19 CFR 351.301(d)(5)(2007)

Untimely or unsolicited information is to be returned to the submitter pursuant to 19 CFR 351.302. Petitioners' allegation dated November 16, 2012 is both unsolicited and

9

**§ 351.301 Time limits for submission of factual information.**
*(a)Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents

        *                          *                        *

(d) *Time limits for certain allegations—*
      *                          *                       *

(5) *Targeted dumping.* In an antidumping investigation, an allegation of targeted dumping made by the petitioner or other domestic interested party under §351.414(f)(3) is due no later than 30 days before the scheduled date of the preliminary determination.

Pursuant to the above, the allegation dated November 16, 2012 was not filed 30 days prior to the preliminary determination published on December 7, 2012 and should not have been considered. Plaintiff recognizes that the regulation was allegedly revoked by Commerce by its notice *-Withdrawal of Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations,* 73 Fed. Reg.74930 (Dec. 10, 2008) (*"Withdrawal Notice"*). However, this Court has held that the *Withdrawal Notice* failed to meet the notice and comment requirements of the Administrative Procedure Act' ("APA"), *5 U.S.C. § 500, et seq.,.* In *GOLD EAST PAPER (JIANGSU) CO., LTD.; NINGBO ZHONGHUA PAPER CO., LTD, v United States,* Slip. Op. 13-74, WL2996231 (CIT June 17, 2013) found that Commerce's justifications failed to support revocation of the regulations in the *Withdrawal Notice (*Slip Op 13-74 at 15*):*

The court finds that none of Commerce's reasons in support of immediate revocation

improvidently enacted rules without adequate experience of how they would work, that the rules apply to ongoing investigations, and the rules could deny relief to domestic industries, do not rise to the level required for it to avoid the APA's requirements. Indeed, those justifications could apply to *almost any* rule promulgated by the agency.

As a result of Commerce's failure to comply with notice requirements in the APA, Plaintiff submits that 19 CFR 351.301(d)(5)(2007) was not revoked as the result of the *Withdrawal Notice* and remains in effect. Accordingly, Petitioner's allegation was untimely submitted.

### B. Assuming arguendo, 19 CFR 351.301(d)(5)(2007) is not applicable, Petitioners' submission is untimely pursuant to 19 CFR 351.301(c)(1)

Factual information submitted by one party to rebut factual information by another must be timely filed within 10 days of service pursuant to 19 CFR 351.301(c)(1).[1] Here, Petitioners' allegation is based upon JBF's US sales database. This database was first submitted (and served on Petitioners) on April 9, 2012. RESPONSE FROM GALVIN AND MLAWSKI TO SEC OF COMMERCE PERTAINING TO JBF SEC B-D QR-PART 8(EXHIBIT C16 & PRINTOUTS), C.R. 17, TAB 8. The second version in response to the first supplemental was filed on July 5, 2012 (RESPONSE FROM GALVIN AND

---

[1] (c) *Time limits for certain submissions*— (1) *Rebuttal, clarification, or correction of factual information.* Any interested party may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party at any time prior to the deadline provided in this section for submission of such factual information. If factual information is submitted less than 10 days before, on, or after (normally only with the Department's permission) the applicable deadline for submission of such factual information, an interested party may submit factual information to rebut, clarify, or correct the factual information no later than 10 days after the date such factual information is served on the interested party or, if appropriate, made available under APO to the authorized applicant.

11

S1-6 PART 3 C12-17, COMPUTER PRINTOUTS, C.R.46, TAB 9) and the last in response

to the second supplemental on September 12, 2012 (DATA FROM GALVIN AND

MLAWSKI TO ACTING SEC OF COMMERCE PERTAINING TO JBF JBFRUS03, C.R.

83, TAB 10. In all three cases, Petitioners' had an opportunity to timely rebut or request an

extension of time to rebut the US sales data. Instead, Petitioners filed its allegation here, over

two months after the last and final US sales data was submitted and served, and some two

weeks before the scheduled preliminary determination. Petitioners had all the information it

needed to make its allegation over two months prior to its submission and has not provided

any excuse as to why it waited until right before the scheduled preliminary determination.[2]

In rejecting Plaintiff's contention that the allegation was untimely Commerce

reasoned MEMO FROM IA TO AS/IA PERTAINING TO INTERESTED PARTIES FINAL

I&D MEMO, P.R. Doc. 134. TAB 6 at 7(Emphasis added and footnotes omitted):

> JBF's arguments on the timeliness of the allegation are unpersuasive. While
> 19 CFR 351.301(c)(1) pertains to rebuttal factual information, Petitioners' targeted
> dumping allegation cannot reasonably be characterized as rebuttal factual
> information, as JBF claims. Rather, Petitioners used the information on the record
> of this review for purposes of advocating that the Department consider using a
> different method to compare normal value and export price (or constructed export
> price). **However, that does not transform Petitioners' allegation into the
> submission of facts, for the facts that served as the basis for Petitioners' claim
> already were on the record. In other words, Petitioners did not submit
> additional facts to disprove anything that JBF previously submitted; instead,
> Petitioners relied upon the very facts submitted by JBF to make an
> allegation.** Moreover, in its regulations, the Department explicitly has
> delineated factual submissions from documents containing allegations similar to
> Petitioners' targeted dumping allegation.[19] Because the nature of the filings listed

---

[2] Any asserted argument that Petitioners' allegation is not factual information subject to the
10 day rebuttal deadline is without merit. See *e.g.* Certain Appliance Shelving from the
People's Republic of China, , Letter from Department dated June 17, 2009, Redaction of
New Information, New King Shan and submission of request by New King Shan for
reconsideration of rejection of brief dated June 19, 2009. There, the Department rejected as
new factual information spreadsheets analyzing verification exhibits. Here, the department
should similarly reject Petitioners' allegation creating alleged facts based upon JBF's sales
data.

12

(and in fact the now-withdrawn targeted dumping allegation was listed under that very provision),[2º] it stands to reason that the Department properly considered Petitioners' submission as an allegation and not rebuttal factual information.

In essence, Commerce's reasoned that the allegation of targeted dumping is an "allegation" but as it was based upon information on record, and not additional underlying information, it is not factual information subject to the time limits of 19 CFR 351.301(c)(1). This is incorrect. Commerce in its regulations defines "factual information" subject to the time limits in 19CFR351.301 in its introduction:

### § 351.301 Time limits for submission of factual information.

*(a)Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such **factual information**, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, **allegations** concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations...

The term "allegation" is defined as "factual information" subject to the time limits of section 301. As Petitioner's allegation was filed over two month's after JBF's submission of the US sales database dated September 12, 2012, it was untimely filed pursuant to 19 CFR 351.301(c)(1) and should not have been considered by Commerce.

### C. Assuming arguendo, 19 CFR 351.301(d)(5)(2007) and 19 CFR 351.301(c)(1) are not applicable, Petitioners' submission is untimely pursuant to 19 CFR 351.301(b)(2)

If 19 CFR 351.301(d)(5)(2007) and 19 CFR 351.301(c)(1) are not applicable, Petitioners' allegation is untimely pursuant to 19 CFR 351.301(b)(1)(2) which provides:

*(a) Time limits in general.* Except as provided in paragraphs (c) and (d) of this section and §351.302, a submission of factual information is due no later than:

13

(2) For the final results of an administrative review, 140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed;

Factual information including the allegations here are subject to the time limits in 19 CFR 351.301. Certain submissions of factual information are subject to specific time limitations in 19 CFR 351.301(c) and (d). Those not provided for in 19 CFR 351.301(c) and (d), are subject to the general time limitations in 19 CFR 351.301(b). Therefore, if the allegation is not subject to the specific time limits in 19 CFR 351.301(c) and (d), it is subject to 19 CFR 351.301(b)(2) requiring submission within 140 days of the last day of the anniversary month - here November 30, 2011. As the allegation was submitted on November 16, 2012, it was filed some 6 months after the 140th day and, is clearly untimely filed.

### b. Commerce issued an unauthorized "post- preliminary determination".

Under the statute, Commerce is required to issue two determinations in an administrative review - preliminary and final determinations. 19 U.S.C. § 1675(a)(2)(B)(iv), (C) ("The administering authority shall make a preliminary determination in a review ... within 180 days ..., and a final determination within 90 days ...; "The determination under this paragraph shall be the basis for the assessment of ... antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties.").

Commerce's regulations also provide for the two determinations and deadlines pursuant to 19 C.F.R. § 351.213(h) ("*Time limits —*(1) *In general.* The Secretary will issue preliminary results of review (*see* § 351.221(b)(4)) within 245 days after the last day of the anniversary month of the order or suspension agreement for which the administrative review was requested, and final results of review (*see* § 351.221(b)(5)) within 120 days after the date on which notice of the preliminary results was published in the FEDERAL

14

determinations. However, due to the late and untimely submission of Petitioners' allegation, there was no possibility that the Department could review, allow JBF an opportunity to comment and consider the allegation before the preliminary determination was required to be issued by statute and regulation. Petitioners' failure to timely submit its allegation does not allow any possible lawful consideration of the allegation. A post- preliminary determination is a third determination not authorized by statute or regulation. The Department should have rejected the allegation as untimely.[3]

3.      **There is no evidence that the pattern found is an attempt to mask dumping. To the contrary, JBF selling practice does not allow it to create a pattern to mask dumping.**

Assuming arguendo that the Department does have the legal authority to consider the allegation, Petitioners' targeted dumping allegation and the post preliminary results blindly apply the Commerce's methodolgy to JBF's sales. The results do not attempt to provide any explanation as to why and how the alleged targeted customers, and time periods were selected and thus allegedly resulted in targeted dumping. Such explanation is necessary for the Department to initiate a targeted dumping inquiry, because it is required to determine whether any observed pricing pattern is the result of an intentional targeted dumping strategy.

The results fail to provide any information on the market for the subject merchandise or the effect of specific time periods on pricing in the U.S. market. Nor does it explain what time periods are most signiflcant and how those time periods can impact

---

[3] Acceptance could be precedent of allowing submission of such allegations on the date of, or even after, the preliminary determination. Time limits for submission of certain allegations are provided in 19 CFR 351.301(d). All provide deadlines that are a reasonable time after filing of information needed as a basis for the allegation. No deadline is provided some two months after the information necessary as a basis for the allegation is of record, and in no case does a deadline allow consideration and a determination after the preliminary determination.

15

targeted dumping test but provide no explanation of what these customers have in common, the significance of the grouping, or how and why the particular combination of customers were targeted. The same is true of the alleged targeted time periods. There is no connection provided between the alleged customers, and time periods, and any evidence that targeted dumping has occurred. Instead, the statistical differences found are the result of JBF's selling practices on a transaction by transaction basis.

  An assertion that the Department has no statutory obligation to determine any connection between the patterns and the exporter's intent to mask dumping is without merit. Congress explained its concerns regarding masked dumping and attempted to address them in section 1677f-1(d)(1)(B): "[i]n such situations, the exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions." Uruguay Round Agreements Act, H.R. 103-826, Oct. 3, 1994, p. 98. While the Department may have no obligation to explain why the patterns exist, the Department cannot ignore, as here, that JBF's sales practice do not allow JBF to mask dumped sales.

  JBF sells to customers in the US on a sale by sale basis at individually negotiated prices reflecting market conditions at the time of sale. There are no short or long term supply contracts, or obligation by the buyer to purchase additional product, or any obligation to sell to any customer. JBF therefore is not aware of the price or timing of its next sale as each sale is individually negotiated. RESPONSE FROM GALVIN AND MLAWSKI TO SEC OF COMMERCE PERTAINING TO JBF SEC A QR-PART 1, C.R DOC. 1 at 20, 21 and 23, TAB 11. In contrast, exporters having at least some term supply contracts for US sales can use future sales to mask dumping. If an exporter is aware of the price of its future sales, it can target sales at a lower dumped price to the US as it can use the sales subject to the term agreement to mask the dumped sales. It can

16

mask any dumping. JBF has no ability to do this. It cannot target sales as it has no assurance that future sales are at prices that will mask dumped sales. It is not as if it can negotiate a sale with a buyer at a price greater than the customer is willing to pay in order to use that sale to mask JBF's dumped sales. JBF's buyers do not have any obligation to, and certainly will not, purchase product at prices to satisfy JBF's alleged need to use the sale to mask dumped sales.

Instead, the pattern that the Department found in the post preliminary result was not the consequence of any attempt to mask dumping as JBF does not have the ability to target prices to mask dumping. The patterns discovered are caused by the fact that the sales were during a period of extreme price volatility or statistical anomalies or the consequence of selling at individually negotiated prices. PET film is a world wide commodity and JBF's prices reflect the volatility in the prices during the POR. As demonstrated by Exhibit 1 to JBF's response to petitioners' targeted dumping allegation, JBF letter of November 29, 2012, prices during the POR, decreased over the POR by approximately a third and price differences or gaps, therefore, can be explained purely by the volatility of pricing during the POR and does not exhibit targeted or masked dumping. LETTER FROM GALVIN AND MLAWSKI TO ACTING SEC OF COMMERCE PERTAINING TO JBF REPLY TO PETITIONERS TD ALLEGATION, C.R. 131 at 18, TAB 12. That the price differences or gaps found by the Department are not the result of masking but the consequence of JBF's selling at negotiated transactaction based prices can be demonstrated by a review of the contemporaneous sale price differences for identical products in home market sales. Compare prices (GRUPHAED) for the following examplars of contemporaneous UAE sales having large price percentage differences found in JBFHS04 database (DATA FROM GALVIN AND MLAWSKI TO ACTING SEC OF COMMERCE

17

|     SEQH |   with |  SEQH |
|----------|--------|-------|
| B15      |        | 2     |
| B4       |        | B15   |
| 95       |        | 111   |
| 190      |        | 206   |
| 334      |        | 340   |
| 344      |        | 346   |
| B87      |        | 461   |

The price differences in the above sales could, if these sales were to the United States, exhibit a pattern amounting to targeting. However, as these are UAE sales and targeting is irrelevant and cannot exist for the purpose of masking dumped sales, the pricing pattern is merely a consequence of JBF's individual transaction sales practice and the volitility of market prices during the POR and nothing more. It demonstrates that if, sales prices are negoitated individually in a volatile market by customer, and time, a pattern may result that may create price gaps but are not targeted. Technical satisfaction of Commerce's test cannot establish targeted dumping within the meaning of the statute without considering whether, as here, the exporter's pricing practice does not allow it to target within the meaning of the statute. Therefore, assuming arguendo, that DoC has no obligation to explain why the patterns exist, it must nevertheless consider JBF's pricing practices that do not allow it to create patterns for the purpose of masking dumped sales.

**4. Commerce Failed to Match JBF'S Prime Films to Non Prime Sales of the Same Film**

18

preceding subsection, Section 1677f-1(c), entitled "determination of dumping margin" provides that the dumping margin shall be determined for each exporter and producer. An "Exception" under Section 1677f-1(c)(2) provides Commerce the authority to make that determination for a reasonable number of exporters or producers, rather than each, exporter or producer where there is a "large number of exporters or producers involved in the **investigation or review...** ". See also Section 1677f-1(e)(2) providing for a similar exception in "**the investigation or review**" with respect to the determination of a countervailable subsidy rate.

## B -The SAA limits the exception provided by Section 16677f-1(d)(1)(B) to investigations "(not reviews)"

Contrary to defendant's assertions, The Statement of Administrative Action restricts targeting allegations to investigations. Def. Br. at 15. In summarizing Article 2.4.2 of the agreement, the SAA states, Statement of Administrative Action, H.R. No. 103-316, vol. 1(1994) at 810:

*       *       *

In a departure from current U.S. law, Article 2.4.2 provides that in investigations **(not reviews)**, national authorities normally will establish dumping margins by comparing either:
- a weighted-average of normal values to a weighted-average of export prices of comparable merchandise; or
- normal value and export price on a transaction-to-transaction basis. Where such comparisons are inappropriate, however, the United States' current methodology is authorized. Authorities may compare a weighted-average normal value to individual export transactions, provided that there is a pattern of prices that differs significantly and that they explain why a weighted-average-to-weighted-average or transaction-to-transaction comparison is not appropriate. (Emphasis added)

6

The parenthetical language in the SAA "(not reviews)" clearly and unambiguously establishes Congress' understanding of the obligation under the agreement that the targeting allegation is to be considered and, if it exists, an alternative comparison method is applied in investigations and "not reviews". In the statute, as explained above, Congress created an explicit exception in Section 1677f-1(d)(1)(B) for investigations (not reviews). Thus, the creation of the exception for investigations but not reviews was not an oversight or silence by Congress with respect to reviews. Rather, the statutory exception reflects the clear and unambiguous intention as expressed in the SAA that the targeting allegation be applied to investigations and "not reviews" to determine whether a comparison method can be used.

Against this background, clearly the creation by Congress of an exception with respect to investigations and its omission of the exception for reviews within the **same section of the Act**, does not confer the authority in reviews created by the exception for investigations. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotes omitted); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994).

## 2.
### THE TARGETED DUMPING ALLEGATION WAS NOT TIMELY FILED PURSUANT TO 19 CFR 351.301

Defendant claims that JBF misconstrues 19 CFR §351.301 and asserts that "...Commerce's regulations distinguish factual information from allegations, such as domestic producers' allegations." Defendant's basis is that the regulations provide for

they then inconsistently argue that even though the alternative comparison exception in Section 166f-1(d)(1)(B) which is silent with respect to reviews is still applicable to reviews because an express prohibition does not exist.

JBF submits that if subsection 351.301(d)(5)(2007) of the regulations is restricted to investigations, it evidences Commerce's understanding at the time of enactment of 19 USC 1677-1(d) that the exception providing for consideration of targeting allegations was only applicable to investigations. That is the reason why Commerce's regulations provided for specific time limits with respect to such allegations in investigations and not reviews.

Defendant also claims that JBF failed to exhaust its administrative remedies. This court's decision in *Gold East* was issued on June 17, 2013, after the final determination here and after this action was filed. Further, JBF filed an amended summons on June 21, 2013 providing notice to the opposing parties of the claim. As defendant states, the failure to assert the matter at the administrative level, deprives the administrative agency the opportunity to consider the matter. Def. Br. at 22. However, here, the claims in JBF's administrative briefs were based on what it understood was the existing regulations. *Gold East* and the invalidity of the revocation of Subsection 351.301(d)(5) was unknown to JBF at that time and was not be asserted until after this action was filed. As such, JBF did not have an opportunity to present this claim because of the revocation of Subsection 351.301(d)(5). Therefore, clearly *Gold East* is intervening legal authority and the exhaustion of administrative remedies is not applicable.

Let us be clear, JBF is not asserting that Commerce has the burden of establishing the seller's intent. It is conceded that the pattern of pricing established by passing the Nails test creates a rebuttable presumption that it is a "targeted" pricing pattern. But it is arbitrary, capricious and an abuse of discretion to refuse to consider evidence which would tend to establish that the pricing pattern was not due to targeted sales but, instead, was for a valid business purpose.

Commerce's current position is in stark contrast to the clear statement of its statutory obligations set forth in its response to comments when it first issued its targeted dumping regulations in 1997:

> More specifically, several commenters suggested that the Department recognize in its final rule that certain ''common commercial patterns of pricing'' do not constitute targeted dumping, such as (1) different pricing for larger or smaller orders, (2) seasonal pricing, and (3)price changes associated with industry practices, such as downward price changes pursuant to lower costs as are typical for semiconductors, personal computers, and other technical products. In contrast, other commenters contended that common commercial practices in an industry can constitute targeted dumping and that such behavior should not be excused or ignored simply because it is considered to be a common commercial practice.
>
> Other commenters proposed additional substantive guidance. For example, one party suggested that targeted dumping should not be found to exist where the pattern of prices exists in both the U.S. and the comparison market. Another commenter suggested that the Department not obligate itself to use ''standard statistical techniques'' in all of its determinations. Several commenters suggested that the Department define in the final regulations the evidentiary threshold for initiating a targeted dumping inquiry. One commenter, in particular, contended that the final rule establish a low threshold for an allegation to be accepted, similar to allegations of sales below cost. Another commenter expressed concern that the Department's brief practice in this area already has established an arbitrarily high initiation standard.
>
> In the preamble to the proposed regulations, the Department specifically avoided the adoption of any per se rules on targeted dumping due to the Department's limited experience administering this provision of the Act. However, the Department recognizes the need to establish guidance in this area and thus will issue policy bulletins setting forth more specific criteria as the Department develops its practice in this area. Moreover, the Department plans to employ common statistical methods in its targeted dumping determinations in order to ensure that the test is applied on a consistent basis and in a manner that

17

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | 1/2/2015 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| JACK MLAWSKI | | /s/ Jack Mlawski |
Name of Counsel | | Signature of Counsel

Law Firm | Galvin & Mlawski

Address | 245 Fifth Av, Suite 1902

City, State, ZIP | New York, NY 10016

Telephone Number | 212 679-1500

FAX Number | 212 971-0417

E-mail Address | jm@customslaw.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.